**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| MAINE YANKEE ATOMIC POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 98-474C<br>(Senior Judge Merow) |

MAINE YANKEE'S OPPOSITION TO DEFENDANT'S
MOTION *IN LIMINE* REGARDING TAKINGS DAMAGES

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005

Counsel For Plaintiff
MAINE YANKEE ATOMIC
POWER COMPANY

Of Counsel:

Robert L. Shapiro
Vivek K. Hatti
SPRIGGS & HOLLINGSWORTH

April 16, 2004

# TABLE OF CONTENTS

**PAGE**

I. The Court Has Already Ruled That There Is Sufficient Evidence For Adjudicating Maine Yankee's Takings Claim.......... 2

II. Maine Yankee Has Properly Asserted A Permanent Takings Claim and Can Prove Damages By Introducing Evidence of Fair Market Value ("FMV").......... 3

A. Maine Yankee's Claim Is For A Permanent Taking Because The Government Is Storing Nuclear Waste Indefinitely, and Perhaps Permanently, on Land Owned by Maine Yankee in an ISFSI, Which is a Permanent, Fixed Structure.......... 3

B. The Government's Motion is Moot With Respect To Evidence Regarding Fair Rental Value.......... 7

C. Maine Yankee Is Entitled To Just Compensation Measured by Fair Market Value, And The Real Estate Appraisals In Question Are Admissible Supporting Evidence of Fair Market Value.......... 8

1. Michael E. Thomas Can Testify Regarding Market Value of Maine Yankee's Property.......... 9

2. The real estate appraisals are admissible under the business records exception to the hearsay rule, Fed. R. Evid. 803(6).......... 10

III. Conclusion.......... 15

# INDEX TO APPENDIX

**DESCRIPTION** **PAGE**

Deposition Transcript of Christopher A. Kouts (6/4/99) [Excerpts] ………………..0001

Nuclear Waste: Technical, Schedule, and Cost Uncertainties of the Yucca Mountain Repository Project (GAO-02-191) ………………………………0006

Viability Assessment of a Repository at Yucca Mountain: Overview (PA-196032 to PA-196080) …………………………………………………0044

Photograph of Maine Yankee Independent Spent Fuel Storage Installation………...0093

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Air Land Forwarders, Inc. v. United States,* 172 F.3d 1338 (Fed. Cir. 1999) ................. 11, 13, 14

*Armijo v. United States,* 229 Ct. Cl. 34, 663 F.2d 90 (1981) ..................................................... 3, 4

*Bass Enters. Prod. Co. v. United States,* 133 F.3d 893 (Fed. Cir. 1998) ....................................... 8

*Boise Cascade Corp. v. United States,* 296 F.3d 1339 (Fed. Cir. 2002) ........................................ 4

*District of Columbia Redevelopment Land Agency v. Thirteen Parcels of Land,* 534 F.2d 337 (D.C. Cir. 1976) ..................................................................................................... 9, 10

*Goodwyn v. United States,* 32 Fed. Cl. 409 (1994) ........................................................................ 5

*Hendler v. United States,* 952 F.2d 1364 (Fed. Cir. 1991) ........................................................ 4, 5

*Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419 (1982) ....................................... 5

*Maine Yankee Atomic Power Co. v. United States,* 225 F.3d 1336 (Fed. Cir. 2000) ..................... 2

*McKay v. United States,* 199 F.3d 1376 (Fed. Cir. 1999) ............................................................. 5

*Munoz v. Strahm Farms, Inc.,* 69 F.3d 501 (Fed. Cir. 1995) ....................................................... 11

*Porter v. Resor,* 415 F.2d 764 (10th Cir. 1969) ............................................................................. 4

*Rancho Oil Company v. United States,* No. CA-3-74-1000-F, 1978 WL 1239 (N.D. Tex. Nov. 22, 1978) ....................................................................................................... 11, 12

*Selig v. United States,* 740 F.2d 572 (7th Cir. 1984) .................................................................... 12

*Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573 (Fed. Cir. 1993) ...................................... 4, 5

*Tal'Wi-Wi Ranches v. United States,* 156 Ct. Cl. 700 (1962) ....................................................... 3

*United States v. 10,031.98 Acres of Land,* 850 F.2d 634 (8th Cir. 1988) ....................................... 9

*United States v. Licavoli,* 604 F.2d 613 (9th Cir. 1979) .............................................................. 13

*Yankee Atomic Elec. Co. v. United States,* 42 Fed. Cl. 223 (1998) ................................................ 2

**Rules**

Fed. R. Evid. 702 ........................................................................................................ 9, 13

Fed. R. Evid. 802 ........................................................................................................... 9

Fed. R. Evid. 803(24)...................................................................................................... 12

Fed. R. Evid. 803(6)...................................................................................................... passim

Fed. R. Evid. 807 .......................................................................................................... 12

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MAINE YANKEE ATOMIC POWER COMPANY, Plaintiff, | : | |
| v. | : | No. 98-474 C (Senior Judge Merow) |
| UNITED STATES OF AMERICA, Defendant. | : | |

**MAINE YANKEE'S OPPOSITION TO DEFENDANT'S**
**MOTION *IN LIMINE* REGARDING TAKINGS DAMAGES**

Maine Yankee Atomic Power Company ("Maine Yankee") respectfully requests the Court to deny the government's February 19, 2004 Motion *In Limine* Regarding Takings Damages ("Motion") because (a) it is simply another attempt at getting rid of Maine Yankee's takings claim without a trial, which this Court has rejected twice before; (b) it is moot with respect to the use of evidence regarding fair rental value ("FRV") because Maine Yankee withdrew its FRV theory; and, (c) it is incorrect in arguing that Maine Yankee cannot present certain evidence of fair market value ("FMV"), which is the measure of just compensation for its takings claim.[1]

The government's Motion mistakenly argues that Maine Yankee's takings claim is one for a temporary taking, Motion at 6-8, and the government's evidentiary objections appear to be an afterthought in its Motion, *see id.* at 3-4. As explained more fully below, Maine Yankee has properly asserted a claim for a permanent taking and can prove damages – measured by the

[1] Although the three Yankee utilities have typically submitted one, common pleading applicable to each of their cases, we are submitting separate responses because the government challenges distinct evidence proffered in each case.

property's FMV – through testimony of Michael E. Thomas, Maine Yankee's Vice President and Chief Financial Officer, supported by real estate appraisals of the land on which Maine Yankee's ISFSI is sited. The real estate appraisals are admissible pursuant to Fed. R. Evid. 803(6), the business records exception to the hearsay rule. The evidence that will be presented in this regard will comprise a very small part of a seven-week trial.

## I. The Court Has Already Ruled That There Is Sufficient Evidence For Adjudicating Maine Yankee's Takings Claim.

The government's Motion is its third attempt at getting rid of Maine Yankee's takings claim without a trial, albeit on new grounds. The government initially moved on June 4, 1998, to dismiss the takings claim, along with Maine Yankee's contract claim, basing its argument primarily on the disputes clause, but also attacking the merits of Maine Yankee's takings claim. *See* Order of November 3, 1998 (citing *Yankee Atomic Elec. Co. v. United States,* 42 Fed. Cl. 223, 225, 229 (1998)). This Court denied the government's motion to dismiss, *id.*, and the Federal Circuit affirmed that denial, *see Maine Yankee Atomic Power Co. v. United States,* 225 F.3d 1336 (Fed. Cir. 2000). Subsequently, this Court also denied the government's November 14, 2001 "Motion for Summary Judgment Upon Count III of Plaintiff's Complaint," *i.e.,* the takings claim, ("MSJ on Takings"), noting that an "examination of the evidence" made a dismissal of the takings claim "premature." Order of June 26, 2003, at 4-5.

In its current Motion, the government mischaracterizes the nature of Maine Yankee's takings claim alleging, without any factual or legal support, that Maine Yankee is asserting "a temporary taking, not a permanent taking." Motion at 6. The government's sole argument in support of this contention is that because Maine Yankee "is claiming only a *partial* breach of contract," *id.* at 7 (emphasis in original), and its "damage model relies upon, and assumes, DOE's future disposal of the waste . . . at some time in the future," *id.,* Maine Yankee somehow

is asserting only a temporary takings claim. This latter assertion (concerning Maine Yankee's damages model) is not even true, as noted below at p. 5-7. More importantly, the government rested its failed MSJ on Takings on similar contract-based grounds, *see* MSJ on Takings at 2, 6-10, ignoring applicable case law on the issue, which fully supports Maine Yankee's position, as discussed below. The Court already, in its June 26, 2003 Order, rejected essentially the same, contract-based arguments the government makes here and concluded "[t]he presence of issues regarding the government's long term policy with respect to the disposition of SNF and/or HLW . . . counsels against resolving the takings count in plaintiff's complaint prior to the conclusion of trial proceedings." Order of June 26, 2003, at 5.

## II. Maine Yankee Has Properly Asserted A Permanent Takings Claim and Can Prove Damages By Introducing Evidence of Fair Market Value ("FMV").

### A. Maine Yankee's Claim Is For A Permanent Taking Because The Government Is Storing Nuclear Waste Indefinitely, and Perhaps Permanently, on Land Owned by Maine Yankee in an ISFSI, Which is a Permanent, Fixed Structure.

Maine Yankee has asserted a permanent takings claim, not a temporary takings claim as alleged by the government. *See* Motion at 6-8. The gravamen of that claim is that the government has decided to store, indefinitely and perhaps permanently, Maine Yankee's spent nuclear fuel ("SNF") and Greater-Than-Class-C ("GTCC") waste on about 20 acres of land owned by Maine Yankee, in a permanent, fixed, dry-storage structure, *i.e.,* an Independent Spent Fuel Storage Installation ("ISFSI"). *See* Appendix to Motion at 18-20.[2]

More than forty years ago, the Court of Claims held, unequivocally, that a taking that is "to be expected for the indefinite future . . . constitute[s] a permanent taking." *Tal'Wi-Wi Ranches v. United States,* 156 Ct. Cl. 700 (1962) (see paras. 25-26 of the decision); *see Armijo v.*

---

[2] The basis of Maine Yankee's takings claim was fully briefed in its December 16, 2002 Opposition to the MSJ on Takings at 1-4, 11-18.

*United States,* 229 Ct. Cl. 34, 663 F.2d 90, 93 (1981) (concluding that when a taking has "no prospect of going away in the foreseeable future" it is "the same as perpetuity"); *Porter v. Resor,* 415 F.2d 764, 765 (10th Cir. 1969) (stating in a takings case that an "indefinite period was permanent"). Thus, even if the government does remove the SNF and GTCC some day in the future, Maine Yankee's claim remains one of a permanent taking because the ISFSI has been, is, and will remain for an *indefinite* period a substantial, major, physical intrusion on its land. Moreover, as discussed below, see p. 5-7, DOE may *never* perform.

As the Federal Circuit explained in *Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573, 1582 (Fed. Cir. 1993):

> A 'permanent' physical occupation does not necessarily mean a taking unlimited in duration. A 'permanent' taking can have a limited term. In *Hendler,* this court concluded that the distinction between 'permanent' and 'temporary' takings refers to the *nature of the intrusion,* not its temporal duration. A 'permanent' physical occupation, as distinguished from a mere temporary trespass, involves a substantial physical interference with property rights. (emphasis added).

In *Hendler v. United States,* 952 F.2d 1364, 1376-77 (Fed. Cir. 1991), the Federal Circuit similarly explained, "permanent does not mean forever" and, conversely, "the term 'temporary' . . . logically refers to those governmental activities which involve an occupancy that is transient and relatively inconsequential, and thus can properly be viewed as no more than a common law trespass." The Federal Circuit applied the same reasoning of *Hendler* in *Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1356 (Fed. Cir. 2002).

In *Hendler,* the Federal Circuit found a permanent taking because the government placed groundwater-monitoring wells on the plaintiff's property. 952 F.2d at 1375-77. In reaching its conclusion, the Court explained:

> There is nothing 'temporary' about the wells the Government installed on plaintiffs' property, in the sense in which we used it in referring to the parked truck of the lunchtime visitor. Years have passed since the Government installed

> the first wells. The wells are some 100 feet deep, lined with plastic and stainless steel, and surrounded by gravel and cement. Each well was capped with a cement casing lined with reinforcing steel bars, and enclosed by a railing of steel pipe set in cement. These surveillance wells are at least as 'permanent' in this sense as the CATV equipment in *Loretto,* which comprised only a few cables attached by screws and nails and a box attached by bolts. 458 U.S. at 422, 102 S.Ct. at 3168. Nothing in the Government's activities suggests that the wells were a momentary excursion shortly to be withdrawn, and thus little more than a trespass. Nor does the . . . Government's subsequent actions disclose any indication of a timetable for withdrawal.

*Id* at 1376 (*citing Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419 (1982)); *see also McKay v. United States,* 199 F.3d 1376, 1381-82 (Fed. Cir. 1999) (concluding that the installation of groundwater monitoring wells which remained on plaintiff's property "for several years" constituted a permanent taking). In *Skip Kirchdorfer,* the Court concluded that a permanent taking took place when the Navy took possession of plaintiff's warehouse for about three years because it was a "permanent physical occupation." 6 F.3d at 1577, 1582-83. In *Goodwyn v. United States,* 32 Fed. Cl. 409, 416-18 (1994), this Court concluded that the government's construction of a dike on the plaintiff's land was a permanent taking because the dike had an estimated life of between 25 to 50 years and "although the dike could be removed in much the same manner as it was built . . . removal was as a practical matter for plaintiffs, impossible."

In this case, the storage of SNF and GTCC waste on Maine Yankee's land will be for an indefinite period of time, perhaps permanently, given the uncertainty of (1) when (if ever) DOE's repository at Yucca Mountain will be ready to accept and dispose Maine Yankee's nuclear waste; and (2) when (if ever) DOE will comply with its statutory obligation to dispose of commercial GTCC waste. The government's Motion forthrightly acknowledges this uncertainty, stating, "DOE *intends* to dispose of Maine Yankee's SNF and HLW." Motion at 3 (emphasis added). What DOE "intends," however, may not happen. Indeed, the government does not even

propose, in its proposed factual findings included in its pretrial submissions, that the Court find as a fact that DOE will perform in 2010 *or at any other time*.[3] Ultimately, DOE may never remove Maine Yankee's SNF and GTCC waste, or may only remove it well beyond the 2010 date, perhaps decades later. In fact, the government has stated, both in deposition testimony by its fact witnesses and in documents, that the 2010 date for removal of SNF is uncertain and increasingly unlikely. The following are two key examples:

1. The General Accounting Office, in "Nuclear Waste: Technical, Schedule, and Cost Uncertainties of the Yucca Mountain Repository Project," issued in December 2001, concludes, after examining the state of the Yucca Mountain project, "DOE is unlikely to achieve its goal of opening a repository at Yucca Mountain by 2010 and currently does not have a reliable estimate of when, and at what cost, such a repository can be opened." A11.

2. Christopher A. Kouts, Director, Office of Systems Analysis and Strategy Development, Office of Civilian Radioactive Waste Management ("OCRWM") at DOE, the government's witness designated to testify "about DOE's plan to begin waste acceptance in 2010," *see* 02/19/04 Defendant's Witness List at 4-5, testified at his deposition on June 4, 1999 as follows:

Q. Do you believe it will be done by 2010?

A. I can't really say.

Q. Any particular reason why you can't say?

A. It's predicated upon preceeding budgets, it's predicated upon many, many different variables. I think our schedules are reasonably based, but there are many variables associated with it.

[3] The Government's "Amended Proposed Stipulations of Fact" only assert that DOE "plans" to begin acceptance by 2010. *See* ¶231. DOE has been making that claim at least since its 1998 Report to Congress, *see* "Viability Assessment of a Repository at Yucca Mountain: Overview," A49, 51. Of course, DOE has encountered substantial obstacles in meeting the 2010 date.

Q. What do you expect to happen? Do you expect that you will get the budgetary – all these variables will fall into the place and that the 2010 date will be met?

A. I don't know. I couldn't say.

*See* 6/4/99 Kouts Tr. at 56:3-16, A3. Maine Yankee, for its part, has never stated that DOE will remove its SNF on a date certain, but has only stated that removal of SNF could occur in "2010 at the earliest" based on the government's own pronouncements. *See* Appendix to Motion at 14 (¶176).

Moreover, like the monitoring wells in *Hendler* and *McKay*, and the dike in *Goodwyn*, the ISFSI that Maine Yankee has built to store its SNF and GTCC waste is a permanent, physical structure. The ISFSI entailed significant up-front capital costs for its design, licensing, and construction, including cask fabrication. *See* Maine Yankee Finding of Fact No. 188. Maine Yankee's costs attributable to ISFSI construction and loading alone amount to more than $80 million. *See id.*

Thus, as far as can be ascertained at the present time, the government will require Main Yankee to use its land to store SNF and GTCC waste for the indefinite future, if not permanently, in an ISFSI, which is a large, concrete, fixed structure. *See* A93 (picture of Maine Yankee's ISFSI). Accordingly, Maine Yankee has asserted a perfectly proper claim for a permanent taking.

B. The Government's Motion is Moot With Respect To Evidence Regarding Fair <u>Rental Value.</u>

The government's arguments urging the Court to "affirmatively dismiss Maine Yankee's FRV claim from this litigation," Motion at 6, improperly characterizes a particular just compensation *theory* as a distinct claim. Moreover, this issue is a moot point. Maine Yankee has withdrawn its FRV theory in its "Response to Defendant's July 3, 2003 Interrogatories,

Requests for Admission And Requests for Production of Documents." *See* Response to Interrogatory 67, Appendix to Motion at 22-23. As the government acknowledges, *see* Motion at 5, Maine Yankee unequivocally stated in its response to Interrogatory 67 that it has "decided not to pursue its fair rental value theory and will seek just compensation on its takings claim only in the amount of fair market value. Maine Yankee will withdraw proposed stipulation 229 and amend proposed stipulation 231 to delete the phrase 'fair rental value or.'" Appendix to Motion at 22-23. This unequivocal response to a discovery request by the government constitutes a formal response regarding Maine Yankee's intentions with respect to its FRV theory. Thus, the government's complaints that Maine Yankee "has still not informed the Court of this fact," Motion at 5, or that it "declined to respond to the Government's discovery requests regarding this matter," *id.* at 5-6, are unavailing and untrue. The issue is moot.

C. Maine Yankee Is Entitled To Just Compensation Measured by Fair Market Value, And The Real Estate Appraisals In Question Are Admissible Supporting Evidence of Fair Market Value.

The government correctly notes that just compensation for a permanent taking is generally the fair market value of the property taken. Motion at 6 (citing *Bass Enters. Prod. Co. v. United States,* 133 F.3d 893, 895 (Fed. Cir. 1998)). The government is incorrect in arguing that Mr. Michael E. Thomas cannot provide testimony regarding Maine Yankee's takings damages. *See* Motion at 10-11. As explained more fully below, Maine Yankee, with Mr. Thomas as its representative, can offer testimony as to the value of its property. The government, moreover, is incorrect in arguing that other Maine Yankee FMV evidence, comprised of real estate appraisals, Exhibits 1750 and 1751, are not admissible. Motion at 8-11. The appraisals are admissible under Fed. R. Evid. 803(6), the business records exception to the

hearsay rule.[4] The appraisals support Maine Yankee's claim that the fair market value of the land taken by the government for the construction of the ISFSI is "not less than $4,100 per acre." *See* Maine Yankee Finding of Fact, ¶230; *see also* Appendix to Motion at 40 ("$/Acre Value Overall" equals $4,100).

1. Michael E. Thomas Can Testify Regarding Market Value of Maine Yankee's Property

Michael E. Thomas, Maine Yankee's Vice-President and Chief Financial Officer, who has been designated by Maine Yankee to provide testimony regarding "valuation matters pertaining to the government's takings of Maine Yankee's real property," *see* Maine Yankee's Witness List at 2, will offer testimony regarding the value of the property taken by the government. As the property owner, it is axiomatic in American law that Maine Yankee can offer such testimony. *See, e.g., United States v. 10,031.98 Acres of Land,* 850 F.2d 634, 639-41 (8th Cir. 1988); *District of Columbia Redevelopment Land Agency v. Thirteen Parcels of Land,* 534 F.2d 337, 138 (D.C. Cir. 1976). The Eighth Circuit observed, "[A]n owner, because of his ownership, is presumed to have special knowledge of the property and may testify as to its value. He may offer such testimony *without further qualification* [and] *is entitled* to the privileges of a testifying expert." *10,031.98 Acres of Land,* 850 F.2d at 636 (emphasis added). In *10,031.98 Acres of Land,* the Court noted that corporate owners of land can offer testimony regarding land value through a designated corporate officer. 850 F.2d at 639, 639 n.4. In this case, the appraisals will provide a "basis" for Mr. Thomas' testimony, *id.* at 637, whether or not they are actually admitted into evidence. The advisory committee note to Fed. R. Evid. 702 fully incorporates property owners within the scope of expert testimony stating, "[W]ithin the scope of

---

[4] Accordingly, the government's general hearsay objection to the appraisals under Fed. R. Evid. 802, *see* Motion at 9, is without merit.

the rule are . . . 'skilled' witnesses, such as . . . landowners testifying to land values," which the government did acknowledge in its Motion at 9. The D.C. Circuit stated that there is a "policy in favor of permitting owners to testify as to the value of condemned property" because the owner "stands to gain or lose the most from the tribunal's determination of the value of his property." *Thirteen Parcels of Land,* 534 F.2d at 138. Accordingly, the government's objections to Mr. Thomas' testimony regarding the value of Maine Yankee's land are without merit. *See* Motion at 10-11.

2. The real estate appraisals are admissible under the business records exception to the hearsay rule, Fed. R. Evid. 803(6).[5]

Maine Yankee's real estate appraisals can be admitted pursuant to Fed. R. Evid. 803(6). Maine Yankee obtained the real estate appraisals in 1998 and 1999 to get the market value of its property in order to negotiate property taxes with Wiscasset, Maine, as Mr. Thomas will testify at trial. The appraisal provides the market value of Maine Yankee's land as of May 1999. Appendix to Motion at 139-140.

The government is simply incorrect to argue that the real estate appraisals cannot be admitted pursuant to the business records exception because only the preparer of the appraisals, Goslin + Company, can testify about them. *See* Motion at 9-11. The Federal Circuit has squarely held that, pursuant to Fed. R. Evid. 803(6), "a document prepared by a third party[, here Goslin + Company,] is properly admitted as part of the business entity's records[, here Maine Yankee,] if the business integrated the document into its records and relied upon it."

[5] Fed. R. Evid. 803(6) states, in pertinent part: "A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. . . ."

*Air Land Forwarders, Inc. v. United States,* 172 F.3d 1338, 1342 (Fed. Cir. 1999). In *Air Land Forwarders,* the Federal Circuit held,

> "Rule 803(6) does not require that the document actually be prepared by the business entity proferring the document. Rather two factors . . . indicating reliability . . .would allow an incorporated document to be admitted based upon the foundation testimony of a witness with first-hand knowledge of *the record keeping procedures of the incorporating business*, even though the business did not actually prepare the document. The *first factor* is that the incorporating business rely [sic] upon the accuracy of the document incorporated and the *second* is that there are other circumstances indicating trustworthiness of the document.

172 F.3d at 1343 (emphasis added); *see also Munoz v. Strahm Farms, Inc.,* 69 F.3d 501, 503 (Fed. Cir. 1995) (admitting photographs produced by a third party pursuant to Fed. R. Evid. 803(6) because they were "reliable[]" and "sufficient foundational testimony to satisfy the requirements of the exception" were provided by the testimony of the custodian of the photos). In *Air Land Forwarders,* the Federal Circuit affirmed the admission of repair estimates for damage to military service-members' household goods during moving. The Federal Circuit agreed with the government that the repair estimates, including those prepared by third-party repair shops, qualified as business records of the military because they "constituted records of the regularly conducted activity of adjudicating a service members claim." *Id.* at 1341.

On similar reasoning, courts have admitted property appraisals into evidence pursuant to Fed. R. Evid. 803(6). In *Rancho Oil Company v. United States,* No. CA-3-74-1000-F, 1978 WL 1239, at *2, *4 (N.D. Tex. Nov. 22, 1978), the court admitted a real estate appraisal valuing ranch land at $1,152,600 as a business record under Fed. R. Evid. 803(6). The Court explained,

> The subject appraisal was clearly a 'memorandum' or 'report'; was made at or near the time for which the market value of the subject property is relevant in this case; was made by a person who had ample personal knowledge of the facts upon which to base an opinion as to the value of the property; and was kept by plaintiff in the course of its ordinary business activities. Furthermore, it was the customary practice of plaintiff to obtain appraisals of real estate in conjunction with the transfer or exchange of real

> property. Finally, there is nothing to indicate that the appraisal in any way lacked trustworthiness. All conditions surrounding its preparation indicate the contrary.

*Id.* at *4.[6] As explained below, Maine Yankee obtained its appraisal so that it could negotiate property taxes with Wiscasset, Maine, as Mr. Thomas will testify at trial.

In *Selig v. United States,* 740 F.2d 572, 578-579 (7th Cir. 1984), the Seventh Circuit affirmed the admission into evidence under Fed. R. Evid. 803(6) of appraisals of the value of baseball player contracts used to support the sale and purchase of the Seattle Pilots by Bud Selig of the Milwaukee Brewers in March-April 1970. *Id.* at 575. Of the $10.8 million purchase price, Selig allocated $10.2 million to the player contracts based on four separate appraisals done in the fall of 1970 and then amortized that cost over a five-year period pursuant to Internal Revenue Code Section 167(a). *Id.* The government challenged the allocation and lost. *Id.* at 573, 575. In admitting the appraisals, the court rejected the government's objections, stating (a) the preparation of the appraisals in the fall of 1970 was sufficiently contemporaneous with the actual closing on April 1, 1970 to constitute business records; (b) "most businesses must prepare as a matter of course documents relevant to tax matters;" (c) "the appraisals were prepared in the regular course of the management of the team;" and, (d) there was "nothing extraordinary in their preparation" and "no evidence suggests that the appraisals were prepared in anticipation of litigation." *Id.* at 578. The court relied on the plaintiffs' appraisals because they were prepared contemporaneously with the sale of the Pilots, and rejected the government's appraisals because they were prepared twelve years after the sale. *Id.* at 579. Here, Maine Yankee similarly obtained its appraisal so that it could negotiate property taxes with Wiscasset, Maine, as Mr. Thomas will testify at trial.

---

[6] The *Rancho Oil Company* court also admitted the real estate appraisal under the "catch-all" exception to the hearsay rule, Fed. R. Evid. 803(24), *see* 1978 WL 1239 at *4, which is now Fed. R. Evid. 807.

In *United States v. Licavoli,* 604 F.2d 613, 622-23 (9th Cir. 1979), the Ninth Circuit affirmed, under Fed. R. Evid. 803(6), the admission of an expert appraisal of a painting, the "Lucretia," commissioned by an insurance company. The painting was valued at $10,000 by an appraiser retained by the owner of the painting and the insurance company after it was stolen. *Id.* at 622. The government moved to admit the appraisal under Fed. R. Evid. 803(6) as a business record of the insurance company to prove the $5,000 jurisdictional amount. *Id.* at 622. In affirming the admission, the Ninth Circuit observed that the government met all of the foundational elements of Fed. R. Evid. 803(6), noting the insurer's reliance on the appraisal "is affirmative evidence of the reliability of the appraisal" because "it was in the interest of the insurance company to pay no more on [the owner's] claim than the painting was actually worth." *Id.* at 623. The court rejected the defendant's argument that the government failed to establish [the appraiser's] expert qualifications under Fed. R. Evid. 702. *Id.* at 622. The court noted that Fed. R. Evid. 803(6) expressly provided "for the exclusion of a business record if the source of information indicates a lack of trustworthiness," and it was not necessary "that every case requires the proponent of a business record containing expert opinion to affirmatively establish the qualifications of the person forming the opinion." *Id.*[7] Here, Main Yankee relied on and used the appraisal in property tax negotiations with Wiscasset, Maine.

The real estate appraisals in this case, *see* Appendix to Motion at 28-143, are part of the business records of Maine Yankee, and both of the *Air Land Forwarders* reliability factors as applied by the cases admitting appraisals have been met. First, Maine Yankee commissioned the real estate appraisals exclusively for a business – not litigation – purpose, *i.e.,* to determine the

---

[7] Accordingly, the government's argument that "[w]ithout Mr. Gosline as an expert witness in this case, Maine Yankee cannot establish any basis for admission of Mr. Gosline's expert opinions regarding the value of Maine Yankee's real property or for applying any exception to the hearsay rule," Motion at 9, is without merit.

value of its land so that it could negotiate property taxes with Wiscasset, Maine. The appraisal notes, "The purpose of the appraisal is to estimate the market value of the subject property . . ." Appendix to Motion at 99 (*See* "Purpose & Function of Appraisal"). The appraisal also notes that it was commissioned exclusively for business reasons stating, "The Use of this Appraisal and the value estimate by the client may be for the purposes of Asset Management Decisions, Loan Underwriting and Management Decisions, Property Tax Assessment, Tax Planning and Documentation, Just Compensation, or other like uses . . ." Appendix to Motion at 35. Second, the appraisal is independent. The appraisal clearly states, "The value conclusion is not influenced by the stated or implied needs or desires of the client or any other entity." *Id.* Third, the appraisal was contemporaneous to its business purpose: it was prepared between January and April 1998, *see* Appendix to Motion 28-29, so that Maine Yankee could negotiate property taxes, and to further that goal it was updated in May 1999, *id.* at 139. Finally, the preparers of the appraisal, Norman A. Gosline and James H. Murphy, were qualified to prepare the appraisal. *Id.* at 38-42 (providing the resumes of the appraisers). Importantly, the government offers no alternative value for the land, nor do they dispute the qualifications of Mr. Gosline and Mr. Murphy.

Mr. Thomas will offer the necessary foundation testimony regarding "the record keeping procedures of the incorporating business," *Air Land Forwarders,* 172 F.3d at 1343, *i.e.,* of Maine Yankee. Mr. Thomas has been designated by Maine Yankee to provide testimony regarding "valuation matters pertaining to the government's taking of Maine Yankee's real property." *See* Maine Yankee's Witness List at 2. As revealed in discovery, Mr. Thomas has "knowledge of the appraisals for the land on which Maine Yankee's ISFSI sits" and he "gained this knowledge through his work for Maine Yankee." *See* Appendix to Motion at 25.

Accordingly, the 1998 and 1999 appraisals are admissible pursuant to the business records exception to the hearsay rule.

## III. Conclusion

Accordingly, for the reasons set forth above, Maine Yankee respectfully requests the Court to deny the government's "Motion *in Limine* Regarding Takings Damages," and permit Maine Yankee to introduce evidence regarding the fair market value of its takings damages.

Respectfully submitted,

Date: April 16, 2004

s/Jerry Stouck
JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800 (phone)
(202) 682-1639 (fax)

COUNSEL FOR PLAINTIFF
MAINE YANKEE ATOMIC POWER COMPANY

Of Counsel:

Robert L. Shapiro
Vivek K. Hatti
SPRIGGS & HOLLINGSWORTH