IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MAINE YANKEE ATOMIC POWER COMPANY, | ) | |
| Plaintiff, | ) | |
| | ) | No. 98-474C |
| v. | ) | (Senior Judge Merow) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION FOR LEAVE
TO FILE AMENDED ANSWER AND COUNTERCLAIM

Pursuant to Rule 15(a) of the Rules of this Court, and pursuant to defendant's discussion with the Court during trial on August 4, 2004, defendant, the United States, respectfully requests the Court to grant defendant leave to amend its answer to assert an affirmative counterclaim and a counterclaim for setoff or recoupment.[1] A copy of the amended answer and counterclaims is attached to this motion. The amended answer is identical to defendant's original answer except that it pleads an affirmative counterclaim and a counterclaim for setoff or recoupment.

STATEMENT OF FACTS

I. THE FEE PROVISIONS OF THE STANDARD CONTRACT

Pursuant to the Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste ("Standard Contract") published at 10 C.F.R. § 961.11, each entity that enters into a Standard Contract is required to pay each quarter a fee "in the amount of 1.0 mil per kilowatt-hour (1M/KWH) on electricity generated by Purchaser's nuclear power reactor(s)" and

[1] We are filing motions for leave to amend our complaint in Connecticut Yankee Atomic Power Co. v. United States, No. 98-154C (Fed. Cl.), and Maine Yankee Atomic Power Co. v. United States, No. 98-474C (Fed. Cl.). Because the plaintiff in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), has already paid its one-time fee, the issues addressed in this motion and the Government's proposed counterclaims do not apply in that case.

sold, designed to cover SNF generated after April 7, 1983. 10 C.F.R. § 961.11, Art. VIII.A.1 & B.1. In addition to that quarterly fee, each contract holder is responsible for paying a separate fee for the disposal of the SNF and/or HLW that it had generated prior to April 7, 1983: "For SNF, or solidified high-level radioactive waste derived from SNF, which fuel was used to generate electricity in a civilian nuclear power prior to April 7, 1983, a one-time fee will be assessed." Id., Art. VIII.A.2 (emphasis added). This fee for SNF generated prior to April 7, 1983 "shall not be subject to adjustment, and the payment thereof by the Purchaser shall be made to DOE as specified in paragraph B of this Article VIII." Id. (emphasis added).

Paragraph B of Article VIII provides each contract holder with three options for the payment of the fee for the disposal of SNF generated prior to April 7, 1983. Under the first option, Option 1, the contract holder agrees to pay its fee prorated evenly over 40 quarters, the last of which must be made prior to the date scheduled for DOE's first acceptance of that contract holder's SNF as identified in an approved DCS. 10 C.F.R. § 961.11, Art. VIII.B.2(a) (emphasis added). Pursuant to the second option, Option 2, the contract holder may elect to satisfy its financial obligation "in the form of a single payment anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule . . .," plus interest. Id., Art. VIII.B.2(b). Pursuant to the third option, Option 3, the contract holder must pay his entire fee prior to June 30, 1985. Id., Art. VIII.B.2(c).

The contract holder is obligated to elect the payment option for its fee relating to the disposal of its pre-April 7, 1983 SNF within two years after contract execution: "For SNF discharged prior to April 7, 1983, and for in-core burned fuel as of 12:00 A.M. April 7, 1983, the

Purchaser shall, within two (2) years of contract execution, select one of the following fee payment options: . . . ." Id., Art. VIII.B.2 (emphasis added).

II. CYA'S AND MYA'S FEE PAYMENT ELECTION

Maine Yankee Atomic Power Company ("MYA") and Connecticut Yankee Atomic Power Company ("CYA") executed the Standard Contracts that are at issue in their cases on June 6 and 30, 1983, respectively. PX 1CY; PX 1MY.[2] Accordingly, pursuant to the provisions of Article VIII(B)(2), MYA and CYA had until June 6 and 30, 1985, respectively, which would have been "within two years of contract execution," to notify DOE as to which of the three available payment options they would elect to pay for the disposal of their pre-April 7, 1983 SNF. Both MYA and CYA elected to pay their one-time fee pursuant to Option 2. Accordingly, both MYA and CYA were required to make their entire one-time fee payments at "anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule, and shall consist of the fee plus interest on the outstanding fee balance." 10 C.F.R. § 961.11, Art. VIII.B.2(b).

As the Court is aware, both CYA and MYA subsequently submitted DCSs, which DOE approved, seeking to obtain DOE's commitment to accept SNF from their nuclear reactors beginning in 1998 and 1999, respectively. Accordingly, in compliance with Article VIII.B.2(b), CYA and MYA were required, if they wanted DOE to begin acceptance of their SNF in 1998 and 1999, to first pay their one-time fees for their pre-April 7, 1983 SNF under their contracts prior to DOE's acceptance of their SNF. In any event, under any of the options for payment of the one-

[2] "PX _____" refers to the plaintiffs' exhibits that have been admitted into evidence at the trial of this matter.

time fee, the contract holder was required to pay the entirety of its one-time fee before DOE began acceptance of that contract holder's SNF and/or HLW. See 10 C.F.R. § 961.11, Art. VIII.B.2. In fact, section 302(a) of the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. § 10222(a)(5), expressly indicates that DOE's obligation to dispose of any utility's SNF is "in return for the payment of fees established by this section," conditioning DOE's acceptance obligation upon that payment. To the present day, neither CYA nor MYA has paid its one-time fee.

III. THE PROCEDURAL HISTORY OF THIS LITIGATION

When CYA and MYA filed their complaints in this Court in 1998, the Government responded by filing motions to dismiss those complaints because CYA and MYA had failed to exhaust their administrative remedies. The Court denied those motions to dismiss, finding that the plaintiffs were not required to exhaust any administrative remedies before they could pursue their partial breach of contract claims before this Court. The Government raised the fact that CYA and MYA had not paid their one-time fees as part of the briefing process for those motions to dismiss, but the arguments associated with the one-time fee related to the Government's ability to provide CYA and MYA with monetary relief through an equitable adjustment to the "charges" that CYA and MYA had not yet paid. The Court found that the one-time fee was not adjustable and, therefore, denied the Government's motions. See Connecticut Yankee Atomic Power Co. v. United States, 42 Fed. Cl. 448, 449 (1998). Subsequently, the Government filed answers to CYA's and MYA's complaints, but the cases were soon stayed to permit an interlocutory appeal of the Court's decisions regarding the exhaustion of administrative remedies issues. After the

United States Court of Appeals for the Federal Circuit affirmed this Court's decisions regarding those issues, this litigation continued.

During the development of this litigation and of the other spent nuclear fuel ("SNF") cases pending before this Court, we have gained a much deeper understanding of many of the unusual legal issues that are presented in these cases. In particular, and as we have discussed in other briefing before this Court in this case and other SNF cases, the plaintiffs in the SNF cases have alleged not a total breach of contract, but a partial breach of contract. As we have discovered during the course of extensive research upon all of the legal issues presented in these cases, the fact that the plaintiffs are only claiming a partial breach has a significant effect upon the continuing obligations of the parties in these cases – not only the obligations of the Government, but the obligations of the plaintiffs. Because the parties' continuing obligations prior to a partial breach of contract are not suspended, both parties to a contract are required to continue with their contract performance obligations unless and until the nonbreaching party timely declares a total breach of contract. Cities Service Helix, Inc. v. United States, 211 Ct. Cl. 222, 234, 543 F.2d 1306, 1313 (1976). Further, the nonbreaching party cannot suspend its own contract performance obligations based upon a theory of "anticipatory partial breach," given that, in response to a breach, it is required to make an election between declaring the contract at an end because of a total breach or deciding that the contract will continue to be performed because the breach at issue was only partial. City of Fairfax, Va. v. Washington Metro. Area Transit Auth., 582 F.2d 1321, 1331 (4th Cir. 1978) ("an anticipatory breach cannot be predicated on a partial breach of the contract . . . ."), cert. denied, 440 U.S. 914 (1979).

In any event, as these cases have developed, we have realized that several of the plaintiffs' failures to pay their one-time fees in several of the pending SNF cases has an effect upon their ability to recover damages for the Government's partial breach of contract. Specifically, in two other spent nuclear fuel cases currently pending before this Court, we have recently filed motions for summary judgment, seeking a ruling that the plaintiffs' payment of their one-time fee was a condition precedent to the Government's obligation to begin accepting their SNF under the Standard Contract and that, because they have never paid that fee, the Government has never had an obligation to begin accepting the SNF under their particular Standard Contracts.

Except for the fact that the Government did not originally raise this issue in response to CYA's and MYA's motions for summary judgment seeking a liability ruling, which was then decided by the Federal Circuit, the same arguments would apply here in relation to CYA's and MYA's failure to pay their one-time fees. However, given the Federal Circuit's decision regarding breach in these two cases, we are not seeking at this point to raise that issue here as a challenge to the breach finding. However, based upon the analysis that we have conducted as we have learned more about the complicated legal issues in these cases, we believe that CYA's and MYA's failure to pay their one-time fees still has an effect upon the Government's obligations to those two plaintiffs. Specifically, had DOE timely arrived at CYA's and MYA's facilities to begin timely acceptance of CYA's and MYA's SNF as required by the Standard Contract, CYA and MYA would have had to have paid their one-time fees at that time. That is, before DOE began that SNF acceptance, CYA and MYA would have had to have completed that payment in full.

In this litigation, CYA and MYA both seek damages for DOE's failure to accept their SNF beginning in 1998. Yet, they do not intend to pay their one-time fees until some unidentified date in the future. As their witnesses have already testified at trial, they continue to retain that money and invest it. In fact, they seek to charge the Government with the costs that they incur to pay to invest and manage that money. Of course, if they simply paid that money to the Government now, they would not need to incur those costs of investment and management. However, they decline to pay that money, we presume, because they can make significant profits from the investments that they make, and neither CYA nor MYA is crediting the Government with those profits as part of this litigation. By withholding the one-time fee payments from the Government while also seeking to recover damages for DOE's delay, CYA and MYA are attempting to place themselves in a better position than they would be if DOE had timely performed the Standard Contract. Had DOE timely begun SNF acceptance, CYA and MYA would have had to have paid the entirety of the one-time fee. For the reasons explained below, to the extent that CYA and MYA receive damages to place them in the position in which they would have been had DOE not breached the Standard Contract, CYA and MYA should be required to pay their one-time fee.

## DISCUSSION

### I. GIVEN THE ABSENCE OF PREJUDICE TO THE PLAINTIFFS OR FUTILITY OF AMENDMENT, LEAVE TO AMEND SHOULD BE GRANTED

Rule 15(a) of the Rules of this Court provides that a party may amend its pleadings by leave of the court and that "leave shall be freely given when justice so requires." This Court has held that "leave to amend should be freely permitted absent sufficient explicit reasons indicating

that it should be denied." St. Paul Fire and Marine Ins. Co. v. United States, 31 Fed. Cl. 151, 153 (1994) (quoting State of Alaska v. United States, 15 Cl. Ct. 276, 279 (1988)); see Principal Mutual Life Ins. Co. v. United States, 26 Cl. Ct. 616, 623 (1992) (Rule 15(a) "sets forth a permissive standard in regard to the granting of amendments" and that, in construing analogous Rule 15(a) of the Federal Rules of Civil Procedure, the Supreme Court has construed the rule "quite liberally"). The Supreme Court has indicated that RCFC 15 must be construed liberally and that amendment should be allowed "except where prejudice to the opposing party would result," United States v. Hougham, 364 U.S. 310, 316 (1960), or inappropriate behavior by the moving party:

> Rule 15(a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded. If the underlying facts or circumstances relied upon by a [party] may be a proper subject of relief, he ought to be afforded an opportunity to test his claims on the merits. In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, etc. – the leave sought should, as the rules require, be "freely given."

Foman v. Davis, 371 U.S. 178, 182 (1962), quoted in St. Paul Fire and Marine, 31 Fed. Cl. at 153.

Although courts consider the following factors when deciding whether to grant a motion to amend: (1) undue delay; (2) bad faith; (3) prejudice to the nonmovant; and (4) futility of amendment, Senza-Gel Corp. v. Seiffhart, 803 F.2d 661, 666 (Fed. Cir. 1986) (applying Ninth Circuit law), the United States Court of Appeals for the Federal Circuit has held that, "[w]here there is lack of prejudice to the opposing party and the amended [pleading] is obviously not

frivolous, or made as a dilatory maneuver in bad faith, it is an abuse of discretion to deny such a motion." Id. at 667 (quoting Hurn v. Retirement Fund Trust of Plumbing, Heating & Piping Industry, 648 F.2d 1252, 1254 (9th Cir. 1981); Howey v. United States, 481 F.2d 1187, 1190-91 (9th Cir. 1973)); see Edwards v. City of Goldsboro, 178 F.3d 231, 242 (4th Cir. 1999) ("law is well-settled 'that leave to amend a pleading should be denied *only when* the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile").

"The single most important factor is whether prejudice would result to the nonmovant." Senza-Gel, 803 F.2d at 666; see Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 644 F.2d 690, 694 (8th Cir. 1981) ("delay must have resulted in prejudice to the party opposing the motion"); SEC v. National Student Marketing Corp., 73 F.R.D. 444, 448 (D.D.C. 1977) ("while several criteria are employed to determine the propriety of a motion for leave to amend, 'the crucial factor is the resulting prejudice to the opposing party'"); 6 C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 1487, at 613-14 ("if the court is persuaded that no prejuidce iwll accrue, the amendment should be allowed"). "[D]elay alone is an insufficient reason to deny leave to amend." Edwards, 178 F.3d at 242; see Buder, 644 F.2d at 694; SEC, 73 F.R.D. at 447. Further, a mere recitation that prejudice will result from the amendment, without an actual showing of prejudice, is insufficient to justify denial of leave to amend. Buder, 644 F.2d at 694.

The Federal Circuit has recognized that "[t]he mere fact that an amendment is offered late in the case is . . . not enough to bar it; amendments may be offered at trial, or even after reversal and remand." Id. (quoting Howey, 481 F.2d at 1191 n.3, & 3 J. Moore, Moore's Federal Practice,

§ 15.08, 0.835)) (emphasis added); see Brock & Blevins Co. v. United States, 170 Ct. Cl. 52, 59, 343 F.2d 951, 955 (1965) (defense raised four months after the trial court's opinion and findings of fact was issued); Gillette v. Tansy, 17 F.3d 308, 313 (10th Cir. 1994) (finding that trial court abused its discretion in denying motion to amend, even though motion was filed after evidentiary hearing was complete); Ricoh Co. v. Nashua Corp., 947 F. Supp. 21, 24-25 (D.N.H. 1996) (granting motion to amend to add new plaintiff filed during trial on the merits). Further, "even where some prejudice to the adverse party would result if the motion to amend were granted, that prejudice must be balanced against the hardship to the moving party if it is denied." Buder, 644 F.2d at 694; see Koston v. Secretary of Health & Human Services, 23 Cl. Ct. 597, 601 (1991) (prejudice to movant if the motion to amend is denied may also be considered), aff'd on other grounds, 974 F.2d 157 (Fed. Cir. 1992).

In fact, courts have found it an abuse of discretion to deny a motion for leave to amend filed even during trial if the late filing would not prejudice the nonmovant. In Howey v. United States, 481 F.2d 1187 (9th Cir. 1973), the Government moved on the second day of trial for leave to amend its third party complaint, which had been pending for five years, to allege a claim for contractual and common law indemnity and/or contribution. Id. at 1189, 1190. On appeal of the trial court's denial of that motion, the appellate court recognized that the Supreme Court "has instructed the lower federal courts to heed carefully the command of Rule 15(a), F. R. Civ. P., by freely granting leave to amend when justice so requires," id. at 1190 (citing Foman v. Davis, 371 U.S. 178 (1962)), because "'[t]he purpose of pleadings is 'to facilitate a proper decision on the merits,' and not to erect formal and burdensome impediments in the litigation process." Id. (quoting Conley v. Gibson, 355 U.S. 41, 48 (1957) (citations omitted). It determined that,

"[u]nless undue prejudice to the opposing party will result, a trial judge should ordinarily permit a party to amend its complaint" and that, while several factors are typically used as criteria to evaluate the propriety of a motion for leave to amend, "the crucial factor is the resulting prejudice to the opposing party." Id. Because the trial court denied the motion for leave to amend, which the Government had filed during the trial of the matter, solely because it was untimely, the appellate court reversed the denial as an abuse of discretion:

> In sustaining RCA's objection to an amendment of the complaint, the district judge did not speak in terms of undue prejudice to RCA. Rather he simply observed that the motion to amend, coming several years after the case had been set down for trial, was not a timely filing of an amendment to a third party complaint. . . .
>
> * * *
>
> The government's motion to amend should have been granted as there was no showing that RCA would have been prejudiced thereby. While it is true that the motion was made five years after the third party complaint had been filed, we know of no case where delay alone was deemed sufficient grounds to deny a Rule 15(a) motion to amend. Where there is a lack of prejudice to the opposing party and the amended complaint is obviously not frivolous, or made as a dilatory maneuver in bad faith, it is an abuse of discretion to deny such a motion. The purpose of the litigation process is to vindicate meritorious claims. Refusing, solely because of delay, to permit an amendment to a pleading in order to state a potentially valid claim would hinder this purpose while not promoting any other sound judicial policy. Only where prejudice is shown or the movant acts in bad faith are courts protecting the judicial system or other litigants when they deny leave to amend a pleading.
>
> Here the trial judge did not find, and there is no allegation that the government's motion was made in bad faith even though the government gave no reason for its lengthy delay. . . . We agree with the Second and Eighth Circuits that the mere fact that the government could have moved at an earlier time to amend does not by itself constitute an adequate basis for denying leave to amend.

Id. at 1190-91 (emphasis added). Based upon its review of the record, the appellate court reversed the trial court's denial of the Government's motion for leave to amend, finding that, "[i]n the absence of any showing of improper prejudice to RCA, or bad faith by the government, it was an abuse of discretion to deny the motion for leave to amend." Id. at 1192.

Similarly, in United States v. Pend Oreille Public Utility District, 926 F.2d 1502 (9th Cir. 1991), the appellant had proposed its amendment to the complaint "approximately eleven months after the court entered judgment against the Tribe in Phase 2 of the trial, and approximately two weeks prior to the commencement of Phase 3." Id. at 1511. Although the trial court rejected the amendment as untimely, the appellate court recognized that the trial court must consider four factors – undue delay, bad faith, futility of amendment, and prejudice to the opposing party – and that the trial court had "relied solely upon the first of these factors in denying the Tribe's motion as untimely." Id. The appellate court determined that "[d]elay alone does not provide sufficient grounds for denying leave to amend . . . ." id. (quoting Hurn, 648 F.2d at 1254), and that "[t]he crucial factor is not length of delay, but prejudice." Id. Finding that, "'[w]here there is a lack of prejudice to the opposing party and the amended complaint is obviously not frivolous, or made as a dilatory maneuver in bad faith, it is an abuse of discretion' to deny leave to amend," id. at 1511-12 (quoting Howey, 481 F.2d at 1190-91), and because the trial court's decision to deny leave to amend was based solely upon timeliness, the appellate court reversed the trial court's denial of leave to amend and remanded the case for further proceedings. Id. at 1512.

## II. THE GOVERNMENT'S COUNTERCLAIMS ARE NOT FUTILE

"One of the basic principles of contract damages is that 'damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching

party fully performed its obligation.'" Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (quoting Massachusetts Bay Transp. Auth. v. United States, 129 F.3d 1226, 1232 (Fed. Cir.1997)). "Thus, the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." Id. (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002)). "[T]he non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'" White, 285 F.3d at 1043 (quoting DPJ Co. v. FDIC, 30 F.3d 247, 250 (1st Cir.1994)).

As demonstrated above, before DOE ever began accepting CYA's or MYA's SNF, CYA and MYA would have been required to have paid their one-time fees pursuant to Article VIII.B.2(b) of the Standard Contract. The amount of CYA's fee was originally $48,726,402.11, but, with interest calculated in accordance with the terms of Article VIII(B)(2), now exceeds $153,430,144. Similarly, the amount of MYA's fee was originally $50,393,966.02, but, with interest calculated in accordance with the terms of Article VIII(B)(2), now exceeds $159,058,215. Had DOE begun accepting CYA's SNF in 1998 and MYA's SNF in 1999, in accordance with CYA's and MYA's approved DCSs, or at any other time that CYA and MYA allege, CYA and MYA first would have had to pay the entirety of their one-time fees. Because CYA and MYA now seek damages for DOE's failure to begin accepting their SNF and seek to be placed in the financial position in which they allegedly would have been had DOE timely begun SNF acceptance, and to the extent that the Court determines that CYA and MYA are entitled to damages for a partial breach of the Standard Contract, DOE should be entitled to recover the amount of CYA's and MYA's unpaid one-time fee (plus the interest calculated from April 7, 1983, as identified in Article VIII.B.2(b) of the Standard Contract) before the Court requires

DOE to pay any damages for DOE's delay in performance – that is, the Court should require the satisfaction of the condition to DOE's obligation to accept CYA's and MYA's SNF before awarding CYA and MYA damages. If the Court were to require DOE to pay damages for failing to begin acceptance of CYA's and MYA's SNF, but failed to allow DOE to recover the monies that it would have received had it timely begun SNF acceptance, the Court would place CYA and MYA in a better position than they would have been in had there been no breach. See Bluebonnet Savings Bank, 339 F.3d at 1345.

Even if the Court did not allow the Government to force satisfaction of the condition precedent in its entirety prior to awarding damages to CYA and MYA, the Court should allow DOE to recoup the amount of the one-time fee against any judgment in CYA's and MYA's favor.[3] The Supreme Court and the Federal Circuit have long recognized the Government's common law right to offset or recoup debts owed to the Government against contract payments and damages due to the debtor. The right of offset was first recognized by the Supreme Court in United States v. Munsey Trust Co., 332 U.S. 234, 239 (1947), in which the Court held that the "government has the same right which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him." Consistent with the Supreme Court's decision in Munsey Trust, the Court of Claims similarly recognized the Government's right of offset in Madden v. United States, 178 Ct. Cl. 121, 371 F.2d 469, 473 (1967), in which

[3] To the extent that the offset allowed by the Court exceeded the amount of the affirmative damages that the Court awards to CYA or MYA, any order regarding the offset would need to make clear that the Government is not waiving its right to recoup the remainder of the one-time fee that was not collected by offset.

the Court held that the Government's right to offset debts owed to it against damages awarded to the debtor for an equitable adjustment of contract was superior to an attorney's lien.

Since the invocation of the common law doctrine of offset in Munsey Trust and Madden, the Government's right to offset or recoup contractual debts owed to it has been sustained in numerous decisions. See, e.g., First Federal Savings & Loan Assoc. v. United States, 58 Fed. Cl. 139, 165 (2003) (Government's right to offset damages can be raised as a "defense or argument in mitigation" during the damages phase of proceedings); Cecile Industries, Inc. v. Cheney, 995 F.2d 1052, 1054 (Fed. Cir. 1993) (Debt Collection Act of 1982, 31 U.S.C. § 3716, does not abrogate or constrict "the Government's long-standing common law right to offset contract debts against contract payments"); Project Map, Inc. v. United States, 203 Ct. Cl. 52, 486 F.2d 1375, 1376 (1973) (Government could withhold amounts owed to a contractor under a contract when the contracting officer had found that plaintiff was overpaid on two other contracts, even though the determination of overpayment was on appeal before the Board of Contract Appeals); Sinclair Oil Corp. v. United States, 291 F.3d 822, 828 (Fed. Cir. 2002) (proceeds received by a purchaser of gasoline from its settlement with a refiner would offset the gasoline purchaser's asserted refund from a DOE fund).[4]

---

[4] Offsets are permissible whether the Government is seeking to recoup or to setoff contractor debts. "Recoupment" is "a demand asserted [by a defendant] to diminish or extinguish the plaintiff's demand that arises out of the same transaction forming the basis of the plaintiff's claim," while a "setoff" "arises out of a transaction extrinsic to the plaintiff's claim." In re Gober, 100 F.3d 1195, 1207 (5th Cir. 1996) (emphasis added); see REW Enters., Inc. v. Premier Bank, N.A., 49 F.3d 163, 170 (5th Cir. 1995) (recoupment involves recovery of "part of a claim upon which one is sued" by means of a "counterclaim arising out of the same transaction"); Vari-Build, Inc. v. City of Reno, 622 F. Supp. 97, 99 (D. Nev. 1985) ("claim in recoupment must concern matters arising out of the same transaction that is the basis for the plaintiff's claim for relief"); Black's Law Dictionary 1275 (6th ed. 1990) ("[r]ecoupment is a purely defensive matter growing out of transaction constituting plaintiff's cause of action and is available only to reduce or satisfy

The Government's common law right to offset contractual debts owed to the Government against contract payments due to the debtor (and damages awarded to a plaintiff) is consistent with the contractual principle that damages for breach of contract cannot place the plaintiff in a better position than it would have been in had there been no breach. The offset doctrine thus mandates that damages for breach of contract be reduced by the amount of contractual debts owed by a plaintiff to the Government to prevent unjust enrichment. "To derive the proper amount for the damages award, the costs resulting from the breach must be reduced by the costs, if any, that the plaintiffs would have experienced absent a breach." Bluebonnet, 339 F.3d at 1345 (emphasis added). Accord LaSalle Talman Bank v. United States, 317 F.3d 1363, 1366 (Fed. Cir. 2003) ("damages due to the breach are subject to offset or mitigation by the benefits of the actions taken after the breach").

In this case, to the extent that the Court awards any damages to CYA and MYA, those damages should be reduced by the amount of CYA's and MYA's unpaid one-time fees (plus interest calculated in accordance with Article VIII.B.2(b)) pursuant to the Government's common law right of offset. See Munsey Trust Co., 332 U.S. at 239; Cecile Indus., 995 F.2d at 1054-55; Sinclair Oil, 291 F.3d at 828. If the Court did not require recoupment of this unpaid fee, it would place both CYA and MYA in better positions than they would have been in had DOE performed the Standard Contract, contrary to established precedent.

---

plaintiff's claim . . .").

## III. THE REQUESTED AMENDMENT WILL NOT CAUSE CYA OR MYA PREJUDICE

The amendment that we request will not prejudice CYA or MYA. During the trial of this matter, CYA and MYA have elicited testimony from their witnesses explaining that neither CYA nor MYA has yet paid its one-time fee pursuant to the Standard Contract. Accordingly, neither CYA nor MYA contest the fact that the Standard Contract requires payment of a one-time fee or that neither of them have yet paid the fee.[5] Further, the specific amount of the one-time fee owed is easily established, and witnesses for MYA and CYA have testified that the one-time fees are in an amount similar to that identified in this motion. The remainder of the Government's position regarding CYA's and MYA's need to pay their one-time fees presents a purely legal issue. That is, the issue of whether CYA and MYA would have been required under the terms of the Standard Contract to pay their one-time fees before or when DOE began accepting their SNF is a legal determination based upon an interpretation of the plain language of the Standard Contract. See Government Sys. Advisors, Inc. v. United States, 847 F.2d 811, 812 n.1 (Fed. Cir. 1988) (contract interpretation is a matter of law and, therefore, is generally amenable to summary judgment); P.J. Maffei Bldg. Wrecking v. United States, 732 F.2d 913, 916 (Fed. Cir. 1984) (same). Neither CYA nor MYA need discovery to determine whether their one-time fees are due before DOE begins accepting their SNF under their Standard Contracts, given that the issue is wholly dependent upon the Standard Contract language. Accordingly, they cannot identify any real prejudice from the requested amendment. In fact, the amendment could be interpreted to

---

[5] In fact, as previously mentioned, CYA and MYA are charging the Government in their damages claims for the costs that they allegedly will incur in managing and investing the one-time fees that they have not yet paid.

benefit CYA and MYA, given that, if they pay their one-time fees, they will no longer need to incur the costs, which they seek as damages in this litigation, associated with continuing to manage and invest that one-time fee.[6]

## CONCLUSION

For these reasons, we respectfully request the Court to grant this request for leave to amend our answer and to order that the amended answer which accompanies this motion be filed.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

---

[6] The final reason for denying a motion for leave to amend is because of the bad faith of the movant. Government employees are presumed to act in good faith and to perform their duties properly, and it requires "well-nigh irrefragable proof" to overcome this presumption. E.g., Sanders v. United States Postal Serv., 801 F.2d 1328, 1331 (Fed. Cir. 1986). The Government has not raised its motion for leave to amend in bad faith.

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

KEVIN B. CRAWFORD
JOHN C. EKMAN
STEPHEN FINN
HEIDE L. HERRMANN
R. ALAN MILLER
SONIA M. ORFIELD
RUSSELL A. SHULTIS
MARIAN L. SULLIVAN
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

August 5, 2004

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 5th day of August 2004, a copy of foregoing "DEFENDANT'S MOTION FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIM" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Harold D. Lester, Jr.