**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| MAINE YANKEE ATOMIC POWER COMPANY, Plaintiff, | |
| v. | No. 98-474 C (Senior Judge Merow) |
| UNITED STATES OF AMERICA, Defendant. | Filed electronically November 17, 2004 |

**MAINE YANKEE'S**
**<u>PROPOSED FINDINGS OF FACT</u>**

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639 (facsimile)

Counsel for Plaintiff,
MAINE YANKEE ATOMIC POWER COMPANY

Of Counsel:

Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH

Dated: November 17, 2004

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION AND OVERVIEW ....................1

II. GENERAL FINDINGS ....................3

III. TRIAL WITNESSES ....................7

IV. DOE CONTRACT ....................14

A. Background and Purpose ....................14

B. Contractual Understandings and Intentions of the Parties Regarding Scheduling Issues ....................18

C. Spent Fuel Acceptance ....................24

D. 3000 MTU is a Reasonable Rate. ....................26

E. Sequence of Spent Fuel Removal ....................33

F. Shutdown Priority ....................38

V. ISFSI DEVELOPMENT ....................39

VI. RERACKING ....................50

VII. GTCC WASTE ....................59

A. Maine Yankee's GTCC Waste Is Covered By the Contract. ....................60

B. Regardless of Whether GTCC Waste Is Covered By the Contract, DOE Would Have Accepted GTCC from Maine Yankee If It Had Accepted SNF. ......67

VIII. GOOD FAITH AND FAIR DEALING ....................70

IX. DAMAGES ....................72

X. TAKINGS ....................95

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| MAINE YANKEE ATOMIC POWER COMPANY, Plaintiff, | : | |
| v. | : | No. 98-474 C (Senior Judge Merow) |
| UNITED STATES OF AMERICA, Defendant. | : | Filed electronically November 17, 2004 |

**MAINE YANKEE'S**
**PROPOSED FINDINGS OF FACT**

Plaintiff Maine Yankee Atomic Power Company ("Maine Yankee") submits the following post-trial Proposed Findings of Fact ("PFF").[1]

## I. INTRODUCTION AND OVERVIEW

1. Maine Yankee has already paid the Department of Energy ("DOE") approximately $65 million in fees required under the parties' contract ("Contract"), and Maine Yankee has performed or is ready to perform all its other contract obligations. Trial Transcript ("Tr.") 2736:22-2737:4 (Thomas).

2. In the aggregate, utilities having similar contracts with DOE have paid the government over $20 billion (including accrued interest) to cover all appropriate costs of DOE's spent nuclear fuel ("spent fuel") and high-level radioactive waste ("HLW") (together, "SNF") disposition program, but less than half that amount has been appropriated to the program. *See*

[1] Sections I-IV and VII below are substantially similar to the Proposed Findings in *Yankee Atomic v. U.S.*, No. 98-126C and *Connecticut Yankee v. U.S.*, No. 98-154C.

Tr. 4088:1-4089:7 (Pollog); Ron Howe, Michigan Public Service Commission, *Nuclear Waste Fund Ratepayer Payments By State Through 3-31-04*, at http://www.cis.state.mis.us/mpsc/lic-enf/nuclear/rep304.pdf (March 31, 2004).

3. DOE breached its reciprocal contract obligation to Maine Yankee and others – the "quid pro quo created by Congress" in the D.C. Circuit's words – to commence acceptance of SNF by January 31, 1998, and thereafter to remove SNF from contracting utilities including Maine Yankee in an economically efficient, reasonable manner. *Indiana Michigan Power Co. v. United States*, 88 F.3d 1272 (D.C. Cir. 1996).

– *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000). *See* PFF ¶¶ 45-46, 51-55, 57 below (addressing DOE performance obligations).

4. Because of the government's breach, Maine Yankee has incurred and is continuing to incur very substantial damages for continued on-site storage of SNF. As detailed below, DOE's partial breach of the parties' Contract has caused Maine Yankee to incur damages in the minimum amount of $159.7 million through the year 2010. *See* Section IX, "Damages," below at PFF ¶¶ 152-178.

– Tr. 2746:6-2749:17 (Thomas); Tr. 7345:4-14 (Smith); Tr. 7480:2-7 (Wise).

– *See* P2043.17 (Wise Demonstrative) (accompanying the record as identified and adopted by Dr. Wise). *See* Tr. 7599:5-7 ("THE COURT: So 2043 and 2043-A shall accompany the record as identified and adopted by the witness.").

a. Damages are now expected to accrue in the years beyond 2010 at the reasonably constant rate of approximately $6.85 million per year in 2002 dollars. *See* PFF ¶¶ 174, 178 below.

– Tr. 3271:14-23 (Wise).

– P2043.25 (Wise Demonstrative) (accompanying the record, Tr. 7599:5-7).

## II. GENERAL FINDINGS

5. Maine Yankee is an electric utility company incorporated under the laws of the State of Maine.

– Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Maine Yankee's March 2003 PFF ¶ 6 (re incorporation under the laws of Maine).

– D618 at MYS-044-00825 or SWT0730100 ¶1 ("... Maine Yankee Atomic Power Company [is] a Maine corporation, having its principal offices in Wiscasset, Maine. . . .").

6. Maine Yankee's only electricity generating facility was a nuclear power plant located near Wiscasset, Maine.

– Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Maine Yankee's March 2003 PFF ¶ 7.

– D781 at MPA010719 at ¶1 ("The Maine Yankee Atomic Power Station (Maine Yankee) is located in the town of Wiscasset, Lincoln County, Maine. . . . The station is comprised of a single nuclear generating unit with supporting facilities. The Maine Yankee Atomic Power Company operates the station.").

7. Maine Yankee commenced commercial operation of its nuclear power plant in December 1972.

– Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Maine Yankee's March 2003 PFF ¶ 8.

– D781 at MPA010723 at ¶3 ("Commercial operation for Maine Yankee was established in December of 1972."); *see also* P829 at MOF035617 ¶1 (Maine Yankee "began commercial operation in December 1972.").

8. Maine Yankee's nuclear power plant was constructed with a fuel pool near the nuclear reactor, to be used for temporary storage of nuclear fuel after its use in the reactor ("spent fuel").

– P829 at MOF035718 ¶¶ 1-2 (“The principal function of the [fuel pool] is to provide a location for the safe storage of new and spent fuel assemblies . . . The spent fuel pool is located in the southeast corner of the Fuel Building and abuts the Reactor Containment Building.”).

– Tr. 2850:8-19 (Whittier) (fuel is discharged temporarily into the Maine Yankee fuel pool from the reactor).

9. Spent fuel remains highly radioactive for many years, and is potentially hazardous to humans if not properly handled.

– Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Maine Yankee’s March 2003 PFF ¶ 10.

10. The Maine Yankee fuel pool was filled with water, which provided a radiation shield and protected both the spent fuel in the pool and the environment.

– Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Maine Yankee’s March 2003 PFF ¶ 12.

– Tr. 2165:15-24 (Heider) (“The spent fuel pool is filled with water. That water . . . shields the fuel and – from radioactivity or radiation, such that people working in and around the fuel will not be exposed to significant amounts of radioactivity.”).

– Tr. 1552:13-21 (Bennet).

11. Nuclear fuel used in commercial reactors, including the Maine Yankee reactor, is configured into “fuel assemblies,” which consist of numerous metallic rods that each contain nuclear fuel pellets and are held together with metallic bindings.

– Tr. 1230:4-10 (Collier) (“The fabrication plant converts the UF6 to a UO2, which is a powder. The UO2 powder is pressed into small pellets something on the order of my little finger. Pressed into pellets, centered in a furnace. These pellets are then placed in rods. The rods are put together into fuel assemblies. And these fuel assemblies are then sent to nuclear reactors.”).

– Tr. 1550:16-22 (Bennet) (a fuel assembly is “basically a long rectangular metal cage which holds individual fuel elements or fuel pins, as we call them. They’re also known as fuel rods. Those fuel rods are metal and are placed in an array and contain the nuclear fuel pellets that have been placed in there during the fabrication process.”).

– P1926.001 (demonstrative photograph of fuel assembly).

12. Maine Yankee's fuel pool contained fuel storage racks, which sit on the pool floor and consist of individual cells, each of which can hold one fuel assembly.

– Tr. 2867:15-2869:12 (Whittier) (explaining P829, which is the Maine Yankee application to the Nuclear Regulatory Commission ("NRC") for permission to rerack its spent fuel pool); P829 at MOF035617 at ¶¶ 3-6 ("the existing racks" in "spent fuel pool" need to be replaced with new higher density racks); *id.* at MOF035575 (the placement and configuration for the spent fuel storage racks existing at Maine Yankee as of January 1993 and requesting approval from the NRC for "the new spent fuel storage racks . . . allow[ing] for the most efficient use of available fuel storage areas within the fuel pool.").

– Tr. 2165:5-14 (Heider) ("In a spent fuel pool, fuel is stored safely by placing the fuel into racks or what we call racks, which are large vertical cells. The racks themselves are constructed of a neutron poison. And that means that it absorbs any neutrons that are being emitted by the fuel in order to make sure that the fuel doesn't go critical in the spent fuel pool. In addition to that, it ensures that the spent fuel assemblies are maintained a certain space from each other, that also prevents criticality.").

13. When it was operating, Maine Yankee's nuclear reactor held and used 217 fuel assemblies in the reactor "core" where fission occurred and generated heat to power steam turbines, which in turn generated electricity.

– Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Maine Yankee's March 2003 PFF ¶ 15.

– Tr. 2850:10-11 (Whittier) (the Maine Yankee "reactor core contained 217 assemblies."); *see also* P1456MY at MPA022571 at ¶1 (at Maine Yankee, the reactor core contains 217 assemblies.).

– Tr. 1550:25-1551:5 (Bennet) (the spent fuel assemblies "through the fission process . . . is . . . used to generate heat which turns – is through the steam generator. Steam is produced. And that that steam, in turn, is used to spin the turbine and generator to produce electricity.").

14. Maine Yankee last generated electricity at its nuclear power plant in December 1996.

– Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Maine Yankee's March 2003 PFF ¶ 16.

– P1456MY at MPA022571 at ¶ 1 (Maine Yankee initially shutdown its plant on December 6, 1996); *see also* Tr. 2731:4-6, Tr. 2737:5-9 (Thomas) (same).

15. As of June 1997, all fuel assemblies from Maine Yankee's reactor had been moved into the fuel pool.

– Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Maine Yankee's March 2003 PFF ¶ 17.

– P1456MY at MPA022571 at ¶ 1 (Maine Yankee, on "June 20, 1997, remov[ed] the full core of 217 assemblies from the reactor vessel to the spent fuel pool. . . .").

16. In August 1997, Maine Yankee determined to permanently cease operation of its plant.

– Deemed admitted pursuant to the Order of November 4, 1998 because the government did not dispute Maine Yankee's March 2003 PFF ¶ 18.

– P1456MY at MPA022571 at ¶ 1 (Maine Yankee "certified its decision on August 6, 1997 to permanently cease further operation of the facility.").

– Tr. 2739:17-20 (Thomas) (Maine Yankee "permanently shutdown the plant" in August 1997); *see also* Tr. 2910:21-2911:2 (Whittier) (same); Tr. 6227:6-9 (Jordan) (same).

17. After June 1997, and until Maine Yankee began transferring spent fuel from the fuel pool to dry storage, there were 1432 spent fuel assemblies in Maine Yankee's fuel pool.

– P1456MY at MPA022571 at ¶ 1 (after permanent shutdown of the plant in August 1997, "the spent nuclear fuel resulting from the operation of the [Maine Yankee] reactor since its startup in 1972, including the recently discharged full core, is stored in the spent fuel [pool, which] contains a total of 1,432 fuel assemblies. . . .").

18. Maine Yankee is currently decommissioning its nuclear power plant, a process involving the dismantlement and decontamination of the plant.

– Tr. 2742:10-2743:19 (Thomas) (Maine Yankee commenced decommissioning of its nuclear plant and plant site after the decision to shutdown the plant permanently in August 1997 and chose DECON or prompt dismantlement, which entails a "deconstruction process of decontamination,

removal of radioactive materials from the site, [and] ultimately demolition of buildings.").

– *See also* Tr. 1562:17-21 (Bennet) ("Decommissioning involves the removal of a significant volume of radioactive waste from the site; in particular, the large components such as the reactor vessel and the steam generators, which can weigh a couple hundred tons.").

19. Decommissioning of Maine Yankee's site cannot be completed until all SNF is removed from its site.

– Tr. 2744:12-18 (Thomas) (even "with prompt dismantlement" decommissioning cannot be completed until "high-level waste [and] fuel is ultimately dispositioned and leaves the site, is taken, if you will, by the DOE.").

– *See also* Tr. 1564:13-22 (Bennet) ("the decommissioning process [cannot] be completed if the spent nuclear fuel remains in the pool [because] the spent fuel pool is part of the nuclear power plant, and it's the entirety of the nuclear power plant that you're going through the decommissioning process to address. So the spent fuel pool itself would remain if it has fuel in it.").

20. Termination of Maine Yankee's NRC licenses and regulation cannot occur until all spent fuel and HLW waste is removed from the site or Maine Yankee's responsibility for spent fuel and Greater-than-Class C ("GTCC") waste is otherwise eliminated.

– Tr. 2744:12-18 (Thomas) (until "high-level waste [and] fuel is ultimately dispositioned and leaves the site, is taken, if you will, by the DOE, we need to maintain NRC – as an NRC licensee to store the fuel and high-level waste.").

21. Until Maine Yankee's NRC licenses are terminated, Maine Yankee must maintain its corporate existence.

– Tr. 2744:12-18 (Thomas) (until "high-level waste [and] fuel is ultimately dispositioned and leaves the site, is taken, if you will, by the DOE, we need to maintain [existence] as an NRC licensee to store the fuel and high-level waste.").

## III. <u>TRIAL WITNESSES</u>

At trial, Maine Yankee presented the evidence supporting its damages claim through the following witnesses:

22. **Loring Mills**, who had a long career in the nuclear industry, testified about the development of the Nuclear Waste Policy Act of 1982 ("NWPA") and the DOE waste disposal contracts, and his role in both. Tr. 263:24-299:14; Tr. 330:1-455:7.

a. From 1958 to 1976, Mr. Mills worked on various aspects of the nuclear fuel cycle at General Electric Company ("GE"), Kerr-McGee Corporation, and Nuclear Fuel Services. Tr. 264:12-265:9; Tr. 265:17-22; Tr. 266:16-267:24. He served for a time as quality assurance manager for Nuclear Fuel Service's reprocessing plant in West Valley, NY. Tr. 266:16-268:2.

b. In 1976, Mr. Mills became a senior executive of the Edison Electric Institute ("EEI") in Washington, DC – a trade association for investor-owned electric utility companies, *see* D02.034 at 1 – where he worked on nuclear fuel cycle issues, including both "front end" issues concerning fresh fuel and, increasingly after reprocessing ceased in 1976-77, "back end" issues concerning spent fuel disposition. Tr. 267:25-269:21. Mr. Mills was actively involved in the late 1970s in developing the Environmental Impact Statement that selected geological disposal for SNF, Tr. 279:11-18, and subsequently in developing the NWPA and then the DOE waste disposal contracts. Tr. 270:5-11; Tr. 279:11-16; Tr. 288:4-289:8 (recounting that Mr. Mills suggested the amount of the contractual "one mill" fee). He worked to promote appropriate implementation of the DOE contracts until his retirement in 1993. Tr. 270:16-271:1.

23. **Dr. John Bartlett** has studied nuclear engineering and worked to design and implement nuclear technologies since early in the Atomic Age. Tr. 578:10-602:3. He testified

both as a fact witness, regarding the DOE spent fuel contracts and programs, and as an expert, offering opinions about an appropriate acceptance rate and schedule for the DOE program.

a. Dr. Bartlett taught nuclear engineering at the University of Rochester, served as a Fulbright scholar teaching nuclear courses in Istanbul, Turkey, Tr. 582:7-17, and assisted in the development of Turkey's nuclear program, Tr. 583:5-10.

b. For most of 1969-1978, Dr. Bartlett worked for Battelle at Pacific Northwest National Laboratory, where he became Manager of Systems Studies in the Nuclear Waste Program Office, a predecessor to DOE's Office of Civilian Radioactive Waste Management ("OCRWM"). Tr. 583:11-18; Tr. 584:11-14. In 1974, Dr. Bartlett led the development of the voluminous Technical Alternatives Document, which compiled information about all technologies used in the management of radioactive waste from the receipt at a storage location to ultimate disposal. Tr. 586:7-22. This document became the basis for DOE's 1980 programmatic environmental impact statement for the national disposal program, which OCRWM now runs. Tr. 586:24-587:4. A principal focus of Dr. Bartlett's work throughout his career has been the management of nuclear waste.

c. From early 1990 until January 1993, Dr. Bartlett served as the presidentially-appointed Director of OCRWM. Tr. 590:2-24.

d. Dr. Bartlett's consulting career since 1993 has included work on developing an international spent fuel repository in Australia. Tr. 595:7-597:3; *see* Tr. 596:9-20 (noting work on receipt of spent fuel from reactors across the world, transportation methods and design of the disposal facility). Dr. Bartlett's experience also includes reactor decommissioning projects, development of NRC regulations, and

providing technical support to the EPA in developing standards applicable to Yucca Mountain. Tr. 600:19-602:3.

24. **Frank Graves**, an economist expert in analyzing and modeling the performance of markets, particularly utility-related markets, testified regarding what would have been an economically reasonable schedule for spent fuel acceptance had DOE begun performing in 1998. Tr. 741:23-765:4 (Graves) (Mr. Graves' credentials); Tr. 767:8-788:18; Tr. 797:13-798:6 ("must-move" fuel analysis); Tr. 777:14-781:7 (reasonable acceptance rate analysis); Tr. 800:6-865:11 (modeling of the exchanges market). Based upon his economic models, Mr. Graves also calculated the time when each Yankee utility's SNF would have been removed if DOE had performed. Tr. 825:10-827:6.

25. **Charles Pennington**, Vice President of Marketing and Business Development for NAC International ("NAC"), has long been involved in the development, design, and pricing of multi-purpose canister systems for storage and transport of SNF and in evaluating the costs of designing and constructing dry storage facilities at utility sites. Tr. 1051:9-20; Tr. 1052:24-1054:2. Mr. Pennington provided expert testimony supporting inputs that Mr. Graves used in his analysis, concerning average or representative costs to implement and operate dry storage and costs of wet fuel pool storage, as well as historical and projected fuel discharges and remaining SNF storage capacities at all domestic commercial nuclear plants. Tr. 1077:23-1112:16.

26. **Daniel Collier**, Vice President of NAC's consulting operations, was previously responsible for NAC's brokerage business, where he arranged purchases of nuclear fuel cycle materials and services, matching buyers and sellers. Tr. 1221:22-1222:2. Mr. Collier testified regarding the acceptability among nuclear utilities, based on prior experience, of exchanging various goods and services. Tr. 1219:17-1263:12.

27. **Ivan Stuart** has substantial expertise, and experience, with the technical and practical aspects of spent fuel storage and transportation.

a. During nearly 30 years at GE's Nuclear Division, Mr. Stuart served as Manager of Licensing for almost a decade (supervising over 100 engineers), then Manager of Training (again supervising over 100 engineers), and beginning in 1987, as Manager of Waste Management Service, where he had particular responsibility for the Vallecitos Laboratory in California (which studied damaged or failed nuclear fuel and other radioactive material) and the Morris Fuel Storage Facility in Illinois. Tr. 1293:9-1311:17.

b. In March of 1990, Mr. Stuart became Vice President of Engineering at NAC International, where he had overall responsibility for design and licensing for all of the casks that NAC owned and was selling. Tr. 1341:18-1342:8; Tr. 1343:2-19. He also worked on numerous projects at NAC involving transportation of spent fuel and GTCC waste, including directing one where DOE had contracted with NAC to take research reactor fuel from around the world back to the United States to be stored in South Carolina. Tr. 1369:23-1370:1; *see* Tr. 1362:24-1363:24 (noting work on the Owl Creek Private Storage Project, a private dry storage facility for storage of SNF).

c. Mr. Stuart testified as an expert that there were no technical impediments to DOE's implementation and operation, beginning not later than January 1998, of a robust program for acceptance, transportation and disposal of spent fuel and GTCC waste. Tr. 1376:18-1377:5.

28. **Michael Thomas** joined Maine Yankee in 1991 as manager of financial services. Tr. 2726:20-23. He stayed in that position for two years, when he also became treasurer of

Maine Yankee. Tr. 2727:18-23. Mr. Thomas was promoted to his current position with Maine Yankee, Vice President and Chief Financial Officer, in 1997. Tr. 2729:21-25. Throughout his tenure with Maine Yankee, Mr. Thomas has been Maine Yankee's formal contracting officer with DOE. Tr. 2733:18-2734:16. As part of his duties at Maine Yankee, Mr. Thomas has responsibility for financial and treasury functions, and oversees the preparation of Maine Yankee's annual budgets. Tr. 2724:17-2729:25; Tr. 2726:13-2727:4; Tr. 2730:25-2731:16. Mr. Thomas testified about Maine Yankee's reasons for permanently shutting down its reactor, the company's implementation of dry storage, the company's use of trust funds, the costs of Maine Yankee's third reracking, and the value of the land on which Maine Yankee's ISFSI is located.

29. **George Douglas Whittier** worked for Maine Yankee between 1983 and 1997. Tr. 2843:25-2844:3; Tr. 2846:14-20. From 1990 through March 1997, Mr. Whittier was Vice President of Licensing and Engineering. Tr. 2845:23-2846:2; Tr. 2846:14-19. His responsibilities included oversight of the Reactor Engineering Group, which stored spent nuclear fuel at Maine Yankee. Tr. 2843:25-2846:20; Tr. 2848:20-2849:2; Tr. 2851:1-4; Tr. 2870:8-16; Tr. 2910:14-24. Mr. Whittier was responsible for Maine Yankee's third reracking, and he testified about the reasons for the reracking.

30. **Todd Smith** worked for Maine Yankee from 1997 to 2004. Tr. 2952:13-17; Tr. 2955:11-14. Mr. Smith developed and maintained a project cost tracking system for Maine Yankee's decommissioning project. As part of his duties at Maine Yankee, Mr. Smith had responsibility for creating Maine Yankee's budget, creating budget estimates, project tracking, cost tracking, tracking production and cost-to-completion of projects, and scheduling major projects. Tr. 2952:13-2954:25; Tr. 2966:5-2971:12; Tr. 2981:5-2982:12. He testified about the

development and implementation of the cost tracking system and the costs incurred and projected to be incurred by Maine Yankee due to the government's breach.

31. **Michael Meisner** is Vice President and Chief Nuclear Officer at Maine Yankee. Tr. 3081:1-3. Mr. Meisner testified about safety and regulatory compliance at Maine Yankee and the operation of Maine Yankee's spent fuel pool and ISFSI. Mr. Meisner has spent his entire career working for commercial nuclear utilities, with a primary focus on regulatory and licensing matters. Tr. 3081:11-3089:25. In this work, he has had substantial participation in industry working groups and committees. Tr. 3091:12-3093:18. He testified about regulatory, licensing and technical matters related to Maine Yankee's damages claim. Tr. 3093:19-3165:25.

32. **Kenneth Wise** is an expert in economics and the determination of economic damages. Dr. Wise holds a bachelor's degree in physics from Harvey Mudd College and a doctorate in economics from the Massachusetts Institute of Technology. Tr. 3188:1-4. Dr. Wise is a principal and founder of the Brattle Group, where he works as a consultant and expert in commercial damages cases, arising from breach of contract, deceptive trade practices, takings, products liability, as well as in environmental cases, involving the allocation of environmental liabilities, insurance recoveries, the economic benefits of noncompliance, and property value impacts. Tr. 3189:25-3191:2. Much of the damages work Dr. Wise has done involves the application of engineering to support his analysis. Tr. 3190:18-21. Dr. Wise has testified on damages issues on 30 different occasions, in federal court, state court, and before mediators and administrative law judges and arbitrators. Tr. 3190:22-3191:2. At trial in this case, Dr. Wise presented his calculation of the minimum damages Maine Yankee is entitled to recover as a result of the government's failure to remove spent nuclear fuel from the plant site. To arrive at damages, Dr. Wise worked closely with the company personnel at Maine Yankee to identify and

properly calculate the incremental costs that resulted from the government's breach. Tr. 3193:24-3239:10.

## IV. DOE CONTRACT

### A. Background and Purpose

33. Since the beginning of the commercial nuclear power industry in this country, the federal government has been responsible for the disposition of spent fuel.

> – 10 C.F.R., Part 50, App. F. (2004) ("Disposal of high-level radioactive fission product waste material will not be permitted on any land other than that owned and controlled by the Federal Government.").
>
> – Tr. 276:3-7 (Mills) ("[F]rom the very beginning of the commercial nuclear program in the United States, it was always understood that the federal government would be responsible for the disposal of waste from the program."); 276:18-24 (Mills) ("And it was a very well understood arrangement within the federal government at that time within the Atomic Energy Commission, as well as within the industry, that they [the government] would be responsible because of the concern of high-level waste and safety – long-term safety that they would be responsible for that.").
>
> – Tr. 1680:17-1681:4 (Bennet) ("Well, it's always been our understanding that the federal government would be responsible for disposal of spent fuel. As I described early on, they actually owned the spent fuel. And until commercial power reactors were allowed to own it, that was the primary understanding. But with the high-level waste policy put in place, that put in place the mechanism by which they do that, that's the – that set up a reliance we had on their responsibility for spent fuel.").
>
> – 42 U.S.C. § 10131(a)(4) (2000).

34. A government solution to the growing backlog of spent nuclear fuel became urgent in the 1970s after President Carter issued an executive Order in 1977 that effectively halted reprocessing of spent nuclear fuel.

> – Tr. 274:14-275:23 (Mills) ("in 1977, President Carter at the time stated in April of 1977 that reprocessing of civilian nuclear fuel would be indefinitely deferred.").

35. To provide for the disposition of SNF from commercial reactors, the government enacted the Nuclear Waste Policy Act of 1982, Pub. L. 97-425, codified at 42 U.S.C. §§ 10101 (2000) *et seq.* ("NWPA"); *see* 42 U.S.C. § 10131 (2000) (Findings and Purposes for NWPA).

> (a) Findings
>
> The Congress finds that –
>
> (1) radioactive waste creates potential risks and requires safe and environmentally acceptable methods of disposal;
>
> (2) a national problem has been created by the accumulation of (A) spent nuclear fuel from nuclear reactors; and (B) radioactive waste from (i) reprocessing of spent nuclear fuel; (ii) activities related to medical research, diagnosis, and treatment; and (iii) other sources;
>
> (3) Federal efforts during the past 30 years to devise a permanent solution to the problems of civilian radioactive waste disposal have not been adequate.
>
> * * *
>
> (b) Purposes
>
> The purposes of this part are –
>
> (1) to establish a schedule for the siting, construction, and operation of repositories that will provide a reasonable assurance that the public and the environment will be adequately protected from the hazards posed by high-level radioactive waste and such spent nuclear fuel as may be disposed of in a repository;
>
> (2) to establish the Federal responsibility, and a definite Federal policy, for the disposal of such waste and spent fuel.

36. To assure that the government fulfilled its obligations for the disposition of SNF, the NWPA established a program under which the government would be responsible for disposition of commercial SNF, in a geologic repository and/or other federal facility(ies), and nuclear utilities would pay substantial fees designed to cover the costs of that program. *See* 42 U.S.C. §§ 10101 (2000) *et seq.*; *see* 42 U.S.C. § 10131(b) (2000).

37. To assure that the government fulfilled its obligations for the disposition of SNF, the NWPA required DOE to implement the SNF disposal program by entering into contracts with nuclear utility companies.

– 42 U.S.C. § 10222(a) (2000).

– Tr. 337:20-338:22 (Mills) ("We [utilities] wanted a firm contract to accomplish the task.").

38. After the NWPA became law, DOE developed a form of "Standard Contract" for acceptance and disposition of SNF.

– P29 at 5458-5459 (February 4, 1983 Notice of Proposed Rulemaking for Standard Contract); P31 at 16597-98 (April 18, 1983 Final Rule for Standard Contract).

– Tr. 344:11-351:22 (Mills) ("the Department of Energy made the decision that they were going to have the contract in the form of a regulation.").

39. DOE was the drafter of the Standard Contract.

– P31; *see* Tr. 347:6-22 (Mills).

40. On June 22, 1983, Maine Yankee and the DOE entered into such a contract (the "Contract").

– P1MY.

41. In the NWPA, Congress legislated a firm deadline of January 31, 1998 for the government to begin accepting and disposing of SNF from commercial reactors. 42 U.S.C. § 10222(a)(5)(B) (2000) ("in return for the payment of fees . . . the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel. …").

42. Congress intended that DOE's acceptance of SNF, beginning in 1998, would be expeditious and timely.

– The NWPA mandated that the contracts provide that DOE "shall take title to the high-level radioactive waste or spent nuclear fuel involved *as expeditiously as practicable* upon the request of the generator or owner of such waste or spent fuel." 42 U.S.C. § 10222(a)(5) (2000) (emphasis added).

– Tr. 3686:18-22 (Morgan) (believed intent of Congress and NWPA was for DOE to remove spent fuel from utilities as fast as it reasonably could).

– (6/28/04) Dep. Desig. 5/10/02 Barrett, 1163:10-1166:7 ("Q. Why did you want to work off that [backlog] inventory of spent nuclear fuel as soon as practicable? A. Because I believe that's the intent of the act.").

43. Congress mandated that the activities contemplated by the NWPA be conducted in a timely manner.

– *See* PFF ¶ 41, 42 above.

– The NWPA specified a timetable for siting and licensing repositories. These statutory deadlines required that within 180 days after enactment of the NWPA [*i.e.*, by July 6, 1983], the Secretary of Energy must recommend to the President five sites for possible repository characterization, *see* 42 U.S.C. § 10132(b)(1)(A) (2000); by January 1, 1985, the Secretary must recommend to the President three sites for actual characterization, *see id.* § 10132(b)(1)(B); by March 31, 1987, the President must recommend to Congress one site for repository construction authorization, *see id.* § 10134(a)(2)(A); and by January 31, 1989 (with limited exceptions), the NRC must issue a final decision on construction authorization, *see id.* § 10134(d).

– (6/28/04) Dep. Desig. 4/24/02 Susan Klein, 172:7-14 (DOE's Rule 30(b)(6) witness) ("Q. Do you agree that the Nuclear Waste Policy Act contemplated that process of siting, licensing, and constructing a repository would have been completed by January 1998? [objection omitted] A. I'm thinking. Yes.").

44. The legislative record reflects that an important purpose of the NWPA was to assure that utilities, including Maine Yankee, would not have to incur additional costs to construct or maintain additional on-site storage of SNF after January 31, 1998. *See also* PFF ¶ 54.

– In enacting the NWPA, Congress specifically found that:

"A national problem has been created by the accumulation of (A) spent nuclear fuel from nuclear reactors; and (B) radioactive

wastes from (i) reprocessing of spent nuclear fuel; (ii) activities related to medical research, diagnosis, and treatment; and (iii) other sources." 42 U.S.C. § 10131(a)(2) (2000).

– Congress further found that:

"Federal efforts during the past 30 years to devise a permanent solution to the problems of civilian radioactive waste disposal have not been adequate." 42 U.S.C. § 10131(a)(3) (2000).

– The NWPA was enacted in response to the "spent fuel bottleneck." H. Rep. No. 97-491, pt. 1 at 28 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792, 3794; *see also* H. Rep. No. 97-785, pt.1 at 50 (1982) (House Report to predecessor bill of the NWPA) ("Continued delays in establishing that radioactive materials can be disposed of safely . . . can no longer be tolerated. This is important . . . because it is no longer acceptable to allow increasing quantities of nuclear waste to be stored on an interim basis.").

## B. Contractual Understandings and Intentions of the Parties Regarding Scheduling Issues

45. The Contract provides, as required by the NWPA, that DOE "shall begin" performing the required services under the Contract "not later than January 31, 1998." P1MY, Art. II. *See* 42 U.S.C. § 10222(a) (2000).

46. The Contract requires that the DOE shall "continue" the required services, after commencing not later than January 31, 1998, "until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A . . . has been disposed of." P1MY, Art. II.

47. The Contract is silent on the specific acceptance rate under which DOE must accept SNF from Maine Yankee. P1MY.

48. The Contract does not provide a mechanism to determine an acceptance rate under which DOE must accept SNF from Maine Yankee. *See* P1MY.

49. The Contract is silent on the specific acceptance schedule under which DOE must accept and dispose of SNF from Maine Yankee. *See* P1MY.

50. The Contract does not provide a mechanism to determine an acceptance schedule under which DOE must accept and dispose of SNF from Maine Yankee. *See* P1MY.

51. The Contract states that DOE is responsible "to take title to the spent nuclear fuel or high-level radioactive waste as expeditiously as practicable upon the request of the generator or owner of such waste or nuclear spent fuel" upon commencement of the repository provided for in the Act. P1MY at 1, second "whereas" clause.

52. At the time the Contract was entered into in 1983, the parties anticipated and intended that a repository would be operational in time for DOE to begin acceptance of SNF no later than January 31, 1998.

– Tr. 383:24-384:14 (Mills) ("And there was expectations as indicated by the members of the Department of Energy. I came [*sic*] name Frank Kaufman specifically, stating that yes, we can satisfy that date. Actually, we believed we can have a repository before that time. And we fully believed that the 15-year advance time was sufficient for this program to actually carry out what was requested.").

– P978 (June 1983 Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste) at 8-9 (In June of 1983 – contemporaneous with the execution of the Contract – DOE prepared its first fee adequacy report, an annual analysis required by the NWPA, 42 U.S.C. § 10222(a)(4) (2000), which stated "[I]t is assumed that each of the two geologic repositories will begin receiving either spent fuel discharge or reprocessing waste in 1998 and 2002, respectively. Each repository has a design receipt rate of 3,000 metric tons (MT) a year, although a receiving rate of 1,800 MT is assumed for the first five years.").

– *See* (7/14/04) Dep. Desig. 5/8/02 Barrett, 1050:1-9 (his understanding is consistent with the statement that "When the nuclear waste policy [act] was enacted, it was envisioned that the department would have a repository available for permanent waste disposal in 1998, and the department entered into contracts with the utilit[ies] to begin accepting waste in 1998 on that basis.").

– *See* P516 at 21794 (DOE May 3, 1995 Notice re Waste Acceptance Issues) ("the Act originally envisioned that a geologic repository would be in operation, and DOE would be prepared to begin acceptance of SNF by January 31, 1998"); P951 at 27008 (DOE May 25, 1994 Notice of Inquiry) ("When the Act was passed, the Department anticipated that a geologic repository would be in operation . . . by January 31, 1998").

– *See* PFF ¶¶ 43.

53. In 1983, the parties anticipated and intended that if a repository was not operational in time for DOE to begin acceptance of SNF by January 31, 1998, then DOE would either establish an alternative facility at which to accept SNF or compensate utilities for the failure to timely accept SNF. P633, attachment at 1-3 (September 1983 DOE Mission Plan Strategy Memorandum) ("the lack of existence of particular type facilities will not delay or postpone the acceptance of spent fuel.").

54. At the time of formation of the Contract, the parties recognized that the rate of DOE's acceptance of utilities' SNF should achieve two objectives: (1) to prevent the nuclear utilities from having to construct or maintain additional at-reactor storage facilities for SNF after January 31, 1998; and (2) to accept SNF at a rate that permitted DOE to keep up with the rate of production of SNF and reduce the existing SNF backlog.

– Tr. 341:7-343:2 (Mills) (discussing understanding of utility representatives and high-level DOE officials).

– P633 (September 15, 1983 Mission Plan Strategy Memorandum), attachment at 1 (DOE explained its waste acceptance strategy for the SNF program as using "an acceptance rate during the first 5 years such that no utility would have to build additional storage facilities after 1998.").

– P678 (December 1983 Morgan Program Overview) (Mr. Morgan publically described the SNF program's strategy as follows: "[B]eginning in 1998, utilities will not have to provide any additional storage facilities on site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that *no utility would have to add any further storage facilities* either on site or at another location.") (emphasis added); Tr. 3682:12-3683:19 (Morgan) (confirming that when he directed the SNF program, he thought it appropriate to have enough waste acceptance capability to meet the discharge rate from utilities and to work off the backlog).

– P636 at 2-1 (December 1983 Draft Mission Plan) ("The waste materials will be accepted in accordance with a Waste Acceptance Schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998.

Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year.").

– P647, enclosure 1 at 1 (July 23, 1984 DOE Richland Operations Office comments on Draft Mission Plan) ("Based upon our interpretation of the NWPA, the minimum acceptance rate should be based upon the rate at which spent fuel is generated by civilian nuclear power reactors. This would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998.").

– *See* (6/28/04) Dep. Desig. 4/22/02 Barrett, at 55-56 (agreeing that "the policy behind the act" would call for reductions of the backlog within a reasonable amount of time) ("Our intention was to design a system that would reduce the backlog to a reasonable sense."); (7/14/04) Dep. Desig. 5/1/02 Milner, 73:20-22 ("At the point I joined the program [in April 1984, Tr. 4711:23-4712:20], my understanding of the intent was to work off the backlog.").

– (7/14/04) Dep. Desig. 5/8/02 Barrett, at 1064-65 (intent of the act was that the utilities would pay once into the waste fund and the utilities "would not have to pay again directly out of their own pockets to provide for such storage and disposal during the period that the department failed to comply. . . .").

a. During the notice and comment period on the Standard Contract, the Edison Electric Institute noted that the Contract was silent on the industry-wide rate of acceptance of SNF. D02.034 at 8, Attachment A, at 2. EEI told DOE that "[w]e believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation plus a reasonable share of the backlog." *Id.*

b. In publication of the Standard Contract as a final rule, DOE did not address the acceptance rate comments or disavow the utilities' expressed understanding. P31 (April 18, 1983 publication of Final Rule in Federal Registry).

55. At the time of formation of the Contract, the parties understood that an industry-wide acceptance rate of 3000 MTU per year would be appropriate to accomplish the objectives identified in PFF ¶ 54 above.

– Tr. 509:15-511:15 (Mills) (parties anticipated annual industry discharges of 2,000 to 2,500 MTU and that DOE would work off backlog of already discharged spent fuel at a rate of about 1,000 MTU per year); Tr. 511:22-

512:12 (Mills) (parties anticipated in 1983 that repository would have capacity of 3,000 MTU per year); Tr. 343:4-14 (Mills) (DOE officials planned spent fuel acceptance from utilities in 1983 at about 3,000 MTU per year).

– P420 (July 1983 DOE Report on Financing Disposal of Commercial SNF) at 8 (each repository designed to receive 3,000 MTU per year).

– P458 (May 4, 1983 Mills statement on importance of provisions of NWPA) at 4 (expectation that DOE receive about 3,000 MTU per year).

– P978 (June 1983 DOE Report on Financing Disposal of Commercial Spent Nuclear Fuel) at 11.

– *See also* (6/28/04) Dep. Desig. 4/22/02 Barrett, 59:4-11 (agreeing that "the 3,000 rate would be consistent with [Mr. Barrett's] understanding of the intent of the act to reduce over a reasonable period of time the backlog of spent nuclear fuel throughout the nation . . ."); *id*. at 56-67 (Mr. Barrett understood in 1986 that the 3,000 rate would accomplish the goal of reducing the backlog).

56. At the time of the formation of the Contract, the parties understood that DOE would accept about 3000 MTU of commercial spent fuel per year and that this acceptance rate would be achievable by 1998.

– Tr. 343:4-14 (Mills) ("Well, there was considerable discussion of what should the capacity be for receiving this waste or spent fuel at a repository. And the capacity that was discussed at that time and has been documented in many ways was the planned activity would be at a quantity of about 3,000 metric ton per year.").

– Tr. 385:14-387:7 (Mills) ("And there were discussions on what was a reasonable rate of receipt at a repository from a design standpoint. This is the Department of Energy identifying what is a reasonable design quantity for a repository. And it was discussed. That quantity was discussed while the legislation was being developed. And it was understood that the design rate would be about 3,000 metric ton per year.").

– Tr. 386:1-387:7 (Mills) ("Q. Did you have discussions about the 3,000-ton rate with DOE officials at that time? A. Yes, I did. Q. Do you recall specifically with whom? A. I am convinced I had those discussions with Frank Kaufman, with Wade Ballard, with Mike Lawrence. And you know, this was over several years' time that this was being developed. So the number of people that were involved in the program at that time were changing. And I believe at that particular time that Shelby Brewer was the assistant secretary for nuclear energy. And I recall having conversations with Mr. Brewer. There was another individual who had responsibility for the program just before the Nuclear Waste

> Policy Act, which was Shelley Myers. And I remember having similar conversations with Mr. Meyers. Q. These were conversations in which the 3,000-ton rate was discussed? A. There were many issues discussed. And I am convinced that many times we discussed that rate of 3,000 metric tons. It shows up in many different ways. Q. Okay. And it's your understanding from those conversations that the Department of Energy officials, at least the ones that you mentioned and discussed this with, expected the 3,000-ton rate to be achieved by 1998; is that right? A. They – they had said the geologic repository receiving rate would be designed for 3,000-ton per year and they had expected they would be able to achieve that by 1998.").

a. The parties' intent and understanding is shown by DOE reports on an appropriate fee to charge utilities for disposal services, which pre-dated the NWPA and the Contract. These reports reflected rates for the acceptance of commercial spent fuel consistent with, or even greater than, the 3000 MTU. P7 at 18, 21 (1978 Estimate of Charges for DOE Services uses 1800 MTU for first five years, 6000 MTU per year thereafter); P1959 at 9 (1980 Report on Fee uses a rate of 1800 MTU for the first five years and 6000 MTU per year thereafter); P978 at 8 (reporting on prior acceptance rates); *see* Tr. 390:24-391:17 (Mills) (the 3000 MTU rate for the first repository pre-dated the passage of the NWPA).

b. The intent of parties to Standard Contracts at the time of contract formation that DOE would accept about 3000 MTU of commercial spent fuel per year is reflected in Loring Mills' May 5, 1983 presentation at a conference attended by the industry and DOE. P458; Tr. 357:19-359:1 (Mills) (P458 accurately reflects the substance of his remarks at a conference attended by both nuclear utilities and members of DOE).

c. In June of 1983 – contemporaneous with the execution of the Contract – DOE prepared its first fee adequacy report, an annual analysis required by the NWPA, 42 U.S.C. § 10222(a)(4) (2000). DOE calculated costs based on a program that would

accept spent fuel from utilities at a steady state rate of 3000 MTU per year by the sixth year of operations. P978 (June 1983 Report on Financing the Disposal of Commercial Spent Fuel) at 8 and 9 ("It is assumed that each of the two geologic repositories will begin receiving either spent fuel discharge or reprocessing waste in 1998 and 2002, respectively. Each repository has a design receipt rate of 3,000 metric tons (MT) a year, although a receiving rate of 1,800 MT is assumed for the first five years.").

## C. Spent Fuel Acceptance

57. The pace and sequence of DOE's acceptance of SNF from utilities should be efficient in order to minimize the total cost to utilities of storing and disposing of SNF.

> – Tr. 609:5-19 (Bartlett) ("The principal goal, if I had to capture it in one word, would be efficiency, to make the system – the program efficient.").
>
> – Tr. 633:25-634:17 (Bartlett) ("[The acceptance rate for spent fuel] would be efficient in terms of making proper use of the equipment facilities and everything associated with the system so that there's nothing wasted or insufficient with respect to the accomplishment of the objective. . . . When the system is operating efficiently at maximum efficiency, if I can use the phrase, it is operating at minimum cost.") (question omitted).
>
> – Tr. 643:6-21 (Bartlett).
>
> – P95 at 15 (the 1985 DOE Mission Plan) identifies timely and efficient acceptance of spent fuel as one of the NWPA's prime objectives:
>
> "[T]he program must vigorously pursue the Act's directive to begin accepting spent fuel and high-level waste for disposal no later than January 31, 1998, and to continue to dispose of the waste in a *highly efficient manner* consistent with the continued orderly operation of the Nation's nuclear power-generation plants." (Emphasis added).
>
> – Tr. 3739:4-20 (Morgan) (he agreed with view expressed in Mission Plan that the program must be conducted in a cost-effective manner).
>
> – (6/28/04) Dep. Desig. 5/8/02 Milner, 266:23-267:4 (an OCRWM employee since April 1984, including Chief Operating Officer for the past four years); Tr. 4711:23-4712:3 ("Q. Has it been the objective of OCRWM to operate the waste management system in a way that can achieve maximum efficiency? A.

Yes. Q. And that's been an objective throughout your time in RW? A. Yeah, I believe it has. Q. And when you consider efficiency in operating the waste management system, is it also proper in your view to take into account utility costs? A. My personal opinion, that should be a consideration.")).

58. Structuring the DOE SNF acceptance program to minimize utilities' total costs of storing and disposing of SNF is consistent with the full cost recovery nature of the Standard Contracts.

– Tr. 618:19-619:18; Tr. 635:9-636:7 (Bartlett) ("[G]iven full-cost recovery as the basis [for operation of the DOE system], you want to operate as efficiently as possible to minimize the costs that are incurred, both by the Department and by the reactors.").

– P1MY, Art. VIII.A.4 and at 2 (fourth "whereas" clause).

– (6/28/04) Dep. Desig. 5/14/02 Barrett, 178:3-12 ("Q. What is your understanding of the relationship between the objective of economic efficiency and the fuel cost recovery nature of the contracts? [objection omitted] A. I believe it is the federal government's responsibility to prepare a cost-effective system to minimize the costs on the waste generators for societal good.").

– Tr. 3739:4-20 (Rusche) (the program must be conducted in a cost-effective manner with full cost recovery).

– P95 at 423 (1985 Mission Plan definition of "full cost recovery").

– (6/28/04) Dep. Desig. 5/8/02 Milner, 267:23-268:25 ("In my personal opinion, I think it – the department should and in fact I think the department did consider utility costs, and that's factored in many decisions what the impacts would be on utility costs.").

– *See* (7/14/04) Dep. Desig. 4/19/02 Trebules, 4:22-5:14 (when working on the Mission Plan in 1984-1985, "I think we used phrases like fiduciary responsibility. People working in the program felt that they had an obligation to try to execute the program efficiently and effectively.").

59. The total cost to utilities of storing and disposing of SNF can be divided into three parts: at-reactor SNF storage costs; the costs that each utility will incur to load its SNF into casks provided by the government pursuant to the Standard Contracts for transport to a

government facility; and the costs of the DOE disposal program (the sum of the fees the utilities have or will pay to the government for the services specified in the Standard Contracts).

> – Tr. 619:3-18 (Bartlett) ("The program is a full-cost recovery system, or operates under full-cost recovery. And that means that you want to minimize the burden of cost for the Department to receive – the cost it incurs to receive the things. But you also have the responsibility to minimize the costs to the reactors, to avoid the need for the reactors to expand their spent fuel capacity, to have excess costs associated with the transfer operations, or to have to spend excess monies just for program costs into the Nuclear Waste Fund. So you minimize costs on both sides, everywhere, and the effective full-cost recovery system.").

> – Tr. 634:18-635:8 (Bartlett) ("The reactors incur what are called program costs, which are the costs that correspond to the fees that are paid into the system to have the fuel received and disposed. They also have the at-reactor storage costs, the costs they incur just to operate and store spent fuel on the site. And they also have the cost associated with their cost associated with the transfer operations to remove spent fuel from storage.").

60. A utility's at-reactor SNF storage costs rise precipitously in two events: (1) if it is forced to add to its at-reactor storage capacity because its pool fills up, and (2) if it is forced to extend at-reactor storage of SNF after its reactor permanently shuts down and all of its spent fuel has discharged or "cooled" for at least five years. The amount of spent fuel that would trigger one of these events can be thought of as "Must-Move Fuel." Tr. 639:24-643:2 (Bartlett); Tr. 767:8-768:24 (Graves).

## D. <u>3000 MTU is a Reasonable Rate.</u>

61. In the 1980s and 1990s, the aggregate amount of Must-Move Fuel at commercial nuclear reactors could be projected to grow at a rate of about 3000 MTU per year starting in 1998.

> – Tr. 777:14-778:10 (Graves) ("But on average, over that whole time frame, about a 3,000 metric-ton-per-year rate is the approximate annual average increase in spent – in must-move spent nuclear fuel. So that's a benchmark for a reasonable acceptance rate.").

62. Had DOE begun acceptance of spent fuel from utilities by January 31, 1998 at a rate reasonably ramping up to 3000 MTU per year, the backlog of utility Must-Move Fuel would have been eliminated by 2002, and very few utilities would have been required to obtain or maintain additional at-reactor SNF storage capacity after January 31, 1998.

– Tr. 611:18-612:1; Tr. 643:22-645:1 (Bartlett).

– *See* (6/28/04) Dep. Desig. 5/10/02 Barrett, at 1368-69 (agreeing that in a "general sense," DOE had established that the 3,000 MTU rate would achieve the objectives of "avoid[ing] not only spent-fuel overflows but pool rerackings to [*sic* and] allow shut-down reactors to empty their sites."); *see also id.* at 1370-71 (3,000 MTU rate is consistent with these objectives).

63. In the 1980s and 1990s, the aggregate amount of spent fuel discharges at commercial nuclear reactors could be projected to be about 2000 MTU per year starting in 1998. Tr. 612:2-5 (Bartlett); Tr. 769:18-771:10 (Graves); P175 (August 17, 1993 PNL Throughput Rate Analysis) (contractor-generated document) at 4-5.

64. An annual acceptance rate of about 3000 MTU of commercial spent fuel would tend to minimize the costs of the DOE disposal program.

– Tr. 633:18-634:12; Tr. 636:25-637:14 (Bartlett) (3000 MTU rate would be efficient).

– Tr. 609:20-611:11 (Bartlett) (3000 MTU per year is maximum rate at which spent fuel can be placed into a geologic repository).

– Tr. 645:2-12 (Bartlett) (an acceptance rate higher than 3000 MTU per year would be unnecessary and wasteful, because not all of the capacity could be effectively used).

– Tr. 612:17-613:8 (Bartlett); Tr. 782:10-783:3 (Graves) (DOE studies show that an annual acceptance rate of 3000 to 4000 MTU would minimize program costs).

– P175 (August 17, 1993 PNL Throughput Rate Analysis) (contractor-generated document) at 4-12 to 4-13 (an annual acceptance rate of 3000 to 5000 MTU would minimize program costs).

– (6/28/04) Dep. Desig. 4/22/02 Barrett, at 197-198 (various system studies done in the eighties and early nineties supported the 3,000 MTU rate).

65. A reasonable acceptance rate for commercial spent fuel should include a buffer capacity above the minimum amount needed to handle the projected needs of utilities in order to be able to handle additional needs for spent fuel acceptance occasioned by previously unanticipated contingencies, such as early shutdowns of nuclear power plants.

– Tr. 612:6-16 (Bartlett) ("[Y]ou need flexibility and buffering in case there are unexpected discharges. And you also might need to, on an intense basis, at some point, accept a quantity for a shutdown reactor, which is incurring costs for storage that they shouldn't have to incur if the reactor is shut down.").

– Tr. 645:20-646:1 (Bartlett).

66. A reasonable acceptance rate should facilitate the use of acceptance campaigns (taking a sufficient amount of spent fuel from a single facility such that fewer DOE visits to the facility are needed) in order to minimize both utility transfer costs and DOE program costs.

– Tr. 1425:6-9 (Stuart) ("It is my opinion that [DOE] would have used campaigns because it is so obvious[ly] a benefit to the program that I can't think of any technical reason not to use a campaign.")

– Tr. 1425:16-1426:22 (Stuart) (the use of acceptance campaigns is much more efficient than frequent small pickups of SNF for both utilities and DOE).

– Tr. 637:15-639:15 (Bartlett) (utilities incur fixed costs in terms of training, preparation and disruption of operating reactor operations each time they deliver spent fuel to DOE, and campaigns minimize utility transfer costs by minimizing the number of times these costs are incurred).

– Tr. 1426:16-22 (Stuart) (DOE uses campaigns and "In fact, it requires it," in transporting research reactor fuel).

– (6/28/04) Dep. Desig. 5/14/02 Barrett, at 174-175 (campaigning promotes efficiencies in transportation, loading, cask handling, receipt and turnaround).

67. An acceptance rate of 3000 MTU of spent fuel per year from commercial reactors would be sufficient to support the use of acceptance campaigns, but a significantly smaller

acceptance rate would not. Tr. 639:16-23 (Bartlett) (3000 MTU per year acceptance rate is consistent with the use of acceptance campaigns but 1000 MTU per year acceptance rate would not be).

68. From the time of the formation of the Contract to the present, DOE has been planning to accept 3000 MTU of spent fuel from commercial utilities.

– DOE's draft Mission Plans, and the 1985 Mission Plan, all set forth acceptance rates of 3000 MTU year. P636 at 2-3 (1983 Draft); P683 at 2-2 (1984 Draft); P95, vol. I, at 26-27 (1985 Mission Plan).

– (6/28/04) Dep. Desig. 4/22/02 Barrett, at 119-120 (since Mr. Barrett's involvement in the program in 1985: "In '85 and today it has always been our intent to try to do what we can from a technical point of view to receive the materials at a reasonable rate" and that rate is one that would ramp up towards 3000 MTU/year); *see id.* at 149 (3000 MTU rate was established before Mr. Barrett's arrival in 1985, and "[i]t seemed like a reasonable number to me then as it does today").

– Tr. 609:20-610:7 (Bartlett) (a DOE acceptance rate of 3000 MTU per year had been established for "quite a while" when he became director of DOE's Office of Civilian Radioactive Waste Management in 1990 and that was the rate his office worked toward achieving during his tenure as director).

– (6/28/04) Dep. Desig. 5/2/02 Milner, at 217 (DOE's intentions with respect to repository design receipt rate has stayed constant at 3000 MTU/year).

– DOE periodically published Total System Life Cycle Costs analyses ("TSLCC"), which were for the purposes of estimating the costs of its spent fuel and HLW acceptance program. From 1984-2001, DOE's TSLCCs all calculate program costs based on a 3000 MTU acceptance rate that is preceded by a brief ramp-up period. P968 (contractor-generated document) at 2-3 (1984 Draft); P245 at 2-1 (1985); P976 at 14 (1986); P246 at 23 (1987); P247 at 2-11 (1989); P248 at 2 (1990 Addendum to 1989 TSLCC); P249 at 8 (1995); P982 at 15 (1998); P977 at 4-14 (2001).

– DOE has used the 3000 MTU rate in its fee adequacy reports. *E.g.*, P421 at 3 (1984); P415 at 3 (1985); P545 at 4 (1986).

– (6/28/04) Dep. Desig. 4/25/02 Klein, at 351-352, 354 (DOE uses the 3000 MTU rate to determine the adequacy of the contracts' fee).

– DOE's published 1988 Draft Mission Plan Amendment projected a steady state repository receipt rate of 3000 MTU by the sixth year of operations. P100 at 18, 19.

– The Standard Contracts required DOE, beginning not later than July 1, 1987 to issue an annual capacity report ("ACR") for planning purposes setting forth the projected annual receiving capacity for the DOE facility or facilities. In the 1980s, those reports used an annual steady-state acceptance rate at or near 3000 MTU year. P52 at 7 (1987 ACR: 2650 MTU rate); P54 at 5 (1988 ACR: 3000 MTU Rate); *see also* P59 at 7 (1990 ACR: Upper bounding rate 3000 MTU rate). DOE's most recent ACR, issued in July 2004, projects a steady state acceptance rate of 3000 MTU per year. P1952 at 2.

69. Technically, DOE could have readily accepted and transported 3000 MTU of spent fuel from utilities per year starting in 1998.

– Tr. 1376:18-1377:5; Tr. 1395:8-22 (Stuart) (there are no technical obstacles or impediments to DOE's program accepting and transporting 3000 MTU a year beginning in 1998); Tr. 1389:14-1390:19 (Stuart) (sufficient transportation casks would have been available); Tr. 1427:8-1430:1 (Stuart) (ample transportation resources other than casks, such as railcars, heavy haul trucks and cranes, would have been available to support a 3000 MTU per year acceptance rate); Tr. 1380:16-1383:5 (Stuart) (Western Europe has annually accepted spent fuel, from around the world, and transported it for reprocessing at rates near or in excess of 3000 MTU a year) ("I think this is probably the most convincing evidence that exists that that can be done.").

– Tr. 607:5-18 (Bartlett) ("The kinds of activities that were to be done had been done many times in other circumstances. So it was simply a matter of adapting existing things to the purpose.").

– Tr. 597:21-598:11 (Bartlett) (plan to accept 10,000 MTU per year in Australia).

– (6/28/04) Dep. Desig. 5/8/02 Milner, 275:1-276:9 (DOE could have developed transportation system to handle 3000 MTU within a few years after 1998).

– Tr. 1362:22-1367:3 (Stuart) (plan to accept 3,000 MTU per year at Owl Creek, a proposed spent fuel storage facility).

– Tr. 1430:2-1446:7 (Stuart) (studies performed by NAC for DOE in the early 1990s showed there were no site-specific impediments to achieving a 3000 MTU per year acceptance rate, and ample transportation infrastructure to do so).

70. An annual acceptance rate of 3000 MTU of commercial spent fuel would have been reasonable had DOE begun acceptance from utilities in 1998.

– *See* PFF ¶¶ 57-69 above.

– Tr. 3685:10-16; Tr. 3686:18-22 (Morgan) (DOE should accept spent fuel as fast as it reasonably could, consistent with the intent of Congress).

– Tr. 3748:18-23 (Rusche) (the waste acceptance schedule in the Improved Performance Plan of the 1985 Mission Plan (P95) at 27 showing acceptance of 3,000 MTU per year starting in 1998 was reasonable).

– (6/28/04) Dep. Desig. 5/14/02 Barrett, 120:22-121:10 ("Q. What schedule would DOE have followed had it begun to take SNF from purchasers by January 31, 1998 pursuant to this contract? [objection omitted] A. We would have operated our system . . . at 3000 metric tons per year after five years. That's what we were planning to do.") and ("That's what we would have done if we could have gotten the, you know, the sites approved, et cetera.").

– Tr. 4749:21-4750:6 (Milner).

– Tr. 617:4-22 (Bartlett) (if DOE were to accept much above 3000 MTU per year, then there would be excess capacity: "It's like leaving an airplane sitting at the dock rather than having it flying." But "if you don't have the 3,000, then you're not doing your job with respect to taking this spent fuel from the reactors at an appropriate rate to avoid their [in]curring costs for additional storage.").

– Tr. 646:2-12 (Bartlett) (a reasonable acceptance rate should be a steady state rate in order to make the best use of all the resources and to avoid the expenses and difficulties of downtime and restart).

– (6/28/04) Dep. Desig. 4/22/02 Lake Barrett, 117:1-122:6; (6/28/04) Dep. Desig. 5/10/02 Barrett, at 1333-1334, 1370; *see also* (6/28/04) Dep. Desig. 4/22/02 Barrett, at 52-59 (Deputy Director of OCRWM at the time of his deposition testified that the 3000 MTU rate is a reasonable rate for DOE's performance).

– Tr. 1364:13-21 (Stuart) (Owl Creek planned 3000 MTU per year, "a reasonable receipt rate"); Tr. 1366:15-18 (Stuart).

– *See also* (6/28/04) Dep. Desig. 4/25/02 Klein, 291:2-11 (DOE considers a 3000 MTU rate to be a reasonable rate to run the SNF program).

71. A reasonable acceptance rate for commercial spent fuel would have ramped up to 3000 MTU no slower than annual acceptance in the first six years of program operations of 1200 MTU, 1200 MTU, 2000 MTU, 2000 MTU, 2700 MTU and 3000 MTU.

a. Reasonable spent fuel acceptance should ramp up to the steady state rate as quickly as reasonably possible in order to make the fullest possible use of the resources developed for DOE's acceptance of spent fuel from utilities and to relieve utilities of their costs of storing spent fuel. Tr. 784:8-785:3 (Graves) (noting this "standard principle of economics"); Tr. 618:19-620:18 (Bartlett) (when he was director, OCRWM was trying to achieve a 3000 MTU full performance rate as quickly as possible in order to minimize costs for both utilities and the DOE program; the DOE program can use its funds more effectively with a faster ramp up rate).

b. DOE should have been able to attain a 3000 MTU per year steady state acceptance rate within about three years of starting spent fuel acceptance given the 15-year planning horizon between the formation of the Standard Contracts in 1983 and the January 31, 1998 deadline for spent fuel acceptance, and the ready availability of casks and equipment.

– Tr. 646:13-647:3 (Bartlett).

– Tr. 1364:5-12 (Stuart) (Owl Creek planned a ramp up starting at 1000 MTU the first year and increasing to 3000 MTU per year in the third year).

– Tr. 618:7-18 (Bartlett) (when Dr. Bartlett was director of OCRWM, he anticipated that DOE could achieve a 3000 MTU per year acceptance rate within three years of the start of waste acceptance.

– Tr. 783:4-784:7 (Graves) (reasonableness of this ramp-up rate is shown by its use in DOE documents, including the 1988 Mission Plan Amendment).

– P100 at 19 (1988 Mission Plan Amendment) (using this ramp-up rate).

– P254 at 15 (1999 Civilian Radioactive Waste Management System Requirements Document, Revision 5, projecting this ramp-up rate at centralized interim storage facility); a central storage facility was the sort of facility OCRWM was principally considering using during Dr. Bartlett's tenure as director in light of the repository schedule. Tr. 607:19-608:1 (Bartlett).

c. The parties understood and DOE planned that spent fuel acceptance would begin prior to 1998, such that by 1998 the acceptance rate already would have ramped up.

– Tr. 382:3-19 (Mills) ("[W]e really expected that the program would have started receiving spent fuel or nuclear waste a few years prior to 1998. And ramp up to a 1998 date in which the delivery amount that was due [sic] be accepted by the federal government, was equivalent to that amount discharged from the reactors in that year, plus some amount to work off the backlog. Q. Okay. And what was the basis of that expectation? A. Many discussions that had occurred between myself and members of Congress when we were developing the waste program – or Waste Policy Act. And with individuals within the Department of Energy that worked on that particular program.").

– P95 at 27 (1985 Mission Plan) (showing spent fuel acceptance beginning prior to 1998 and acceptance of 3000 MTU in 1998).

## E. Sequence of Spent Fuel Removal

72. At the time of Contract formation, the parties understood and intended that the Contract's provision concerning "oldest fuel first" ("OFF") would not be the sequence for DOE's actual acceptance of spent fuel, but only (at most) an initial allocation of priority that could be and would be exchanged.

– Tr. 430:10-431:5 (Mills) ("the OFF concept identified that some of the – a relatively small quantity of spent fuel would be allocated to several different locations. And it just did not make sense from running an efficient program to proceed to those particular utilities that had the oldest fuel first and take a small quantity from them and go to another, take a small quantity, go to a third and take a small quantity. That was not an efficient system. And it was known at that time that was not an efficient system."); *see also* Tr. 362:15-363:7 (Mills).

– P1MY, Art. VI.B.1. (provision indicates OFF would only come into play if utilities intended to deliver more spent fuel than system capacity could accommodate).

73. The Contract provides in Article V.E., for exchanges (or "swaps") between or among contracting utilities so that utilities could adjust the initial OFF allocations in a reasonable and efficient manner. P1MY, Art. V.E.

74. At the time of Contract formation, the parties understood and believed that the exchanges clause would "allow the industry to optimize the allocation of . . . waste acceptance capacity to meet individual utility needs without the overt involvement of the department." Tr. 436:17-437:17 (Mills) (agreeing with statement in P145 (1995 letter from OCRWM Director, Daniel Dreyfus, to Yankee Atomic President Andrew Kadak)); *see also* P30 (April 8, 1983 approval memorandum for publication of Standard Contract in Federal Registry), Tab D at 1.

– P31 at 16592 (publication of Standard Contract as final rule in Federal Register) (explains that at the time of formation of the Standard Contracts many utilities requested that an exchanges provision be added to the contracts, and this was one of the few changes to the draft contract made by DOE).

75. Had DOE performed, utilities would have exchanged acceptance allocation consistent with their economic interests and developed an acceptance schedule that tended to optimize or otherwise effectively reallocate acceptance allocations in accordance with industry needs.

– P145 (1995 letter from Dan Dreyfus, OCRWM Director, to Andrew Kadak, President of Yankee Atomic) ("We believe the exchange provision will allow industry to optimize the allocation of waste acceptance capacity to meet individual utility needs without the overt involvement of the Department.").

– Tr. 4204:24-4205:3 (Zabransky) (noting his current agreement with expression in P145 that exchange provision will enable utilities to "optimize allocation of waste capacity.").

– *See* (7/14/04) Dep. Desig. 5/23/02 Brownstein, at 105-106 ("So you can see a natural imbalance to the utilities themselves and the value of receiving fuel at any particular time. And, if there was that imbalance, we assumed, certainly the contract allowed for, you know, a market to develop."); (7/14/04) Dep. Desig. 4/22/99 Slater, 289:20-23 ("I did anticipate that there would be some amount of DCS exchanges.").

a. There is a practice within the nuclear utility industry of finding efficient ways of trading rights and service and obligations to further their economic self-interests. Tr. 1241:18-1242:7 (Collier) (the nuclear utility "industry is fairly creative in the way it goes about its business. And it's certainly motivated to save money or to make money, whichever the case might be, as much as anybody I've ever seen.").

b. Under the contracts between the nuclear industry and DOE for fuel enrichment services, a robust and effective market developed for the exchange of DOE's delivery commitments. Tr. 1235:23-1241:17 (Collier). This successful market for DOE services pre-dated DOE's spent fuel contracts, and the nuclear utilities had a good idea of how the mechanics of the spent fuel exchanges market would operate based on their experience in the market for DOE enrichment services. Tr. 433:14-21 (Mills).

c. Exchanges would have an enormous economic benefit to the utilities, and those savings are very large in comparison to either DOE's costs to consider exchange approval requests or utilities' transaction costs to find trading partners and agree on terms for exchanges.

– Tr. 839:25-841:23 (Graves); Graves Demonstrative 84.

76. DOE would have been reasonable in its approval of exchange requests and DOE approval would not have been an impediment to an exchanges market.

– P30, Tab D (approval memorandum for publication of Standard Contract as a Final Rule) at 1. As the first Acting Director of the SNF reported to the Secretary of Energy at the time of contract formation:

> The majority of the utilities commented that they should have "exchange" or "swapping" rights to ship their SNF and/or HLW to our repository. After consideration, aside from some complex record keeping, this poses no great problem to us, and consequently, we have accepted this suggestion. It will require our approval, and we intend to be reasonable.

P30, Tab D at 1. Tr. 3640:1-10 (Morgan) (interpreting memorandum to mean that DOE would approve exchanges as long as "the fuel met the acceptance requirements").

– Tr. 4776:20-4777:1; Tr. 4777:11-23 (Milner, the Chief Operating Officer of OCRWM) (DOE would have liberally approved exchanges requests involving shutdown utilities).

– P145 (1995 letter from Dan Dreyfus, OCRWM Director, to Andrew Kadak, President of Yankee Atomic) (DOE stated that exchange provision in contracts should enable utilities to "optimize the allocation of waste acceptance capacity to meet individual utility needs, without the overt involvement of the Department.").

– Tr. 4204:24-4205:3 (Zabransky) (noting his current agreement with expression in P145 that exchange provision will enable utilities to "optimize allocation of waste capacity.").

– (7/14/04) Dep. Desig. 5/23/02 Brownstein, at 106 ("we wanted to do as little as possible in interfering with the market"); (7/14/04) Dep. Desig. 6/13/02 Slater, at 125 ("I think it was our intention to accommodate, to the extent practicable, all reasonable requests to exchange.").

a. Exchanges would have had substantial programatic benefits to DOE by reducing the number of different sites that DOE would have had to visit in a year, and creating more, efficient transportation campaigns that would have taken more substantial quantities of SNF at each site visit. Tr. 839:2-24 (Graves); Graves Demonstrative 91; Tr. 362:15-363:7 (Mills); Tr. 4206:25-4207:21 (Zabransky) (exchanges could lead to more efficient transportation of spent fuel than OFF).

b. DOE also would have benefited from exchanges because they would have increased DOE's access to populations of older, cooler fuel, like the fuel at the Yankee Utility plants. Because utilities can deliver any fuel under the DOE contract that is five-year cooled, had DOE performed, utilities would have generally delivered their younger, hotter fuel with their allocations rather than their older, cooler fuel. Tr. 1395:23-1397:3 (Stuart). DOE would have desired to obtain cooler, older fuel because it would be easier

to transport and could be blended with younger fuel to control the heat load of disposal packages at the repository. Tr. 1448:2-1449:21 (Stuart).

77. There are no significant technical or transportation impediments to exchanges by contracting utilities. Tr. 1446:8-1447:8 (Stuart).

78. Accepting spent fuel in an oldest-fuel-first sequence ("OFF") is not a reasonable or efficient schedule for the acceptance of spent fuel from utilities.

– Tr. 430:10-431:5 (Mills) (at time of formation of the Standard Contracts, parties did not expect spent fuel to be accepted according to OFF, because such an acceptance sequence would be inefficient).

– Tr. 621:14-622:8; Tr. 647:19-648:15 (Bartlett) (OFF acceptance would be inefficient because it would require frequent trips to reactors for relatively small quantities of spent fuel); *see* (6/28/04) Dep. Desig. 5/14/02 Barrett, at 176-177 ("It would be inefficient.").

– Tr. 802:16-803:22 (Graves) (OFF would be an economically inefficient acceptance regime).

– Tr. 832:8-833:13 (Graves) (industry-wide, if DOE had started accepting spent fuel at a rate reasonably ramping up to 3000 MTU starting in 1998, utilities would have incurred far greater spent fuel storage costs under OFF acceptance than would have been the case if spent fuel acceptance were based on efficient exchanges of spent fuel acceptance allocations).

– Removal of spent fuel in an OFF order allocation system starting in 1998 at a reasonable acceptance rate would have resulted in a large amount of avoidable storage costs by utilities. Tr. 832:8-9 (Graves); *see* Tr. 831:19-839:1; Tr. 834:20-835:25 (Graves). (In the non-breach world, Mr. Graves calculated that approximately $2.4 billion of additional at-reactor storage costs would have been avoided if the market reallocated acceptance allocations to the utilities that needed them most rather than proceeding on an acceptance schedule based on OFF).

– Tr. 836:1-839:24 (Graves) (showing that the OFF sequence leads to many more trips by DOE to pick up spent fuel than a sequence with exchanges of allocations); *see also* Graves Demonstrative 91.

– (6/28/04) Dep. Desig. 5/14/02 Barrett, at 64 ("Q. [I]s it your understanding that . . . this listing of allocations of oldest fuel first is going to be the actual sequence in which the Department picks up spent fuel from the various contract holders? [objection omitted] A. I doubt it."); at 65 ("most likely" there would be arrangements for more efficient campaigns); *see id*. at 71-72 (from a

cost perspective, it would be in the utilities and DOE's interests to re-arrange the sequence from OFF).

79. If DOE had performed, DOE would have completed removal of all Maine Yankee's SNF in June 2002.

– Tr. 825:10-826:1; 826:23-827:6 (Graves).

– *See* PFF ¶¶ 131-144 regarding GTCC waste.

80. Mr. Graves used highly reliable data to model the exchanges market that would have occurred absent DOE's breach. NAC International, a leading nuclear engineering firm that tracks such information, supplied the pool capacity, discharge data and storage cost data used by Mr. Graves. Mr. Graves also used data from DOE.

– Tr. 944:20-945:2 (Graves).

– Tr. 945:3-5 (Graves).

– Tr. 1034:23-1035:19 (Pennington).

– Tr. 1077:23-1079:15 (Pennington).

**F. <u>Shutdown Priority</u>**

81. The Contract provides for priority acceptance by DOE of SNF removed from a commercial reactor that is permanently shut down. P1MY, Art. VIB.1.

82. If DOE had performed at a reasonable acceptance rate beginning by January 31, 1998, DOE would have provided shutdown priority to Maine Yankee, if necessary, to prevent Maine Yankee from waiting a substantial period of time to complete its decommissioning.

– Tr. 441:24-442:25 (Mills) ("[I]t just seemed reasonable in that the industry would have an ability to decommission shutdown plants and be able to decommission them, return those particular sites to whatever use was appropriate, and to be able to do so in a reasonable time period after they were shut down."

– At the time of formation of the Standard Contracts, the parties understood and expected that DOE would implement priority acceptance of spent fuel and HLW from shutdown reactors, as provided in Article VI.B.1.(b), if and as

necessary to prevent shutdown utilities from waiting a substantial period of time to complete their decommissioning. 48 Fed. Reg. 16590, 16593 (April 18, 1983).

– During the process of developing the Standard Contracts, DOE rejected requests by certain utilities to omit the Article VI.B.1.(b) priority acceptance provision, explaining "[t]his type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity." 48 Fed. Reg. 16590, 16593 (April 18, 1983).

– *See* (6/28/04) Dep. Desig. 5/3/02 Milner, at 418-419 (DOE had an interest in and objective allowing shutdown reactors to timely decommission); *see also* (7/14/04) Dep. Desig. 5/15/02 Barrett, at 339-340 ("I felt that it was in the nation's interests to support utilities like Yankee who were trying to clean up their sites and return that real estate to useful societal purpose in that we should try to move the fuel off as quickly as we practically could, consistent with sound national policies.").

## V. <u>ISFSI DEVELOPMENT</u>

83. DOE did not perform under the Contract as the parties understood and intended it would.

– Tr. 2734:17-2735:3 (Thomas).

– PFF ¶¶ 45-56 above re: parties' understanding and intentions.

– P1952 at 2 (2004 ACR/APR) (showing DOE does not anticipate any acceptance of SNF before 2010).

– PFF ¶¶ 84-92, 96 below re: Maine Yankee's need to build additional at-reactor storage.

84. Beginning soon after the DOE spent fuel contracts were executed, DOE SNF program planning documents and public statements raised concerns within the nuclear utility industry, and among members of Congress, that DOE might be unable or unwilling to meet the January 1998 start date or otherwise to fulfill its contract commitments to utilities regarding acceptance and removal of SNF.

– Tr. 403:5-20 (Mills) (describing concerns raised by low acceptance rates in 1983 draft mission plan and by DOE's failure to meet the statutory deadline [of July 6, 1983 – 180 days following enactment of NWPA, 42 U.S.C. 10132(a) (2000)] for issuing repository siting guidelines); *see* PFF ¶ 43.

– P1925 (November 17, 1983 letter from Members of Congress to Secretary of Energy questioning delayed repository start up date in draft mission plan).

– Tr. 408:9-409:11 (Mills) ("great anxiety" caused by statements by Mr. Morgan at a December 1983 conference, which "did not satisfy our understanding earlier in the year when we signed the contract"); *see also* D1 at 11-12.

85. In the late 1980s and throughout the 1990s, DOE SNF program delays and other events caused contracting utilities, including Maine Yankee, to reasonably believe that DOE would neither (i) commence acceptance of SNF by the January 1998 start date, nor (ii) proceed, after commencing acceptance, on a schedule that was reasonable and consistent with the purpose and intent of the DOE contracts and the NWPA as set forth above.

a. In its June 1987 Mission Plan Amendment, DOE stated it would not begin accepting spent fuel at a permanent repository until 2003, P99 at 6, 10, and in its November 1989 "Reassessment" Report to Congress, DOE stated it did not expect to take spent fuel for disposal at a repository until 2010, P101 at vii, 9-11. *See also* P99 at 61 (noting estimated receipt rate at repository in 2003 of only 400 MTU/year).

b. Although DOE suggested in both P99 and P101 that it still could meet the 1998 start date by accepting spent fuel at an interim storage facility ("MRS"), *see* P99 at 6; P101 at vii-viii, those suggestions lacked credibility. Under the 1987 amendments to the NWPA, an MRS could not be built until after the NRC authorized construction of a repository, 42 U.S.C. § 10168(d)(1), and in the 1989 Reassessment DOE estimated it would not receive construction authorization until 2004, *see* P101 at 10. *See also* P101 at x ("the current linkages between the repository and the MRS program make it impossible for the DOE to accept waste at an MRS facility on a schedule that is independent from that of the repository"), 12 ("If the current statutory linkages to the repository are maintained, an additional delay of 5 years would result, with startup estimated at 2007 for

the basic MRS facility."); Tr. 1718:17-1719:1 (Bennet) (1989 OCRWM report to Congress spelled out numerous operational problems with getting the repository on line and "really did a thorough assessment of the project as being in trouble. In fact, it remarked that the view at the time was that repository operations would be delayed until 2010. So 6 years into the contract, they were looking at a 12-year delay.").

c. By the early 1990s, Maine Yankee understood that the chance of DOE performing its duties under the contract in a reasonable manner was "very much in serious jeopardy." Tr. 2735:18-21 (Thomas).

– D129 at 2 (December 18, 1990 Memo from Jordan to Whittier re: draft report evaluating long term spent fuel storage options, which was "necessitated by the failure of the DOE to meet its contractual obligation to assume timely control of the spent fuel for placement in a repository.").

– Tr. 6256:3-6257:12 (Jordan) (by December 1990, Maine Yankee recognized that "the probability of the successful transfer of fuel to the Department of Energy" on January 31, 1998 "was low.").

– D133 at 1 (February 6, 1991 Memo from Jordan to Maine Yankee Officers re: report evaluating long term spent fuel storage options, which was "necessitated by the inability of the DOE to meet its contractual obligation to assume timely control (*e.g.*, 1998) of the spent fuel for placement in a repository.").

– Tr. 6257:13-20 (Jordan) (Maine Yankee continued to believe in 1991 that there was a "low" probability that DOE would begin acceptance of spent fuel on January 31, 1998).

– Tr. 2866:14-16 (Whittier) (by January 1993, Maine Yankee "did not expect DOE to perform in '98"); *see also* P829 (January 25, 1993 NRC license submittal for third reracking of spent fuel pool at MOF035617, noting that the fuel pool will be full in 1999 and that "[t]he unavailability of a high-level waste repository and lack of assurance that the Federal Government will take possession of the spent fuel by the date that the spent fuel pool is full necessitate the reracking of the pool").

d. In May 1994, DOE stated in a Federal Register notice that it would not be able to begin disposing of spent fuel in 1998 because a repository would not be

operational until, at the earliest, 2010. P951, "Notice of Inquiry," 59 Fed. Reg. 27,007, 27,008 (1994).

e. In May 1995, DOE published its formal position that its obligation to commence spent fuel acceptance by January 1998 was conditional upon the existence of an operating repository or interim storage facility constructed under the NWPA, "Final Interpretation of Nuclear Waste Acceptance Issues," P516, 60 Fed. Reg. 21,793, 21795 (1995), a position DOE had previously articulated in the course of approving delivery dates in delivery commitment schedules "dependent upon the existence of an operational repository or interim storage facility. . . ." D30.18 (transmitting DCS so legended to Yankee Atomic). *See* D218 at YDK007570 (June 1994 response to Yankee Atomic for Secretary O'Leary stating "Department's preliminary view that it has no statutory obligation . . . to accept spent nuclear fuel beginning in 1998 in the absence of an operational repository or other facility constructed under the [NWPA], though such an expectation may have been created through implementation of the Standard Contract").

86. From at least the mid-1980s, no option has been available to Maine Yankee for storage or disposition of its spent fuel other than (a) removal by DOE pursuant to its contract with Maine Yankee, or (b) on-site storage either in its fuel pool or dry storage ISFSI.

– Tr. 2853:5-11 (Whittier) ("In the mid 1980s, … following the second refuelling, we knew that … one or two things would have to happen in the mid to late 1990s, and that is that DOE would have to honor its obligations to begin taking spent fuel in 1998, or Maine Yankee would have to somehow increase its on-site storage capacity or capability for spent fuel.").

– Tr. 3478:1-4 (Kouts) (DOE has no plan to accept commercial spent fuel that does not lead to the repository); Tr. 3522:17-23 (Kouts) (Private Fuel Storage has been trying to get its license for seven years and still does not have it).

87. Because of the anticipated breach by DOE, Maine Yankee began to take steps, in the late 1980s and early 1990s, to arrange a substitute for DOE performance and/or to mitigate the damages it expected as a result of DOE's anticipated failure to perform. This action was reasonable and appropriate.

– *See* testimony and exhibits cited in PFF ¶¶ 84-85 above.

– Tr. 2861:11-2862:2 (Whittier) (Maine Yankee "always considered that there would come a time whe[n] [it] would need to increase storage capacity unless DOE honored its contract obligations. So [Maine Yankee] always had . . . a low-level effort monitoring technology changes and DOE developments. In the late '80s, early '90s, we were projecting that we would need to undertake a project in earnest. And that's the time frame we really began working in earnest to look at the various options that we had available to us at that time to increase storage capability.").

– Tr. 6226:24-6227:5 (Jordan) (stating that an additional, third reracking was considered as a storage option starting in 1989).

– D129 (December 18, 1990 Memo from Jordan to Whittier re: draft report evaluating long term spent fuel storage options).

– D133 (February 6, 1991 Memo from Jordan to Maine Yankee Officers re: evaluating long term spent fuel storage options).

– P1013 (May 3, 2000 letter from OCRWM Director Itkin to Governor King of Maine) (assuring Governor King that the Standard Contracts provide that DOE will accept and dispose of spent fuel that has been stored in accordance with NRC approved proceedings).

– D218 (at YDK007561) (October 4, 1993 letter from Lake Barrett, Acting Director of OCRWM, to Representative Norman Dicks) ("Once the Nuclear Regulatory Commission has certified Sacramento Municipal Utility District's transport-storage system, the Department would be willing to initiate the appropriate actions to include such a system as an acceptable waste form under the terms of the Standard Contract. . . .") (emphasis in original).

88. Beginning in the late 1980s and through the late 1990s, Maine Yankee evaluated alternatives for extended storage of its SNF both on-site and off-site at other than a DOE facility. This action was reasonable and appropriate.

– *See* testimony and exhibits cited in PFF ¶¶ 84-85, 87 above.

– Tr. 2861:11-2865:22 (Whittier) (explaining that beginning in the late 1980s, Maine Yankee evaluated alternative spent fuel storage options including dry storage, off-site storage, fuel consolidation, and reracking).

– D129 (December 18, 1990 Memo from Jordan to Whittier re: draft report evaluating long term spent fuel storage options).

– D133 (February 6, 1991 Memo from Jordan to Maine Yankee Officers re: evaluating long term spent fuel storage options).

– P1456MY (November 3, 1997 Report by Raytheon, "Independent Assessment of Wet v. Dry Spent Fuel Storage" for Maine Yankee).

– D297 (October 8, 1998 Report by David Rivard, "Evaluating Spent Fuel Storage Options").

89. Based on DOE conduct and statements, and other events, Maine Yankee's reasonable uncertainty regarding the date when DOE will commence acceptance of SNF has continued from the early 1990s to the present; and, as a result, it became reasonable for Maine Yankee to believe that DOE would not commence acceptance of SNF until at least 2010, and perhaps never will.

– *See* testimony and exhibits cited above at PFF ¶ 84-85.

– D133 at 1 (February 6, 1991 Memo from Jordan to Maine Yankee Officers re: report evaluating long-term spent fuel storage options, which was "necessitated by the inability of the DOE to meet its contractual obligations to assume timely control (*e.g.*, 1998) of the spent fuel for placement in a repository.").

– Tr. 6257:5-20 (Jordan) (Maine Yankee continued to believe in 1991 that there was a "low" probability that DOE would begin acceptance of spent fuel on January 31, 1998).

– Tr. 2734:17-2735:21 (Thomas) (at the time he joined Maine Yankee in 1991, it was "understood . . . that there was certainly risk that the Department of Energy would not come beginning in 1998 and remove our fuel" and it "was very much in serious jeopardy, that the DOE would actually begin performing under the contract.").

– Tr. 2866:14-16 (Whittier) (by January 1993, Maine Yankee "did not expect DOE to perform in '98"); *see also* P829 (January 25, 1993 NRC license submittal for third reracking of spent fuel pool at MOF035617, noting that the

fuel pool will be full in 1999 and that "[t]he unavailability of a high-level waste repository and lack of assurance that the Federal Government will take possession of the spent fuel by the date that the spent fuel pool is full necessitate the reracking of the pool.").

– Tr. 2865:9-2866:20; Tr. 2936:7-2937:19 (Whittier) (Maine Yankee proceeded with an incremental, phased plan for the reracking of its spent fuel pool in 1991-1997 in order to minimize and, if possible, avoid expenditures for reracking in the event that DOE somehow actually started to accept Maine Yankee's spent nuclear fuel).

– P1456MY (November 3, 1997 Report by Raytheon, "Independent Assessment of Wet v. Dry Spent Fuel Storage" for Maine Yankee) at MPA022574 ("Given . . . the risks of depending on someone else to 'take-over' Maine Yankee's high-level wastes, it appears prudent for MYAPC to assume the spent fuel will remain on-site until a repository is operational. A 2010 date for operation of this first-of-a-kind facility with century-long performance assessments to be accepted for public licensing in a state that has continually contested the selection and delayed the limited progress is clearly (and admitted by DOE) optimistic.").

– Tr. 2746:6-2750:5; Tr. 2754:9-23 (Thomas) (Maine Yankee ensured that its 1998 dry storage contract with Stone & Webster was structured to allow the dry storage project (which was completed in 2004) to be stopped in the event an alternative storage solution, such as DOE removal of the fuel, occurred).

90. Because at least by 1990, and continuing into the present, Maine Yankee reasonably has believed that DOE would not begin accepting SNF until well after January 31, 1998, Maine Yankee concluded in 1991-1992 that the most reasonable, cost-effective method to expand on-site storage capacity to accommodate additional, projected discharges of spent fuel was to rerack Maine Yankee's fuel pool, which occurred in 1992-1997. This action was reasonable and appropriate. *See* PFF ¶¶ 84, 85, 86, 89, 121, 122, 125, 126.

91. After its nuclear plant ceased operation in 1997, Maine Yankee determined that the best and most cost-effective way to store its SNF until DOE accepts and removes that material would be to implement dry storage at its reactor site. This determination was reasonable and appropriate.

– Tr. 2747:16-2748:20; Tr. 2750:6-2752:6 (Thomas) (Maine Yankee chose dry storage because of the "costs associated with establishing a dry cask storage system versus keeping it in wet storage," which showed that dry storage was approximately "$30 million" cheaper than wet storage, and because as a "practical problem . . . you really can't decommission . . . the plant if the spent fuel pool is there.").

– P1456MY (November 3, 1997 Report by Raytheon, "Independent Assessment of Wet v. Dry Spent Fuel Storage" for Maine Yankee) at MPA022570 ("an independent evaluation of the relative costs of the 'Wet Storage' [Spent Fuel Pool Island] ('SFPI') concept and the 'Dry Storage' on-site ISFSI, as a basis for recommendations on which of the two concepts should be pursued for long-term spent fuel storage."); MPA022596 at ¶ 1 ("[T]he ISFSI option provides significant economic (from 31 to 42 million dollars), decommissioning interfacing, and public acceptance benefits."); MPA022596 at ¶ 2; MPA022597 at Figure 7.1; MPA022598 at Figure 7.2. (an ISFSI project started in 1997 would become cheaper than wet storage from 2008 onwards).

92. Maine Yankee continued to evaluate its SNF storage options, and an updated evaluation in 1998 confirmed Maine Yankee's determination that dry storage was the most reasonable and most cost-effective storage method until DOE removes the SNF.

– Tr. 2750:6-20; Tr. 2758:18-2759:19 (Thomas) (the 1997 Raytheon study was updated in 1998 in order to "revisit an important decision and make sure that it was the best course for us to continue on" and utilize the additional cost information provided by the Stone & Webster bid in analyzing the decision to implement dry storage.).

– D297 (October 8, 1998 Report by David Rivard, "Evaluation of Fuel Storage Options") at MOF067652 ("was performed to assess the economic consideration of the wet and dry storage options available to Maine Yankee"); MOF067663-64 ("As before, the dry storage option is the clear economic choice. . . . Economically, based on the assumption used, dry storage is the favorable choice for Maine Yankee long term fuel storage.").

93. In the course of deciding to implement dry storage, Maine Yankee determined to procure and use transportable storage containers that would allow its spent fuel to be readily transported to a DOE facility. This determination was reasonable and appropriate.

– Tr. 2749:13-2750:5 (Thomas) (Maine Yankee chose "a dual purpose transportable dry storage system" with fuel "ready to go and to be shipped" because Maine Yankee "understood that . . . DOE has intended and intends [to] come in and remove the fuel").

– Tr. 3142:16-3144:17 (Meisner) (Maine Yankee uses containers "designed for storage and later transportation.").

– *See also* Tr. 1578:25-1579:17 (Bennet) (Yankee Atomic selected multipurpose containers because: (1) "that was the path that was envisioned by DOE. In fact, they went through a process of going to procure multipurpose casks themselves," and (2) "[b]ut to us, and our stakeholders at Yankee Atomic, the most important issue was, since this fuel was to go to Yucca Mountain, that it, indeed, be transportable.").

– *See also* Tr. 1603:25-1607:25 (Bennet) (discussing DOE's 1994 initiative to procure multipurpose canisters ("MPCs")); Tr. 1607:9-18 (Bennet) (that after cancellation of that procurement Yankee Atomic "made the immediate calculation that the MPC was the way that DOE intended to get fuel out to Yucca Mountain. So we specifically adopted the MPC specification as the main part of our request for proposal.").

– Tr. 1355:21-1356:15 (Stuart) (in early 1990s, DOE Secretary Watkins believed multipurpose canisters were a "good idea").

– Tr. 1358:2-21 (Stuart) (listing advantages of multipurpose canisters).

– Tr. 1360:24-1361:6 (Stuart) ("I believe everyone in the industry at that point in time [early 1990s] felt that the handwriting was on the wall by DOE that MPC concept would be the acceptable way for the program to progress.").

– Tr. 1361:7-10 (Stuart) (the industry's reaction to what DOE was announcing "was to begin designing MPC type systems.").

94. In the course of implementing dry storage, Maine Yankee determined that the best and most cost-effective way to store its spent fuel assemblies that are classified as failed or damaged would be to either reconstitute the assemblies or place them in special containers, and in either case to then store the reconstituted or canned assemblies in the same dry storage canisters and casks as intact assemblies. This determination was reasonable and appropriate.

– Tr. 3153:1-3159:21 (Meisner) (damaged or failed fuel assemblies "are pretty rugged things. In fact, those little defects we found, like greater than pinhole leaks or greater than hairline cracks, really as a practical matter have no effect on the structural stability of these assemblies." "[A]bsolutely no special handling" is needed and assemblies are handled by a "crane or bridge that moves over the spent fuel pool. And it has a grapple that goes down and mechanically interacts with the top of the assembly and simply lifts it out of the rack and puts it into a cell in the canister. The only difference between damaged and undamaged

is, if we have a damaged assembly, we would have, before we moved it, put into the store – the dual-purpose canister in one of those slots this thin metal can. That would go in first, and then we would simply move the damaged assembly over and put it down within the can within the canister."); *see also* Tr. 6936:8-6938:7 (Meisner) (same).

95. In the course of deciding to implement dry storage, Maine Yankee determined that the best and most appropriate way to store its GTCC waste, including such waste derived from reactor internals, would be to arrange for storage of such waste in the same dry storage canisters and casks as its spent fuel. This determination was reasonable and appropriate, particularly given Maine Yankee's reasonable understanding that GTCC waste would be disposed in the DOE repository and that DOE was obligated by the statute and Contract to remove GTCC waste with the spent fuel.

– Tr. 3150:19-3151:1 (Meisner) (it is Maine Yankee's "understanding … that, ultimately, the Department of Energy is obligated to remove and dispose of Maine Yankee's [GTCC] waste," "but in the interim" Maine Yankee is storing its GTCC waste until removal by DOE.).

– Tr. 3151:2-3152:25 (Meisner) (Maine Yankee decided to store its GTCC waste in the same "dual-purpose" storage and transportation canisters as its spent fuel and HLW because Maine Yankee "expected that, as a matter of prudency and responsibility, the government would take … the most responsible and economic approach to taking this material off site. And I think it is a pretty universal view that the most cost-effective and efficient way to do that is to take advantage of the transportation systems that the government has set up for [spent] fuel, [and] there would be no difference for Greater Than Class C waste[, such that DOE could] take the GTCC along with the fuel.").

– Tr. 3149:21-3150:18 (Meisner) (the GTCC waste generated at Maine Yankee mainly consists of reactor internals).

96. If the DOE had performed under its Contract with Maine Yankee, Maine Yankee would not have implemented dry storage for its SNF.

– *See* testimony and exhibits cited at PFF ¶¶ 83-95.

– Tr. 2746:6-2749:17 (Thomas) (Maine Yankee implemented dry storage because "Maine Yankee had to deal with the spent fuel because the

Department of Energy was not picking it up" pursuant to its contract with Maine Yankee).

– Tr. 2734:17-2735:21 (Thomas) (at the time he joined Maine Yankee in 1991, it was "understood . . . that there was certainly risk that the Department of Energy would not come beginning in 1998 and remove our fuel" and it "was very much in serious jeopardy, that the DOE would actually begin performing under the contract.").

– Tr. 7345:4-14 (Smith) ("[I]f the DOE would have shown up on site at Maine Yankee and removed the fuel in the committed time frame per the contract, there would have been no need to even construct the ISFSI or to transfer fuel. . . . [T]he real point, the real fact is that if the DOE would have performed according to their contract, it would never have been a need to construct an ISFSI or move spent nuclear fuel.").

97. Implementation of dry storage at Maine Yankee was incremental and structured to maintain flexibility in the event that viable alternative storage options became available.

– Tr. 2748:21-2749:12; Tr. 2753:8-2754:23 (Thomas).

98. Maine Yankee decided to implement decommissioning and dry storage through a decommissioning and operator control ("DOC").

99. The process, which followed site characterization, was isolation of the spent fuel pool in a "spent fuel island."

– Tr. 2746:12-24 (Thomas) (after the permanent shutdown decision in August 1997, the first two projects were site characterization followed by spent fuel pool islanding).

100. The overall decommissioning contract included an agreement for a fully constructed and fully loaded ISFSI.

– Tr. 2753:3-7 (Thomas) (decommissioning contract included the ISFSI).

– Tr. 2752:10-2753:2; Tr. 2754:24-2756:21 (Thomas) (the bid and selection process for Maine Yankee's DOC).

– Tr. 2756:22-2757:22 (Thomas) (financial protections included in the contract, including performance bonds, payment bonds, and review of financials).

– Tr. 2758:18 (Thomas) (signing of contract).

101. By the end of February 2004, Maine Yankee's ISFSI was completed and fully loaded with all of Yankee Atomic's spent fuel and GTCC waste.

– Tr. 2770:11-17 (Thomas).

– Tr. 3149:15-20 (Meisner).

– Tr. 6890:21-24 (Meisner).

102. Maine Yankee acted reasonably and appropriately in contracting for the design, licensing, fabrication and loading of its dry storage canisters and casks and the construction of its ISFSI, in overseeing and managing the contractors selected to perform these tasks, in performing certain related tasks directly through employees, and in incurring the costs needed to accomplish these tasks.

– *See* PFF ¶¶ 87-101 above.

## VI. <u>RERACKING</u>

103. From 1992 to 1997, Maine Yankee expanded its on-site storage capacity for spent fuel by choosing to rerack its spent fuel pool for the third time.

– Tr. 2848:20-2849:2 (Whittier) (while employed at Maine Yankee, Doug Whittier knew that Maine Yankee performed a second reracking in the 1983 to 1990 period, and that he was involved with the subsequent "third reracking and the events that led up to the third reracking."); *see also* Tr. 6246:5-9 (Jordan) (noting that the Maine Yankee pool was reracked "three times.").

104. Reracking is the removal and replacement of storage racks in the fuel pool with racks of higher density, creating more compact storage of fuel assemblies, which allows more fuel assemblies to be stored in the pool.

– Tr. 2849:3-10 (Whittier) ("[R]eracking is … changing out the racks that are in the spent fuel pool in order to increase the storage capacity for spent fuel assemblies in the spent fuel pool."); *see also* Tr. 2590:6-9 (Mellor); Tr. 1552:22-1553:8; Tr. 2306:16-25 (Bennet).

> – Tr. 6243:10-24 (Jordan) (high-density racks that "could pack the fuel assemblies very close together" only became available in the mid-1990s).

105. From at least the mid-1980s, no option has been available to Maine Yankee for storage or disposition of its spent fuel other than (a) removal by DOE pursuant to its contract with Maine Yankee, or (b) on-site storage at Maine Yankee.

> – Tr. 2853:5-11 (Whittier) ("In the mid 1980s, … following the second refuelling, we knew that … one or two things would have to happen in the mid to late 1990s, and that is that DOE would have to honor its obligations to begin taking spent fuel in 1998, or Maine Yankee would have to somehow increase its on-site storage capacity or capability for spent fuel.").

106. In the mid-1980s, Maine Yankee reasonably believed that it was possible that DOE would perform under its contract with Maine Yankee to remove spent fuel and thus avoid the need to increase on-site storage capacity.

> – Tr. 2861:14-21 (Whittier) (Maine Yankee "always considered that there would come a time where we would need to increase storage capacity unless DOE honored its contract obligations. So we always had … a low-level effort monitoring … DOE developments.").

107. Maine Yankee deferred any decision committing it to any expansion of on-site storage space for as long as reasonably possible in order to provide DOE with every opportunity to perform pursuant to its contract with Maine Yankee, thus allowing Maine Yankee to minimize and defer the significant cost of expanding on-site storage capacity, to monitor improvements in the technology for storing spent fuel assemblies, and to fulfill its frugal operating philosophy.

> – Tr. 2853:19-2855:4 (Whittier) ("What we decided to do is wait as long as possible before committing to any additional on-site storage capability or projects. And that had really a couple of benefits. It would defer expenditures. It would allow us to monitor changes in technology with respect to spent fuel storage. And, also, it would give DOE every opportunity to perform under their contractual obligations to pickup fuel in '98 … . Maine Yankee was very frugal. We did not like to spend money that we judged to be unnecessary. We prided ourselves in providing low-cost, efficient power. That was important to us … .").

108. In the late-1980s to early-1990s, Maine Yankee began to take steps to arrange a substitute for DOE performance and/or to mitigate the damages it expected as a result of DOE's anticipated failure to perform. This action was reasonable and appropriate.

– Tr. 2861:14-2862:2 (Whittier) ("In the late '80s, early '90s, we were projecting that we would need to undertake a project in earnest. And that's the time frame we really began working in earnest to look at the various options that we had available to us at that time to increase storage capability.").

– Tr. 6226:24-6227:5 (Jordan) (an additional, third reracking was considered as a storage option starting in 1989); Tr. 6225:20-6226:5 (Jordan) (Robert Jordan was the project manager for Maine Yankee's third reracking, and he reported to Mr. Whittier).

– D129 (December 18, 1990 Memo from Jordan to Whittier re: draft report evaluating long term spent fuel storage options).

– D133 (February 6, 1991 Memo from Jordan to Maine Yankee Officers re: evaluating long term spent fuel storage options).

109. In the late-1980s to early-1990s, when Maine Yankee began to take steps to arrange a substitute for DOE performance and/or to mitigate the damages it expected as a result of DOE's anticipated failure to perform, Maine Yankee planned to continue as an operating reactor until the end of its license life in October 2008.

– Tr. 2735:22-2736:12 (Thomas) (Maine Yankee fully expected to continue operations to the end of its operating license, which would have expired in October 2008).

– Tr. 2910:8-24 (Whittier) (Maine Yankee expected the plant to continue operations).

– Tr. 6240:8-11 (Jordan) (when he was project manager for reracking, Maine Yankee did not have any understanding that it would shutdown permanently in 1997).

110. In the late-1980s to early-1990s, because it planned to continue operations at least until October 2008, Maine Yankee's primary on-site storage concern was "to make sure [it] had enough room for the spent fuel in the pool." Tr. 2735:22-2736:12 (Thomas).

– *See also* D133 (February 6, 1991 Memo from Jordan to Maine Yankee Officers re: evaluating long term spent fuel storage options) at MOF024133 ("One of the challenges confronting Maine Yankee in the next several years is the provision of adequate storage space for the spent fuel residing in the spent fuel pool.").

111. During its operating history Maine Yankee always maintained sufficient capacity in its fuel pool (known as "full core reserve") in order to be able to discharge into the fuel pool all fuel assemblies in the reactor core.

– Tr. 2850:14-21 (Whittier) ("There's a concept called full core reserve, and that was a concept where we made an effort to make sure that we had sufficient space in the spent fuel pool to temporarily discharge the fuel that was in the reactor if that was necessary for, typically for maintenance reasons. Again, that would be a temporary discharge. And the fuel was meant to go back into the reactor.").

– Tr. 2856:13-25 (Whittier) ("Maine Yankee also believed that it was a prudent business decision . . . to maintain full core offload capability . . . . If you were to lose the ability to offload the core, and a need came up to offload the core for a maintenance reason, then the plant might not be able to operate.").

– D133 (February 6, 1991 Memo from Jordan to Maine Yankee Officers re: evaluating long-term spent fuel storage options) at MOF024133 ("the urgency of" storage space in the pool "is exacerbated by the fact that Maine Yankee will lose the capacity to fully discharge the active core to the spent fuel pool" in the future).

– *See also* Tr. 2671:17-2672:2; Tr. 2676:14-17 (Heider) (Yankee Atomic also maintained full core reserve).

112. Maintaining full core reserve so that the fuel assemblies in the reactor core can be discharged into the fuel pool allows the reactor to be maintained and repaired when necessary.

– Tr. 2850:14-19; Tr. 2856:13-25 (Whittier) (*see* quotes above at PFF ¶ 111).

– Tr. 6229:6-18 (Jordan) ("The full core reserve concept permits us to unload the entire core from the reactor vessel to the spent fuel pool if, for some reason, we need to perform maintenance activities or repair activities to the reactor vessel itself. The spent nuclear fuel in the vessel being so radiologically hot as to preclude those activities.").

– Tr. 5430:23-5431:20 (Abbott) ("… there may be times when you need to offload all of those assemblies into the spent fuel pool. So that amount of space is reserved for fully offloading the core, hence the word 'full core reserve' … . There is an obvious operational need to maintain that space, so that maintenance can be done on the reactor vessel, so there's no argument there.").

– Tr. 2591:19-2592:3; Tr. 2592:8-17 (Mellor) (maintaining full core reserve is necessary in the event repairs need to be performed in the reactor.).

113. The Nuclear Regulatory Commission ("NRC") has stated that it prefers nuclear utilities to maintain full core reserve capability, and NRC in-service inspections conducted every 10 years require the discharge of all fuel assemblies in the core. But maintenance of full core reserve capability is not required.

– Tr. 2856:13-17 (Whittier) ("NRC did not require that we maintain full core offload capability, but they did state it as a preference.").

– Tr. 2857:18-21 (Whittier) ("certain inspections that are required by the NRC that require full core offload" include "[i]n-service inspections . . . every 10 years.").

114. During its operational life, Maine Yankee actually did discharge all of the fuel assemblies in its core to repair the core's thermal shield and for inspections of the reactor vessel.

– Tr. 2857:11-17 (Whittier) ("We conducted repairs to the thermal shield, and that required offload of a core. And we also did inspections of the reactor vessel that required . . . offloading of the core.").

115. In order to determine when Maine Yankee would have to undertake an expansion of storage capacity in its pool, Maine Yankee monitored at every refueling cycle the discharge of spent fuel assemblies from the core into the spent fuel pool, and projected future discharges of spent fuel assemblies into the spent fuel pool.

– Tr. 2855:5-2856:6; Tr. 2857:22-2860:10 (Whittier) ((1) calculation of projections of future discharges of spent fuel from the reactor, (2) technical improvements allowing smaller reload batches and higher burnups of spent fuel allowed for smaller discharges of spent fuel into the pool, thus pushing out the date it would become full, and (3) Maine Yankee's 1995 plant shutdown for the repair of its steam generator tubes increased the pool's "capacity factor," also pushing out the date it would become full.); *see also* Tr. 2869:24-2870:7

(Whittier) (explaining that the 1995 plant shutdown for repair of the steam generator tubes caused "a one year, one refueling cycle" delay).

116. Maine Yankee's discharge projections based on January 1993 and January 1996 fuel cycle data demonstrated that Maine Yankee would lose full core reserve in May 1997.

– Tr. 2851:19-2852:14 (Whittier) (discharge of fuel assemblies from June 1974 to May 1997).

– Tr. 2857:22-2860:10; Tr. 2860:15-2861:10 (Whittier) (Maine Yankee's projected date for losing full core reserve was pushed out from September 1996 to May 1997 by (a) technical improvements that allowed smaller reload batches and increasing burnups of spent fuel and (b) Maine Yankee's 1995 plant shutdown for the repair of its steam generator tubes.); *see also* Tr. 2869:24-2870:7 (Whittier) (explaining that the 1995 plant shutdown for repair of the steam generator tubes caused "a one year, one refueling cycle" delay).

– Tr. 2850:6-21 (Whittier) (the capacity of the pool before the third reracking).

117. Maine Yankee would not have reracked its spent fuel pool if DOE had been making reasonable progress toward performing its spent fuel acceptance obligations under the Contract in the 1980s and early 1990s.

– Tr. 2870:17-2871:14 (Whittier) ("If we had believed that DOE was going to perform its contract obligations, we would not have performed the third reracking" because "additional storage beyond – capability . . . beyond what we already had, assuming that DOE was going to perform, was not required," but instead Maine Yankee would have used "the temporary rack … that we were licensed to use [to] provide[] sufficient additional storage such that the full core could have been offloaded on a temporary basis, should it have been required.").

– Tr. 6259:22-6260:5 (Jordan) ("If the Department of Energy was going to be coming and picking up the fuel, and we were confident that we knew what that schedule was, then in all probability, we would have accepted the loss of full core discharge and we would have accepted the use of the temporary rack in the cask pit area and be able to have waited for the Department of Energy to alleviate the storage problem in the spent fuel pool.").

– Tr. 6256:3-6257:20 (Jordan) (stating that Maine Yankee pursued alternative storage options because "we recognized at that time . . . the probability of the successful transfer of fuel to the Department of Energy was low.").

– Tr. 2866:14-16 (Whittier) (by January 1993, Maine Yankee "did not expect DOE to perform in '98"); *see also* P829 (January 25, 1993 NRC license submittal for third reracking of spent fuel pool at MOF035617, noting that the fuel pool will be full in 1999 and that "[t]he unavailability of a high-level waste repository and lack of assurance that the Federal Government will take possession of the spent fuel pool by the date that the spent fuel pool is full necessitate the reracking of the pool").

118. If DOE had been making reasonable progress toward performing its spent fuel acceptance obligations under the Contract in the 1980s and early 1990s, so as to give Maine Yankee reasonable confidence that DOE would perform its spent fuel acceptance obligations under the Contract, Maine Yankee would have procured a temporary rack capable of holding 30 spent fuel assemblies to maintain full core offload capacity.

– Tr. 2870:17-2872:10; Tr. 2873:5-24; Tr. 2874:20-25; Tr. 2904:10-2906:17 (Whittier) (January 1993 and January 1996 fuel data projections confirm that only a temporary rack would have been necessary if there had been confidence that DOE would have fulfilled its contractual obligations.).

– Tr. 6259:22-6260:5 (Jordan) ("If the Department of Energy was going to be coming and picking up the fuel, and we were confident that we knew what that schedule was, then in all probability, we would have accepted the loss of full core discharge and we would have accepted the use of the temporary rack in the cask pit area and be able to have waited for the Department of Energy to alleviate the storage problem in the spent fuel pool.").

– Tr. 6257:21-6259:8 (Jordan) (a temporary rack would have been used if it had been needed).

119. Maine Yankee's operating license allowed the manufacture and use of a temporary rack for up to 121 assemblies.

– Tr. 2850:12-13; Tr. 2872:5-8; Tr. 2906:13-17 (Whittier); *see also* Tr. 6234:6-10; Tr. 6244:9-6245:3 (Jordan) (explaining why Maine Yankee had a license for a temporary rack).

120. The cost of a 30-assembly temporary rack would have been $115,000.

– Tr. 2875:13-2876:7 (Whittier).

121. Because at least by 1990, and continuing through 1997, Maine Yankee reasonably believed that DOE would not begin accepting spent fuel until well after January 31, 1998, Maine Yankee concluded that the most reasonable method to expand on-site storage capacity to accommodate additional, projected discharges of spent fuel was to rerack Maine Yankee's fuel pool.

– Tr. 2870:17-23 (Whittier) ("If we had believed that DOE was going to perform its contract obligations, we would not have performed the third reracking").

– Tr. 2861:14-2865:22 (Whittier) (explaining why other spent fuel storage options, such as dry storage, off-site storage, and fuel consolidation, were rejected and reracking was selected).

– Tr. 6256:3-6257:20 (Jordan) (stating that Maine Yankee pursued alternative storage options because "we recognized that … the probability of the successful transfer of fuel to the Department of Energy was low.").

– Tr. 2899:5-15 (Whittier) (stating that the Maine Yankee Board of Directors approved the decision to rerack the spent fuel pool a third time in 1991-1992.).

122. Maine Yankee commenced the reracking project in the 1992-1993 timeframe.

– Tr. 6226:18-21 (Jordan).

123. Maine Yankee proceeded with an incremental, phased plan for the reracking of its spent fuel pool in order to minimize and, if possible, avoid expenditures for reracking in the event that DOE somehow actually started to accept Maine Yankee's spent nuclear fuel. Maine Yankee, therefore, structured the reracking project so that the company could stop the project at any time, especially at a major phase, such as completion of licensing, completion of final design, the completion of fabrication of the racks, and prior to installation of the racks.

– Tr. 2865:9-2866:20; Tr. 2936:7-2937:19 (Whittier).

124. Maine Yankee submitted its licensing submittal, entitled "Proposed Revisions to Technical Specification Change No. 177: Maine Yankee Spent Fuel Pool Reracking," to the

U.S. Nuclear Regulatory Commission on January 25, 1993, to gain approval for the reracking of its spent fuel pool and requested approval to expand the spent fuel pool's storage capacity from 1,417 assemblies to 2,019 assemblies.

– P829 (licensing submittal to NRC, at MOF035571).

– Tr. 2866:21-2867:16 (Whittier).

125. After receiving NRC approval, *see* Tr. 2869:13-15 (Whittier), Maine Yankee first finalized the design of the new spent fuel assembly racks, had the racks fabricated beginning in 1994, Tr. 6226:22-23 (Jordan), and had the racks installed, Tr. 2869:16-23 (Whittier).

126. Maine Yankee commenced the installation of racks after the initial shutdown of the reactor in December 1996 and terminated the installation in August 1997, when Maine Yankee decided to permanently shutdown.

– Tr. 2870:8-16; Tr. 2909:21-2911:6 (Whittier) (after the December 1996 shutdown, Maine Yankee commenced reracking because "it was our intent at that point in time, our expectation that the plant would continue to operate;" and, that "reracking was stopped" after the August 1997 decision to permanently shutdown the plant.); *see also* Tr. 6227:6-9 (Jordan) (stating reracking ended after the August 1997 decision to "permanently cease operations.").

– Tr. 2737:5-2739:20 (Thomas) (Maine Yankee permanently shutdown in August 1997).

127. Maine Yankee incurred costs of $10.3 million to perform the third reracking of its spent fuel pool.

– Tr. 2780:14-18 (Thomas) (the "total project" cost for the third reracking was "10.3 million."); *see also* Tr. 6240:21-24 (Jordan) (agreeing that "Maine Yankee incurred costs totalling $10.3 million to create space for 576 additional assemblies.").

– P1731MY (Maine Yankee Spent Fuel Reracking Costs); Tr. 2780:19-2782:15 (Whittier) (P1731MY is "a summary of our accounting of the reracking costs, as indicated, through February of 1998" and is a summary of "the project records where employees, for example, would co-run their time sheets, time … that was spent on the reracking project and purchase orders that were used to

work on the reracking project. This is really the summary of the culmination of those entries.")

128. Maine Yankee would not have incurred the reracking costs of $10.3 million if DOE had been making reasonable progress toward performing its spent fuel acceptance obligations under the contract in the 1980s and early 1990s.

– Tr. 2870:17-2871:14 (Whittier) ("If we had believed that DOE was going to perform its contract obligations, we would not have performed the third reracking" because "additional storage capacity . . . beyond what we already had, assuming that DOE was going to perform, was not required," but instead Maine Yankee would have used "the temporary rack . . . that we were licensed to use [to] provide[] sufficient additional storage such that the full core could have been offloaded on a temporary basis, should it have been required.").

– Tr. 6259:22-6260:5 (Jordan) ("If the Department of Energy was going to be coming and picking up the fuel, and we were confident that we knew what that schedule was, then in all probability, we would have accepted the loss of full core discharge and we would have accepted the use of the temporary rack in the cask pit area and be able to have waited for the Department of Energy to alleviate the storage problem in the spent fuel pool.").

## VII. GTCC WASTE

129. During decommissioning, Maine Yankee segmented activated metal from near the reactor core, sometimes called "reactor internals," which is classified as greater-than-Class C ("GTCC") waste.

– Tr. 3149:21-3150:23 (Meisner).

– Tr. 1565:10-1566:17 (Bennet).

– Tr. 5557:8-5558:1 (Abbott).

– *See also* P1910 at HQR165 0190 (activated metal is "from the decommissioning of commercial nuclear power plants"); (7/14/04) Dep. Desig. 6/13/02 Campbell, 47:24-48:16.

130. GTCC waste from the segmentation of Maine Yankee's reactor internals is highly radioactive material.

– P1785 (NRC letter to Senator Lieberman) (characterizing Connecticut Yankee's GTCC waste as "highly radioactive").

– Tr. 3150: 5-18 (Meisner) ("these metals were themselves very highly radioactive").

– Tr. 5937:17-20 (Abbott) ("Q: GTCC waste from commercial reactors is highly radioactive? A: Yes."); Tr. 5557:21-23 (Abbott) (during generation, the reactor internals "become highly activated").

– *See also* P1911 at HQR-164-0053 (Draft March 21, 2002 memorandum for the Secretary) ("The largest portion of GTCC consists of highly radioactive metal from commercial nuclear power plants").

**A. <u>Maine Yankee's GTCC Waste Is Covered By the Contract.</u>**

131. Congress intended that the NWPA, and the geologic repositories contemplated by the NWPA, would be the solution for disposal of highly radioactive utility waste other than spent fuel that did not otherwise have a disposal path.

a. In the NWPA, Congress found that "*radioactive waste* creates potential risks and requires safe and environmentally acceptable methods of disposal." 42 U.S.C. § 10131(a)(1) (2000) (emphasis added).

b. Congress found that a "national problem" had been created by the accumulation of spent fuel and the accumulation of radioactive waste from reprocessing and "other sources." 42 US.C. § 10131(a)(2) (2000).

c. Congress recognized that "Federal efforts during the past 30 years to devise a permanent *solution* to the problems of civilian radioactive waste disposal have not been adequate. 42 U.S.C. § 10131(a)(3) (2000) (emphasis added).

d. Congress defined "disposal" in the NWPA to include "emplacement in a repository of high-level radioactive waste, spent nuclear fuel, or *other highly radioactive material*. . . ." 42 U.S.C. § 10101(9) (2000) (emphasis added).

e. In the NWPA, Congress defined "disposal package" as a container that holds "solidified high-level radioactive waste, spent nuclear fuel, *or other* radioactive materials. 42 U.S.C. § 10101(10) (2000) (emphasis added).

f. In the NWPA, Congress defined HLW broadly to include – in addition to spent fuel and the highly radioactive byproducts from reprocessing – "other highly radioactive material" that the NRC "determines by rule requires permanent isolation." 42 U.S.C. § 10101(12) (2000).

g. Disposal in a repository constitutes permanent isolation. (6/28/04) Dep. Desig. 4/25/02 Klein, 440:14-19 (Rule 30(b)(6) witness) (disposal in repository would constitute permanent isolation); (7/14/04) Dep. Desig. 6/14/02 Campbell, 444:20-445:3 (similar); *see also* P1157 (contractor-generated document) at IDF017 0305 (1995 analysis by the National Low-Level Waste Management Program of statutory and regulatory provisions pertinent to co-disposal of GTCC waste with HLW).

132. At the time of Contract formation, the parties understood that decommissioning would generate waste from the reactor internals that would have been exposed to intense radiation and achieved levels of radioactivity too great to permit their burial in the low-level waste disposal facilities that were the responsibility of the states. Tr. 450:17-451:2 (Mills).

133. Although the terminology "GTCC waste" had not yet been identified at the time of Contract formation, the industry, Tr. 449:11-14 (Mills), understood that DOE would remove from utility sites and dispose of in the repository(ies) all highly radioactive waste that needed to be disposed of in a repository.

> – Tr. 454:11-23 (Mills) ("We knew that any waste with a radioactivity Greater Than Class C was the responsibility of the federal government. . . . We had thought at the time of the contracts that any of those wastes would go to the geologic repository"); Tr. 450:20-451:2 (Mills); *see also* Tr. 451:21-452:4; Tr.

451:3-20 (Mills) (the LLWPAA and NWPA "indicated the mechanism and the responsibility for the disposal of all radioactive waste from commercial power operation").

134. The Low Level Radioactive Waste Policy Amendments Act of 1985 ("LLRWPAA") codified and confirmed the federal government's responsibility for the disposal of all GTCC waste from all sources, including that arising from the nuclear utilities' decommissioning. 42 U.S.C. § 2021c(b)(1)(D) (2000); *see generally*, P1047 at iii (DOE's statutorily-required, 1987 Report to Congress and the President ("1987 GTCC Report to Congress") ("Under paragraph 3(b)(1) of the Act . . . the Department of Energy has responsibility for the disposal of . . . [GTCC waste].").

135. From the enactment of the LLRWPAA until the present, DOE has intended and planned to dispose of utilities' GTCC waste along with the utilities' spent fuel in the repository.

– P1972 at HQR-077-0671 (OCRWM Director Ben Rusche's comments to the 1987 GTCC Report to Congress: "It is our present intent that reactor hardware would be disposed of in the repository.").

– P1089 at 2 (senior NRC official Robert Bernero July 23, 1990 letter to OCRWM Director Bartlett) (NRC sees "little benefit" in developing a regulatory alternative path, and "[w]e believe that it is much more reasonable now to use the planning assumption that residual capacity at the HLW repository can accommodate much or perhaps all of the GTCC waste.").

– Tr. 627:3-628:4 (Bartlett) (Bartlett and Bernero "concurred that it would be easy to dispose of [GTCC] waste" in the planned Yucca Mountain repository because "it exists in very small quantities.").

– P1139 at YDK012782 (DOE December 20, 1994 letter to Yankee Atomic) (DOE's analyses of its GTCC waste program strategy "strongly suggested that the Department should consider co-disposal of utility-generated [GTCC] waste in the geologic repository being developed by the Department for disposal of high-level radioactive waste and spent nuclear fuel").

– P1144 at 2 (DOE memorandum authorizing publication of the 1995 Federal Register Notice regarding DOE's preferred strategy for GTCC waste) ("it appears that a dedicated GTCC LLW disposal facility cannot be justified by the volume of the waste or the hazard it presents.").

– 60 Fed. Reg. 13424, 13425 (DOE's March 13, 1995, publication in the Federal Register of its "tentative selection of a strategy for GTCC LLW management and disposal," identifying "co-disposal of GTCC LLW with spent nuclear fuel and high-level waste in a geologic repository as the preferred co-disposal option."); Tr. 4421:25-4422:10 (Huizenga) (agreeing that this notice appears to reflect DOE's policy at the time).

– P1155 at YDK012703 (DOE June 1995 presentation slides produced from Yankee Atomic's files, stating "Pursue co-disposal of GTCC LLW in a geologic repository.").

– P1280 at i & 13 (1995 GTCC Waste Management Plan) ("co-disposal with high-level radioactive waste (HLW) and spent fuel in a repository is the most viable disposal option").

– P1298 at HQR141 0151 (1999 GTCC Waste Management Plan) ("The strategy also supports DOE's long term approach to dispose of GTCC LLW in a geologic repository"); *id.* at HQR-065-0462 ("DOE's long-term solution for the disposal of GTCC LLW is the same as that for spent nuclear fuel . . ."); *see also* Tr. 4410:6-4411:2 (Huizenga) (1999 Plan was an update of the 1995 Plan).

– P1654 (June 22, 1999 teleconference summary reflecting that within DOE "there is an understanding between GC, RW, and EM that GTCC waste will go to the repository"); (7/14/04) Dep. Desig. 1/29/03 Campbell, 606:18-610:23, 615:2-9 (confirming that DOE official Mr. Frei stated that there was an understanding that GTCC waste would go to the repository and directing that other options not be pursued); *see also* (6/28/04) Dep. Desig. 4/25/02 Klein, 499:3-20 (DOE's Rule 30(b)(6) witness) (admitting that at the policy level an understanding exists that GTCC will go to the repository, if authorized, and DOE expects that it will have such authority).

– P1658 at NRC004 0090 (DOE September 1, 1999 presentation to NRC) (identifying repository disposal as the long-term disposal option).

– P1909 at HQR165-0179 to HQR165-0180 (Memorandum for the Secretary from Patrice Bubar's files) ("it appears that the NRC and Congress anticipated that the GTCC wastes would ultimately be disposed of in the RW-managed repository – *i.e.*, no other licensed repository has been authorized by Congress for siting").

– P1911 at HQR165-0053 (March 21, 2002 DOE draft memorandum for the Secretary) (Utility GTCC waste "has a number of similarities to SNF and is best suited for disposal in the proposed repository").

– P1909 at HQR165-0181 (within DOE, OCRWM "has taken the position that, *other than* activated metal from commercial reactors, it cannot accept GTCC wastes within the repository") (emphasis added).

136. Knowledgeable participants in the nuclear utility industry have understood, at least from the enactment of the LLRWPAA to the present time, that disposal of utility GTCC waste was a DOE responsibility and that DOE would fulfill that responsibility by disposing of the utility GTCC waste at a repository.

– Tr. 454:11-21 (Mills) ("We knew that any waste with a radioactivity Greater Than Class C was the responsibility of the federal government. . . . We had thought at the time of the contracts that any of those wastes would go to the geologic repository").

– Tr. 4947:13-16 (Kadak) ("the responsibility for GTCC is clearly DOE's, but the definition, if you connect the dots, okay, it will lead one to conclude it has to go into a repository . . ."); Tr. 4951:12-15 (Kadak) ("And I made a recommendation that, why doesn't the NRC simply, in its regulations, declare it as high level waste because it will ultimately end up in the repository anyway?").

– Tr. 5927:7-9 (Abbott) ("There's a greater than .5 probability that the GTCC waste will go to Yucca Mountain"); Tr. 5929:11-16 (Abbott) ("Q: In fact, every one of the . . . decommissioning cost estimates that includes spent nuclear fuel storage costs that you prepared at ABZ, assume that DOE would be accepting failed fuel and GTCC, correct? A: That's correct.").

137. Consistent with the NWPA, the Contract defines the term "high-level radioactive waste" to include "other highly radioactive material that the [NRC], consistent with existing law, determines by rule requires permanent isolation." P1MY, Art. I.12.(b).

138. The NRC has determined by Rule that GTCC waste requires permanent isolation.

a. NRC's 1989 Rule unambiguously requires permanent isolation of GTCC waste "unless" there is an NRC-approved alternative, and there is no such alternative.

– P1069 at 22583 (1989 Rule) (GTCC waste "must be disposed of in a repository . . . .").

– P1613 at 1 (May 25, 1989 NRC memorandum authorizing publication of the Rule) (the rule "requires disposal of [GTCC] waste in the nation's high level radioactive waste repository"); *see also* P1069 at 22582 (1989 Rule comments) ("the Commission believes that the course of action it had proposed – *requiring* geologic repository disposal of GTCC waste, or approved alternative – should be adopted") (emphasis added).

– P1157 (contractor-generated document) at IDF017 0308 (1995 analysis by the National Low-Level Waste Management Program of statutory and regulatory provisions pertinent to co-disposal of GTCC waste with HLW) ("it should be noted that virtually *all* NRC regulations reserve latitude for the Commission to make exceptions. In general, provisions allowing exceptions do not obviate the mandatory nature of rules") (emphasis in original).

– P1280 at 13 (1995 GTCC Waste Plan) ("NRC, in 10 C.F.R. 61.55(a)(2)(iv) *requires* that GTCC LLW be disposed of in a repository unless the DOE makes a compelling case for another disposal option") (emphasis added); *see also* Tr. 4441:20-4442:6 (Huizenga).

– Tr. 1837:17-20 (Bennet) ("We consider GTCC waste to be high-level waste under the contract. . . . the NRC has declared it as requiring permanent isolation.").

– In *Connecticut Yankee Atomic Power Co.*, 84 FERC ¶ 63,009, 86 (1998), a FERC Administrative Law Judge found that: "DPUC and Staff argue persuasively that there is a reasonable likelihood that GTCC waste removal and disposal is covered in the standard DOE contract."

b. DOE has never proposed an alternative disposal path to NRC, and is not considering any such proposal.

– P1654 (June 22, 1999 teleconference summary) ("[o]ptions other than the repository are considered politically undesirable in light of overall DOE waste management objectives").

– (6/28/04) Dep. Desig. 4/25/02 Klein, 448:3-6 (DOE not considering proposing an alternative to NRC); *see id.* at 496:11-21 (it would be "difficult" to site another facility for GTCC waste).

– (7/14/04) Dep. Desig. 1/29/03 Campbell, 494:3-495:2 (not aware of any proposal to NRC for an alternate facility and doesn't know of any effort in DOE to develop intermediate disposal capacity).

– Tr. 4538:2-4540:25; Tr. 4560:23-4564:5 (Huizenga) (Mr. Huizenga was and is ("[a]nd I am currently") unaware of any other substantial, credible options for GTCC waste other than the repository).

– P1144 at HQR-077-1686 (February 14, 1995 Memorandum re: Federal Register notice) ("it appears that a dedicated GTCC LLW disposal facility cannot be justified by the volume of the waste or the hazard it presents.").

– P1139 at 1 (Grumbly December 20, 1994 letter to Thayer).

139. The Contract obligates DOE to remove Maine Yankee's GTCC waste no later than DOE's removal and disposal of its spent fuel. *See* PFF ¶¶ 131-138.

– (6/28/04) Dep. Desig. 5/15/02 Barrett, 395:18-396:4 (Lake Barrett, who served as the Director or Deputy Director of OCRWM from 1993-2002) ("Q. Now, a different question: Is it your expectation that when the Department of Energy commences the acceptance of Yankee Atomic's spent fuel, it will accept at the same time contemporaneously Yankee Atomic's GTCC and remove it away from the site? [Objection omitted] A. When all extraneous legal matters are finally resolved my expectation is the greater than Class C waste will go at the same time, contemporaneously, at the same time."); *see also id.* at 400:9-17 & 397:9-10 ("at the end of the day, I believe that [GTCC waste] should go at the same time").

– Tr. 3152:4-16 (Meisner) ("as a matter of prudency and responsibility . . . . we would have expected the government to take the most responsible and economic approach to take this material off site. . . . it is a pretty universal view that the most cost-effective and efficient way to do that is to take advantage of the transportation systems that the government has set up for fuel. . . . And take the GTCC along with the fuel.").

– P1857 at NRC004 0294 (draft letter from DOE Secretary to Governor King, with NRC comments) ("It is my intention that nuclear utilities would not have to store GTCC waste beyond the time that they will have to store spent nuclear fuel").

– P1659 at NRC004 0167 (DOE to NRC's Advisory Committee on Nuclear Waste: utilities should not be "stuck with their greater than Class C waste *after* their spent fuel is gone. . . .") (emphasis added); *see* (6/28/04) Dep. Desig. 5/8/02 Milner, at 195-96 ("My personal opinion . . . I think it would be bad policy to leave GTCC sit at a reactor site long after all of the spent fuel has been removed from that reactor site.").

– Tr. 4514:19-4515:25 (Huizenga) (impeached with prior deposition testimony that his understanding, during his tenure working on GTCC waste, was that DOE intended that utilities would not have to store GTCC waste beyond the time they would have to store SNF).

– (7/14/04) Dep. Desig. 6/13/02 Campbell, 165:10-166:18 (it "would be an unreasonable or an untenable situation" for utilities to have to store GTCC waste after their SNF is removed); *see also id.* 6/14/02, 396:1-17 ("if the repository was available [in 1998], then, you know, based on the suitability of that repository to dispose of [GTCC] waste, yes, a path should have been in place.").

– Tr. 5926:18-5927:19 (Abbott) (there is a greater than fifty percent chance that DOE will take the utilities' GTCC waste to the repository); *accord* Tr.

5928:20-5930:22 (Abbott) (many professionals in the industry, including Abbott, believed that DOE was obligated to remove the spent fuel and GTCC waste beginning in 1998, and that it was a "reasonable assumption" to assume that the GTCC from decommissioning would be removed no later than the last fuel assembly).

– Tr. 5929:11-16 (Abbott) (Q: "In fact, every one of the . . . decommissioning cost estimates that includes spent nuclear fuel storage costs that you prepared at ABZ, assume that DOE would be accepting failed fuel and GTCC, correct? A: That's correct.").

**B. Regardless of Whether GTCC Waste Is Covered By the Contract, DOE Would Have Accepted GTCC from Maine Yankee If It Had Accepted SNF.**

140. Apart from the Contract, DOE has a statutory duty to accept and dispose of Maine Yankee's GTCC waste. 42 U.S.C. § 2021c(b)(1) (2000); *see* Tr. 4375:16-21 (Huizenga); PFF ¶ 134.

141. DOE's policy and plans have long been to accept GTCC waste for storage or disposal when the need arises.

– P1047 at iv-v (1987 Report to Congress) ("DOE plans to carry out its responsibility . . . by ensuring that such waste in need of disposal is directed to an appropriate facility . . . . Until the time that GTCC low-level waste can be disposed, DOE plans to accept such waste *as necessary* . . .") (emphasis added).

– (7/14/04) Dep. Desig. 6/13/02 Campbell, 162:9-163:16 (Mr. Campbell's understanding is that in the 1987 Report, DOE committed to accept GTCC waste for storage when needed).

– Tr. 4376:2-4377:5 (Huizenga) (DOE is presently accepting sealed sources because there is a need to do so); Tr. 4445:17-4448:14 (Huizenga) (ongoing case-by-case acceptance of sealed sources is consistent with DOE's policy in the 1987 Report).

142. DOE has not removed Maine Yankee's GTCC waste, and has no plans to do so, because (1) it intends and plans to manage and dispose of the nuclear utilities' GTCC waste together with their spent fuel, (2) there is no need or urgency to remove the GTCC waste from utilities' sites because their spent fuel will remain on utilities' sites for the foreseeable future, and there is no significant impact on utilities to store GTCC waste while the spent fuel remains on

site, and (3) DOE is concerned that any actions to develop such plans would undermine its litigation position in these cases.

a. DOE plans to manage utility GTCC waste the same as spent fuel.

– *See* PPF ¶ 138 above.

– P1785 (NRC letter to Senator Lieberman) (Regarding Connecticut Yankee's SNF and GTCC Waste: "This remaining waste will remain on site, awaiting ultimate transfer to a permanent repository operated by the Department of Energy").

b. No need or urgency because the utilities must store their spent fuel for an extended period of time.

– P1280 at 3-4 (1995 GTCC Waste Plan) (DOE-sponsored evaluations "recognized that storage of GTCC LLW generated by nuclear utilities could be done at the generator site without significant impact . . . ") and 6 ("[e]ach waste stream can be handled independently meeting the specific needs for assistance by generators which have different timing. Nuclear utility wastes are assumed to remain on-site until the spent nuclear fuel is sent to disposal").

– P1910 at HQR-165-0191 (Bubar May 23, 2002 memo to Roberson) ("The nuclear utilities are having to continue to store their SNF until the repository opens, and therefore have the capability to store their activated metal waste in the same facilities (which is the current practice).").

– P1911 (March 21, 2002 DOE draft memorandum for the Secretary) at HQR-164-0054 ("The commercial utilities are required to store their SNF, and most utilities undergoing decommissioning are managing their activated metal GTCC the same way they are managing SNF").

– (7/14/04) Dep. Desig. 6/13/02 Campbell, 166:20-167:8 ("the impact of the utility storing [GTCC waste] while they have to store their spent fuel is smaller than the impact of having to store the spent fuel. So given that situation, storing the activated metal while they store the spent fuel, is not an unreasonable situation in – from my point of view. Once the spent fuel is gone, though, then you've – I think that creates a problem."); *id.* at 168:4-5 ("once the fuel [has] left, the urgency would increase.").

c. Litigation has curtailed progress on GTCC waste planning.

– P1337 at 2 (Issue paper on GTCC waste and Maine Yankee) ("GC's position was that since we are in litigation with Maine Yankee over the issue of GTCC waste, that *DOE should do nothing*.") (emphasis added).

– P1614 & P1616 (DOE and DOJ litigators in December 20, 2000 meeting with NRC and DOE regarding GTCC waste planning).

– (7/14/04) Dep. Desig. 1/29/03 Campbell, 544:1-545:16, 546:13-18, 549:5-552:15 (Robert Campbell's superior directed him to cancel a presentation to NRC's Advisory Committee on Nuclear Waste regarding DOE's plans for GTCC waste because of this litigation).

– Tr. 4511:6-20 (Huizenga).

– P1907 (Huizenga January 29, 2002 memo to Roberson) at HQR130-0005 ("There would likely be political sensitivities to accepting activated metal GTCC but not accepting SNF for storage. Currently, DOE is in litigation with nuclear utilities over SNF and utility related GTCC issues."); Tr. 4525:6-4529:12 (Huizenga) (discussing same).

– *See* P1910 at HQR-165-0193 (Bubar May 23, 2002 memo to Roberson) ("transfer options which include RW will require resolution of the current litigation"); Tr. 5046:15-5047:4 (Bubar) (Ms. Bubar's understanding is that transfer of GTCC waste responsibility to the spent fuel program will require resolution of the spent fuel litigation).

– P1908 at HQR-168-0007 (Yuracko June 17, 2002 e-mail to Bubar) ("Transfer of GTCC waste responsibility to RW could complicate current nuclear utility litigation issues").[2]

– P1910 at 2 (Bubar May 23, 2002 memo to Roberson) ("we would need to ensure that such a decision [to presently accept other than sealed source GTCC waste] does not affect/undermine the ongoing litigation with the utilities about commercial spent fuel").

– (6/28/04) Dep. Desig. 5/14/02 Barrett, at 140 (regarding RW's consideration of whether to accept GTCC for the repository, the litigation "has made it more difficult to reach closure on this matter.").

143. Technical issues concerning transportation, handling and disposal of GTCC waste are less challenging than for spent fuel; therefore, DOE readily could have removed Maine Yankee's GTCC waste at the same time as its spent fuel.

---

[2] The government has asserted that P1908 is a "contractor document." It is an e-mail, with an attached memorandum for the Secretary and related policy papers, that was sent from the contractor to Ms. Bubar (DOE). The document was produced from Ms. Bubar's files, sets forth the activities of DOE, and contains no indicia of untrustworthiness, and it is admissible for the truth of its contents pursuant to the Court's September 17, 2004 Order.

– Tr. 1421:24-1422:6 (Stuart) (providing opinion that DOE could have removed the GTCC waste from Yankee utilities in 1998 "quite readily").

– Tr. 1421:24-1424:25 (Stuart) ("The requirements for handling and transporting GTCC are much low[er] than for handling spent fuel.").

– (7/14/04) Dep. Desig. 6/14/02 Campbell, 416:10-23.

– (7/14/04) Dep. Desig. 6/13/02 Campbell, 153:15-154:25 (logistically and technically, if packaged like fuel, GTCC can be taken without problems to the repository); *id.* at 150:12-152:24; 156:18-157:7 (reporting that Mr. Zabransky advised that GTCC can be placed in the repository); *see also id.* at 205:18-206:16.

– P1346 at 3 (Issue paper re EIS) (disposal of utility GTCC in repository "would pose no technical difficulty).

– Tr. 4535:16-4538:2 (Huizenga) (discussing P1346).

144. Even if GTCC waste were not covered by the Contract, had DOE removed the spent fuel from Maine Yankee's site, DOE would have met its obligation under the LLRWPAA and also removed Maine Yankee's GTCC waste at the same time.

– *See* PFF ¶¶ 134-136, 140-143 above.

## VIII. GOOD FAITH AND FAIR DEALING

145. The Contract provides for Maine Yankee to list the amount of spent fuel it "wishes to deliver" on delivery commitment schedules ("DCSs") that Maine Yankee would submit to DOE. P1MY, Art. V.B.1.

146. In 1992, DOE instructed and required Maine Yankee to complete its DCSs in conformity with the stated pace and schedule for spent fuel acceptance set forth in DOE's then-current Annual Capacity Report/Annual Priority Ranking (the "1991 ACR").

– D29.001 at GPE0010053 (DCS instructions) ("The allocations in the 1991 [ACR] should be the basis for the DCS submittals"); at GPE0010056 ("only DCSs submitted by Purchasers with an allocation in the delivery year will be considered for approval"); and at GPE0010060 ("the total quantity of SNF designated for delivery must not exceed the allocation in the ACR; exceeding the allocation will result in disapproval of the DCS(s)").

147. The acceptance rate projected in the 1991 ACR was unreasonably low and inconsistent with the intent of the NWPA and the parties to the Contract.

– *See* PFF ¶¶ 52-71 above.

148. DOE instructed and required utilities to conform their DCSs to the unreasonably low acceptance rate in the 1991 ACR because DOE knew that it would not accept SNF beginning not later than January 31, 1998, as required by the Contract, and DOE wanted to try to limit its liability to utilities.

– Tr. 7618:22-7622:19 (Vance) (DOE used low rates in the 1991 ACR because it knew that it would not make the 1998 deadline and it wanted to limit liability).

149. No later than early 1997, DOE suspended consideration of both DCSs and the Final Delivery Schedules ("FDSs") provided for in the Standard Contracts, P1MY, Art. V.C., and no FDS was ever approved. D29.005 (non-conforming request by Maine Yankee that DOE take all of its SNF in three years); P301MY (DOE refusal to consider Maine Yankee's FDS submittal); *see* D30.021 (non-conforming FDS submitted by Yankee Atomic for 1998); D30.022 (DOE refusal to consider Yankee Atomic's FDS); *see, e.g.,* P2040 (DOE January 29, 1998 letter refusing to consider Yankee Atomic's DCS submittal); Tr. 3995:12-3997:21 (Pollog) (DOE stopped processing DCS submittals in late 1996/early 1997; and DOE apparently believed that may limit liability); Tr. 4118:2-12 (Zabransky) (DOE stopped processing DCSs on advice of counsel).

150. DOE's actions, referred to in PFF ¶¶ 146-149 above, precluded utilities, including Maine Yankee, from obtaining or negotiating mutually agreeable DCSs or FDSs. P1MY, Art. V.B.2.

– D29.005 & P301MY (Maine Yankee's non-conforming request and DOE's refusal to consider it); *see* D30.002 (September 25, 1992 Yankee submits non-conforming DCSs); D30.004 (December 01, 1992 DOE rejection); D30.005

(January 7, 1993 Yankee resubmits non-conforming DCSs); D30.006 (DOE April 8, 1993 letter rejecting Yankee Atomic's non-conforming DCSs); D30.007 (April 28, 1993 Yankee letter: DOE schedule "is unacceptable"); D30.008 at 3 (Yankee June 10, 1993 letter: DOE did not negotiate); D34 at 1 (same); D30.009 (DOE July 15, 1993 letter rejecting again non-conforming DCSs); D30.010 (Yankee July 26, 1993 DCS submittal under protest); D30.021 (Yankee Atomic's January 31, 1997 FDS including request that DOE take all of Yankee Atomic's SNF and GTCC waste in 1998); D30.022 (DOE's March 11, 1997 refusal to consider FDS submittal).

151. DOE's actions, referred to in PFF ¶¶ 145-150 above, were contrary to plaintiff's justified expectations and the implied Contract obligation of good faith and fair dealing.

## IX. DAMAGES

152. At trial, Maine Yankee established that it is entitled to recover "minimum damages" of $159,744,297. This is the "minimum damages" amount based on evidence set forth at trial, as adjusted by changes agreed to by Maine Yankee.

– Tr. 7480:2-7 (Wise); P2043.17 (Wise) (providing Maine Yankee minimum damages of $159,744,297 (using a risk-free discount rate)[3] after agreed upon changes at trial of $8,176,996 are deducted); P2043.14 (Wise) (providing details about Maine Yankee's agreed upon changes totaling $8,176,996); *see also* Tr. 3258:14-3262:24 (Wise); P2043A.20, .22 (providing Maine Yankee minimum damages using risk-free discount rate submitted with Maine Yankee's March 2003 damages claim).

– Tr. 3209:21-3210:5 (Wise) (Maine Yankee's minimum damages claim assumes that in breach world DOE comes in 2010 and removes all fuel in single campaign); Tr. 3211:6-15 (Wise); P2043A.9 (minimum damages claim assumes that in nonbreach world Maine Yankee's fuel would be gone by June 2002).

153. As of year-end 2002, $78,089,649 of Maine Yankee's minimum damages had already been incurred as "past damages," and by the time of trial even more damages had been incurred.

---

[3] All damages figures in PFF ¶¶ 152-178 reflect a risk-free discount rate, unless otherwise indicated. *See* PFF ¶ 175 (explaining appropriateness of risk-free rate).

a. Past damages of $78,089,649 to year-end 2002 are calculated by deducting from the $84,005,961 in past costs submitted by Maine Yankee in March 2003 and initially at trial, *see* Tr. 3260:7-21 (Wise); P2043A.20, adjustments agreed to at trial that are attributable to pre-2003 (*i.e.,* past) damages items and total $5,916,312. That total is comprised of $1,391,092 for the removal of the crane upgrade, *see* PFF ¶ 178.a., plus $4,525,220 for the pool-to-DOE transfer in the non-breach world, *see* PFF ¶ 178.b.

– Tr. 3259:7-10 (Wise) (agreeing that for Maine Yankee "we have the past costs of 2002 and prior, and the future costs of 2003 and the future . . ."); *see also* Tr. 3248:8-13 (Wise) ("we submitted the report in 2003 so at that point, 2003 was the future and 2002 was the past. The future costs are based on the estimates provided by the company. The past costs are based on costs that were actually realized or, in the case of Yankee Atomic, projected to be experienced in 2002.").

154. As of year-end 2002, approximately $81.65 million of Maine Yankee's minimum damages were projected future damages if DOE picks up Maine Yankee's SNF in 2010, and by the time of trial in 2004 this future damages amount had been reduced even further. The future damages at the time of trial consist almost entirely of annual ISFSI operating costs and end-of-life ISFSI unloading and decommissioning costs.

a. Future damages of approximately $81.65 million as of year-end 2002 are calculated by taking the total damages for the years 2003 to 2011 given in P2043A.22 (Wise), which is $83,915,332, *see also* Tr. 3260:22-3261:6, Tr. 3262:8-24 (Wise), and then deducting adjustments agreed to at trial and attributable to post-2002 (*i.e.,* future) damages items, which total $2,260,683. That total is comprised of $342,639 for excess severance payments, *see* PFF ¶ 178.c., $697,874 for security guards after 2010, *see* PFF ¶ 178.d., $29,421 for a FFD Medical Review Officer after 2010, *see* PFF ¶ 178.e., $970,961 for electricity, *see* PFF ¶ 178.f., and $219,788 for non-incremental maintenance agreements, *see* PFF ¶ 178.g.

– Tr. 3259:7-10 (Wise) (agreeing that for Maine Yankee "we have the past costs of 2002 and prior, and the future costs of 2003 and future . . ."); *see also* Tr. 3248:8-13 (Wise) ("we submitted the report in 2003 so at that point, 2003 was the future and 2002 was the past. The future costs are based on the estimates provided by the company. The past costs are based on costs that were actually realized or, in the case of Yankee Atomic, projected to be experienced in 2002.").

155. Maine Yankee's actual past costs and future cost estimates underlying Maine Yankee's damages claim are reasonable and reliable.

a. Maine Yankee's February 20, 2003 Revision 7 Budget, which is part of P1726MY, includes actual past costs to 2002 and estimated costs from 2003 forward, provides the basis for Maine Yankee's damages claim, *see* P1726MY, and is reasonable and reliable. Maine Yankee's Revision 7 Budget is based on Maine Yankee's 1997 decommissioning and deconstruction budget, which formed the basis of Maine Yankee's 1997 submittal to FERC. The government's expert witness, Mr. Abbott, agrees that cost estimates prepared for submission to FERC are reasonable and reliable.

– Tr. 5570:20-5571:22 (Abbott) (agreeing that when utilities submit cost estimates to FERC in a rate-making proceeding, those estimates have to be reasonable, that the standard at FERC for judging cost estimates is that they have to be reasonable and that if a utility in a FERC rate proceeding claimed a cost that was not reasonably going to be incurred in the future, it would likely be thrown out).

– Tr. 2956:2-2957:2; Tr. 2971:21-2972:3 (Smith) (explaining that Maine Yankee's first budget in 1997, *i.e.,* the Revision 0 Budget, sets forth in detail every aspect of Maine Yankee's $500 million decommissioning and deconstruction project and formed the basis of Maine Yankee's 1997 Submittal to FERC).

– *See* additional support for the reliability of P1726MY below under PFF ¶¶ 163-167.

156. Maine Yankee's damages fall into three categories: ISFSI construction damages, ISFSI operations damages and wet pool-related damages.

– Tr. 3260:7-21 (Wise); P2043A.20 (listing damages in the past and in the future, broken down by each of the three damages categories: ISFSI

construction, ISFSI operation and wet pool related); *see also* Tr. 3243:15-3244:20 (Wise) (explaining that Maine Yankee's budget and damages submittal was broken down into these three damages categories).

157. Maine Yankee's ISFSI construction damages consist of costs for the design, licensing and fabrication of Maine Yankee's dry storage system and for the transfer of its spent fuel and GTCC waste from the spent fuel pool to the ISFSI. This damages category totals $83,715,146, after adjustments for changes agreed to at trial.

a. $83,715,146 in ISFSI construction costs at the risk-free rate is calculated by deducting from the $89,631,459 in ISFSI construction costs submitted at trial, *see* P2043A.22 (entitled "Maine Yankee Damages by Year" and comparable to charts attached to Dr. Wise's expert report and shows conclusions of his minimum damages analysis); *see also* Tr. 7471:24-7472:12, Tr. 7474:16-21 (Wise), adjustments agreed to at trial attributable to ISFSI construction costs totalling $5,916,312. That total is comprised of $1,391,092 for the removal of the crane upgrade, *see* PFF ¶ 178.a., plus $4,525,220 for the pool-to-DOE transfer in the non-breach world, *see* PFF ¶ 178.b.

– Tr. 3305:22-3306:2 (Wise) ("ISFSI construction cost . . . are the costs that are associated with designing and licensing and constructing the ISFSI up through the point when the ISFSI is completely loaded with fuel."); Tr. 3307:13-22 (same); *see also* Tr. 3244:14-17 (Wise) (ISFSI construction costs).

b. Maine Yankee's ISFSI construction costs damages consist of costs associated solely with Maine Yankee's ISFSI construction project, and comprise costs for the design, licensing and fabrication of Maine Yankee's ISFSI and for fuel transfer operations to load fuel into the ISFSI.

– Tr. 2987:11-2989:20 (Smith) (explaining that Maine Yankee's "section 2 analysis is a representation of what we would consider our ISFSI projects . . . What you have here is a combination of 1998 through 2002 actual costs, which represents the inception of the project through, obviously, calendar year 2002, and an estimate to complete the . . . ISFSI capital portion of our decommissioning project"); P1726MY at "Back-up to Section 2, Total ISFSI

Capital Costs," "Back-up to Section 2, ISFSI Capital Costs – Actuals Through 2002."

c. All of Maine Yankee's ISFSI construction damages have already been incurred because Maine Yankee finished loading its completed ISFSI in February 2004.

– Tr. 2770:11-17 (Thomas) ("[I]n February of '04 . . . we completed all 64 canisters to be completely loaded. And our ISFSI . . . as of February was fully loaded . . . ."); Tr. 6890:21-24 (Meisner) (same).

d. ISFSI construction damages incurred by Maine Yankee were reasonable.

– Tr. 3352:12-3353:9 (Wise) ("The fact of the matter is, as a matter of proper damage analysis, they [ISFSI construction and ISFSI operations costs] should be included as damages. . . . It's unique to the breach world and is properly included as a damage element.").

– Tr. 5914:13-5915:9 (Abbott) (Maine Yankee incurred costs in loading its ISFSI for technical information and special tools, for equipment for lifting trunnions, for spare parts and for consumables needed to perform use and maintenance on the cask).

– Tr. 5917:3-17 (Abbott) (agreeing that there is a learning curve associated with moving fuel from the pool into the canisters and casks and transporting them to dry fuel storage, and also a learning curve in moving fuel from the pool into transportation containers; as you climb this learning curve, you would expect that the level of difficulties encountered would be reduced and loading time would decrease).

158. Maine Yankee's ISFSI operations damages consist of costs to operate Maine Yankee's ISFSI, and the company after the ISFSI is fully loaded and until DOE comes to pick up its fuel (assumed to be in 2010 in the "minimum damages" scenario). This damages category totals $58,953,978 after adjustments for changes agreed to at trial.

a. $58,953,978 in ISFSI operations costs at the risk-free rate is calculated by deducting from the $61,214,661 in ISFSI operations costs submitted at trial, *see* P2043A.22 (entitled "Maine Yankee Damages by Year" and comparable to charts attached to Dr. Wise's expert report and shows conclusions of his minimum damages analysis); *see also* Tr. 7471:24-7472:12; 7474:16-21 (Wise), adjustments agreed to at

trial attributable to ISFSI operations costs totalling $2,260,683. That total is comprised of $342,639 for excess severance payments, *see* PFF ¶ 178.c., $697,874 for security guards after 2010, *see* ¶ PFF 178.d., $29,421 for a FFD Medical Review Officer after 2010, *see* ¶ PFF 178.e., $970,961 for electricity, *see* PFF ¶ 178.f., and $219,788 for non-incremental maintenance agreements, *see* PFF ¶ 178.g.

> – Tr. 3306:21-3307:6 (Wise) ("[T]he ISFSI operations costs includes all of those costs that are associated with maintaining the companies. And that includes, also, the general and administrative costs that, up to the point of the completion of decommissioning, do not constitute damages. But beyond that point in time, are damages, because they are only being incurred because of the necessity to maintain the corporation while the ISFSI is on site and being maintained.").

> – Tr. 3306:6-14 (Wise) (once the ISFSI is loaded, "the company shifts into long-term operations with the ISFSI there, where they're still in business, because the ISFSI is there and the fuel is on site. And that operation continues through the point when the DOE comes to remove the fuel in the future, and the company has to conduct decommissioning of the ISFSI and undertake the other activities that are necessary to run down the corporation."); *see also* Tr. 3244:5-9 (Wise) (same).

b. Maine Yankee's ISFSI operations damages consist of costs associated solely with operating the ISFSI, including fees (*i.e.,* regulatory fees) and property taxes, other contracted services (*e.g.*, long-term security, outside support, etc.), staff augmentation (*i.e.,* outside contractors), insurance, contingency, craft contractors (*i.e.,* specialized manual labor), legal services, purchased power (*i.e.,* electricity), miscellaneous expenses (*e.g.*, travel), materials and supplies, personal expenses, training, telephone, rentals & leases, and employee benefits.

> – Tr. 2983:23-2987:6 (Smith); P1726MY at "Final Three Section Submittal," "Back-up to Section I Summarized by Budget Line Description," "Back-up to Section I Sorted by Cost Center."

c. Maine Yankee's ISFSI operations damages are reasonable.

– Tr. 3352:12-3353:9 (Wise) ("The fact of the matter is, as a matter of proper damage analysis, they [ISFSI construction and ISFSI operations costs] should be included as damages. . . . It's unique to the breach world and is properly included as a damage element.").

– Tr. 7350:1-7353:2; Tr. 7353:19-7357:7; Tr. 7358:9-7359:6; Tr. 7360:15-7387:12 (Smith) (explaining the reasonableness of Maine Yankee cost estimates for categories and items in ISFSI operations that the government challenged as being not reasonable or not incremental).

– Tr. 7187:1-7216:5 (Thomas) (explaining the reasonableness of Maine Yankee cost estimates for categories and items in ISFSI operations that the government challenged as being not reasonable or not incremental).

d. Maine Yankee's cost/staffing estimates for ISFSI operations are reasonable.

– Tr. 3128:14-3129:21 (Meisner) (explaining Maine Yankee's estimate of a staff of four FTEs ("full time equivalents") needed to run its ISFSI, in addition to the security staff); *see also* Tr. 7363:1-6 (Smith) (explaining that for the ISFSI, "Maine Yankee's security staff, in general, was understated in the estimate for damages for the simple fact that Maine Yankee failed to quantify in damages the effects of September 11th and the fact that our security staff grew from around 20 employees to well up over 60 employees").

– Tr. 5938:8-5940:13 (Abbott) (acknowledging his first report and first depositions in this case set forth his "judgment" that a staff of 5 FTEs, in addition to security staff, was a reasonable number of people to operate an ISFSI and that it could even be as high as seven full-time staff, plus security; and, 5 FTEs net of security was consistent with decommissioning cost estimates he and ABZ had done for other nuclear utilities; and, dry storage staffing numbers should not vary from plant to plant).

159. Maine Yankee's wet pool-related damages are the costs for operating its fuel pool after June 30, 2002, the date Maine Yankee's pool would have been empty in the non-breach world, through December 31, 2003, when Maine Yankee projected it would complete the transfer of its spent nuclear fuel and GTCC to its ISFSI. This damages category totals $7,006,155. There were no adjustments to this category of damages.

a. $7,006,155 is calculated by adding the wet pool related damages in 2002 ($2,315,096) and 2003 ($4,691,059) as provided in P2043A.22 (Wise); *see also* Tr. 3260:7-9; Tr. 3260:22-3261:6 (Wise).

– Tr. 3305:10-16 (Wise) ("[Wet pool operations] consists of costs that are incrementally incurred by the companies because they have the pool on the facility at a point in time after which you would have been empty by the DOE removal campaign in our nonbreach world.").

– Tr. 7471:24-7474:21 (Wise) (P2043A.22, entitled "Maine Yankee Damages by Year," is comparable to charts attached to Dr. Wise's expert report and show conclusions of his minimum damages analysis.).

b. Maine Yankee's wet pool related damages have already been incurred.

– Tr. 3261:22-3262:2 (Wise) ("[T]he pool related costs start in 2002 when DOE would come in the nonbreach world and take the fuel out of the pool, or at least complete taking the fuel out of the pool. And, also, just in 2003, stopping in 2004 when the ISFSI was assumed to have been completed and operational.").

– Tr. 2770:11-17 (Thomas) ("[I]n February of '04 . . . we completed all 64 canisters to be completely loaded. And our ISFSI . . . as of February was fully loaded . . . ."); Tr. 6890:21-24 (Meisner) (same).

c. Maine Yankee's annual wet-pool related damages of approximately $2.3 million in 2003 and $4.69 million in 2004 are reasonable.

– Tr. 6015:15-6016:10 (Abbott) (in a survey Mr. Abbott performed in the mid-1990s of annual wet pool storage costs incurred by shutdown plants, he found that the annual costs of operating a spent fuel pool ranged from $2.5 million to $12 million per year, and Maine Yankee incurred costs, *see* P2043A.22).

– Tr. 6040:24-6043:2; Tr. 6047:4-22 (Abbott) (TLG workpapers for 1999 Decommissioning Cost Estimates for Zion Nuclear Power Station Units 1 and 2 (February 1999) showing $7,564,677 annual cost to run Zion spent fuel pool in 1993 dollars (which, when adjusted to 2003 dollars and post-9/11 security needs are added according to formula used by government expert Mr. Abbott (*see* 6035:13-6036:2), equals approximately $12 million in annual wet pool costs).

d. Maine Yankee's wet pool staffing of 21 net of security is reasonable and in line with the staffing level in decommissioning cost estimates for other utilities.

– Tr. 3113:7-3115:14 (Meisner) (explaining the wet pool staffing depicted in P1726MY "Estimate of Costs Associated With DOE End Date of 6/30/02 vs. Current End Loading Date of 12/31/03," which shows Maine Yankee's wet pool staffing is 21 net of security).

– P169 (contractor-generated document) (August 1991 "Cost Estimates of Operating On Site Spent Fuel Pools After Final Reactor Shutdown," prepared for U.S. Department of Energy by Pacific Northwest Laboratories) at 3.4 shows wet pool staffing of 35 net of security.

– Tr. 5673:8-5674:12; Tr. 5679:19-5692:21; Tr. 5700:10-18; Tr. 5702:22-5703:4; Tr. 5710:9-20; Tr. 5846:11-5860:7 (Abbott) (discussing Yankee Atomic Demo No. 1: "Decommissioning Cost Estimates Wet Storage Staffing (FTEs Less Security), depicting cost estimates prepared for several nuclear power plants by Mr. Abbott's firm, ABZ, showing wet storage staffing of 29.25 FTEs (Vermont Yankee 1997), 48.5 FTEs (San Onofre 2001), 50 FTEs (Duane Arnold 2002), 60 FTEs (Calvert Cliffs, Unit 2 1993), and 112 (Nine Mile Point 1996); P1954, P1965 (Duane Arnold Energy Center Decommissioning Cost Estimate, ABZ November 1998 and 2002 update, respectively); P1989 at EXD-1173 (2001 ABZ cost estimate for San Onofre showing wet storage staffing of 48.5 FTEs); P1985 at EXD-1550-51 (1997 ABZ cost estimate for Vermont Yankee showing wet storage staffing of 29.25 FTEs); P1986 at EXD-0224 (1996 ABZ cost estimate for Nine Mile Point showing wet storage staffing of 112 for Unit 1 in Wet SAFSTOR); P1985; P1990 at EXD-0513 (1993 ABZ cost estimate for Calvert Cliffs showing wet storage staffing of 60 FTEs for Unit 2 in Wet SAFSTOR)).

160. In calculating damages resulting from the government's breach, accurate and reliable estimates of breach and nonbreach world costs come from the companies.

– Tr. 3193:10-14 (Wise) ("Basically, in almost any damage case, the fundamental concept is a comparison of an actual world and a but-for world. In this case, we're calling the actual world the breach world. And the but-for world is referred to as the nonbreach world.); P2043A.3, .4 (Damages Process, 1999 and 2003).

– Tr. 3364:22-3365:4 (Wise) ("And through the process of educating ourselves and the companies as to what the issues are going to be and how we might address them, the use of the company budgets as a primary source of information for our analysis was a result of that process. The deliberative process led us to the conclusion that using the company budgets would be a very good way to do this analysis.").

161. Executives at Maine Yankee, including Todd Smith, Maine Yankee's project controls manager who created and managed the budget, Michael Thomas, Vice President and

CFO, who assisted in the preparation of the budget, and Michael Meisner, former President and currently Chief Nuclear Officer, are knowledgeable about costs Maine Yankee has incurred and will incur to manage and store SNF on site.

> – Tr. 2952:18-2955:18; Tr. 2966:5-2971:12 (Smith) (explaining his role in creating Maine Yankee's budgets); Tr. 2981:5-2982:12 (Smith) (explaining his role in developing Maine Yankee's three section damages submittal).
>
> – Tr. 2726:13-2727:4; Tr. 2730:25-2731:16 (Thomas) (explaining his role in the preparation of Maine Yankee's annual budgets).
>
> – Tr. 3105:9-3146:18 (Meisner) (explaining the level of required NRC inspections, pool-to-DOE costs, wet pool labor, and ISFSI staffing levels).
>
> – Tr. 3204:25-3205:9 (Wise) ("And in this case, I have the benefit of working with people who are actually operating a nuclear utility through the decommissioning process who routinely put together cost estimates for purposes of running the business or for purposes of going before rate-setting boards. And so this is definitely the sort of information that you would want to rely on because you're dealing with information prepared by people who are quite expert in that type of area.").

162. P1726MY sets forth all costs Maine Yankee has incurred from 1997 to 2002 and estimates it will incur from 2003 through 2023. Exhibit P1726MY is comprised of two major parts. The first major part is Maine Yankee's Revision 7 Budget, which is the January 2003 edition of Maine Yankee's budget. Tr. 3028:6-3029:6 (Smith). The Revision 7 Budget contains the entire Maine Yankee estimate for construction of the ISFSI and the decommissioning of Maine Yankee's nuclear plant, and contains 1,438 line items of projects and personnel devoted to ISFSI construction and plant decommissioning. Tr. 2966:5-2971:12 (Smith) (Revision 7 budget); P1726MY ("MY Rev VII File 2-20-03"). The second major part of Exhibit P1726MY is Maine Yankee's three-section damages submittal that spans the years 1998 to 2023. The costs in Maine Yankee's three-section damages submittal are extracted directly from the actual past and estimated future costs contained in the Revision 7 Budget. Tr. 3031:20-3032:8 (Smith). Section 1 details the long-term ISFSI operational costs, Section 2 details the ISFSI capital costs

actually incurred and estimated as of January 2003, and Section 3 details the wet storage costs that Maine Yankee incurred for the period June 30, 2002 to December 31, 2003. Tr. 2966:9-12; Tr. 2981:5-2982:12 (Smith) (three-section damages submission).

163. P1726MY is reliable.

a. The process of preparing Maine Yankee's Revision 7 budget was reliable. *See* PFF ¶ 164.a.-g. below.

b. Capable company personnel prepared the Revision 7 Budget. *See* PFF ¶ 165.a.-b. below.

c. Maine Yankee's long-term cost estimates, like those contained in the Revision 7 Budget, have been found to be reliable by FERC and others. *See* PFF ¶ 166.a.-d. below.

d. Maine Yankee's three-section damages submittal is extracted directly from the Revision 7 Budget. *See* PFF ¶ 167 below.

164. The process Maine Yankee used in preparing Maine Yankee's Revision 7 budget is reliable.

a. In 1997, because of the decision to permanently shutdown the plant, Maine Yankee changed its budgeting system to a project management approach with the aim of deconstructing, decommissioning, and terminating Maine Yankee's Nuclear Regulatory Commission license within a set period of time. Tr. 2730:25-2732:22 (Thomas). Prior to the decision to permanently shut down its plant, Maine Yankee, as an operating nuclear plant, based its budget on an annual, departmental system based on regular costs. Tr. 2730:25-2732:22 (Thomas).

b. Based on the project management approach, Maine Yankee included in its deconstruction budget detailed information on each project, including the name of the responsible officer or manager, whether a cost is fixed or variable, responsible department, project number and description, cost center number and description, budget line number and description, the actual costs incurred for each project or employee, and estimated costs for each project or employee. Tr. 2966:5-2971:12 (Revision 7 budget) (Smith); P1726MY ("MY Rev. VII File 2-20-03").

c. Maine Yankee developed each project line in its budget by directly communicating with the managers of projects and departments to determine the scope of work. After determining the scope of work of every department and project, specific cost information, building rates, and contract values were applied to each scope of work. Tr. 2972:4-19 (Smith).

d. Maine Yankee used project numbers, cost center numbers, and budget line numbers to track costs and to hold managers accountable for their performance. Tr. 2957:11-2958:16; Tr. 2958:25-2961:8 (Smith). Maine Yankee's project controls group performs this tracking of costs on a monthly basis. Tr. 2962:15-2963:9 (Smith). The project controls group uses three specific tools to track costs, *i.e.,* requisitions, timecards, and purchase orders, each of which contains a project number, cost center number, and budget line number information. Tr. 2961:10-2965:19 (Smith). Requisitions track requests to spend money on a project. Tr. 2961:23-2962:14 (Smith). Timecards track labor costs. Tr. 2963:10-2964:24 (Smith). Purchase orders track procurement from vendors. Tr. 2964:25-2965:19 (Smith).

e. The January 2003 Revision 7 Budget is a result of periodic updates to Maine Yankee's budget in the normal course of its business. Tr. 3028:16-22 (Smith). Budget updates are done on an annual basis or when a major event takes place. For each update, the project controls group calculates all actual costs incurred and projects future estimates of the cost-to-complete each project within the overall decommissioning budget. Tr. 2956:19-2957:10; Tr. 3028:14-22 (Smith). The annual budgeting process starts in the fourth quarter of every year to identify what has actually been spent and to project what will be spent in the next calendar year. Tr. 3029:7-11 (Smith). Two major events outside of the regular, annual budgeting process required the budget to be updated: first, the termination of the Stone & Webster contract and, second, the termination of the NAC contract. Tr. 2972:20-2974:7 (Smith); *see also* Tr. 2759:20-2770:10 (Thomas) (explaining the reasons for terminating the contracts with Stone & Webster and NAC).

f. As a result of terminating the contracts with Stone & Webster and NAC, Maine Yankee took over direct management of the full scope of work that had been covered under both contracts. Maine Yankee broke down the work covered by each of the two contracts into individual project numbers, cost center numbers, and budget line numbers and then added them to the Maine Yankee budget. The Maine Yankee budget before the Stone & Webster termination comprised approximately 450 lines. After the Stone & Webster termination, the budget grew to in excess of 1,100 lines. The budget after the NAC termination grew to the present 1,438 lines, which is the size of the Revision 7 budget that is part of P1726MY. Tr. 2972:20-2978:2 (Smith).

g. The Revision 7 budget presents the budget for 2003, including actual, incurred costs to the end of 2002, and estimated future costs for 2003 and afterwards.

The Maine Yankee budget has been updated since then, and the budget for 2004 is the Revision 8 Budget. Tr. 3028:6-3029:6; Tr. 2972:20-2973:1 (Smith) (regarding the 2003 and 2004 versions of the budget); Tr. 2970:19-2971:3 (Smith); P1726MY ("MY Rev VII File 2-20-03") (regarding past and future costs).

165. Capable Maine Yankee personnel prepared the Revision 7 Budget.

a. To effect the transition to the project management budget approach, Maine Yankee management in 1997-1998 hired people with project management experience, including Todd Smith. Tr. 2732:23-2733:11 (Thomas).

b. Todd Smith directed the creation of Maine Yankee's first deconstruction budget in 1997, which set forth in detail every aspect of Maine Yankee's $500 million decommissioning project and formed the basis of Maine Yankee's 1997 Submittal to FERC. Tr. 2952:13-2953:14; Tr. 2956:2-2957:2; Tr. 2971:21-2972:3 (Smith).

166. Maine Yankee's long-term cost estimates, like those contained in the Revision 7 Budget, have been found to be reliable by FERC and others.

a. FERC approved the 1997 Revision 0 budget of $500 million and Maine Yankee's budget and costs have stayed within 1 percent of this budget during the period 1997 through 2004, in which time approximately 90% of the project has been completed. Tr. 3002:17-3003:11; Tr. 2952:13-2953:14; Tr. 2956:8-14 (Smith).

b. The parties to the settlement of Maine Yankee's October 2003 FERC rate case agreed, after an extensive review and examination of Maine Yankee's decommissioning operations and expenditures, that Maine Yankee's decommissioning expenses were prudently incurred. Tr. 3003:12-3004:19 (Smith). The parties involved in

the settlement are FERC, Maine Yankee, Maine OPA, Maine PUC, and NSTAR Electric and Gas Corporation. Tr. 3051:1-9 (Smith).

c. The government's technical witness, Mr. Abbott, agrees that when utilities submit cost estimates to FERC in a rate-making proceeding, those estimates have to be reasonable, that the standard at FERC for judging cost estimates is that they have to be reasonable and that if a utility in a FERC rate proceeding claimed a cost that was not reasonably going to be incurred in the future, it would likely be thrown out. Tr. 5570:20-5571:22 (Abbott).

d. The bankruptcy court in Maine Yankee's Stone & Webster litigation found for Maine Yankee approximately $64.8 million in damages for Maine Yankee's decommissioning work (based on a $65 million contractual cap on the amount of recoverable damages pursuant to the Court's interpretation of the Stone & Webster decommissioning contract). Maine Yankee's damages claim was $81 million and was based on Maine Yankee's cost to complete its decommissioning work. Tr. 2771:15-2772:3 (Thomas).

167. Maine Yankee's three-section damages submittal is extracted directly from the Revision 7 Budget.

a. Todd Smith prepared Maine Yankee's three-section damages submission in January 2003 by extracting costs from the Revision 7 budget. Tr. 3031:20-3032:8 (Smith). Mr. Smith used a method similar to the one he used to prepare Maine Yankee's budgets. For the three-section submittal, all costs incurred through 2002 were calculated from actual costs and all costs-to-complete future work were estimated. Tr. 2982:9-25

(Smith). A summary of Maine Yankee's three-section damages submission is part of P1726MY. *See* P1726MY at "Final Three Section Submittal."

168. Maine Yankee's damages expert, Dr. Wise, in conjunction with Maine Yankee, reviewed the Revision 7 Budget, Tr. 3204:5-7 (Wise), and identified company costs that were incremental to the breach and eliminated non-damages items.

> – Tr. 3207:6-25 (Wise) ("Maine Yankee has a different kind of a budget, which had a longer period of past costs. But Maine Yankee also supplies a budget that has a large number of lines. And each line item is coded as a particular type of cost. And we talked to Maine Yankee. And the individuals at Maine Yankee who we're working with would tell us what sort of line item numbers would constitute a damage item and which would not. And of course we would need to understand why they would think they would constitute a damage item. So there's a collaborative process there. But at the end of the day it's a process where we went over each line item with the people from Maine Yankee to determine what would be included in our analysis damages.").

> – Tr. 3355:22-3356:3 (Wise) ("The initial information that we need to do the damage analysis comes from the company budgets. As I indicated yesterday, there are some lines in those company budgets that we need to eliminate because they do not include damage items, such as lines relating to decommissioning, which would pertain in both worlds.").

> – Tr. 3369:18-3370:2 (Wise) ("We discussed every line item with the companies. Because even if a line item doesn't look very interesting, there's certainly a possibility that there would be some sort of corresponding cost in the nonbreach world that we would have to take into account in our model. And so it's a very thorough process where we went over every line in their budgets to make sure that there wasn't some sort of issue that we had to address to get a correct estimate of damages.").

169. The cost codes (project, cost center, and budget line numbers) in the Revision 7 budget aided Dr. Wise in identifying what constituted damages items.

> – Tr. 3220:24-3221:7 (Wise) ("Maine Yankee . . . g[a]ve us a budget that has lots of line items and various project codes. And we know which project codes would not constitute damages and which would. And we also worked with Maine Yankee to identify where there would be offsets in a nonbreach world that we need to net out of the appropriate line items in their budgets."); *see also* Tr. 3370:4-13 (Wise) (explaining Maine Yankee offsets in the nonbreach world that would offset costs in the breach world.).

170. The three-section damages submittal prepared by Maine Yankee assisted Dr. Wise by allowing him to compare and confirm his damages analysis with Maine Yankee's own damages calculations.

– Tr. 3279:25-3280:3 (Wise) (Maine Yankee's "sectional analyses were useful in that we could compare what we were getting to what the company was getting to see if there was some issue raised that we should pursue with the company.")

171. The reliability of Maine Yankee's Revision 7 Budget and three-section damages submittal is further established by the rigorous audit process in this litigation.

a. The audit process in this litigation was rigorous and comprehensive.

– Tr. 7216:14-7217:13 (Thomas) ("I had a lead role to make sure that Maine Yankee was properly supporting the audit. . . . [I]t started rather suddenly for me when I returned from vacation and was told that there were at least five DOE representatives that were expected to show up that morning that had been arranged by my staff. But we met and discussed – and it was an initial protocol where I think there was some – a little bit of searching on both sides. We were trying to learn what the scope of the process would entail, how much resources it would require on our part, and how we could effectively communicate with the Department of Justice and the consultant. I think, as time developed, we developed into a more efficient working relationship. And I can't remember whether we initiated or the government initiated, and the consultants, a process to put requests in writing. We had a process of informal interviews. I was impressed by the extensiveness of the audit process. I think our invoices over $5,000 were reviewed throughout that time period. There were several informal interviews that were conducted. . . . I participated in some of those.").

– Tr. 7217:16-7218:19 (Thomas) ("[I]n addition, [I had] several days or few days of depositions. . . . So it was a very extensive and, from my perspective, very complete process. I did try to tell the [government] team where my office was. And if people had problems or we weren't being responsive enough, that my door was always open. I wanted to know to make sure we were meeting our responsibilities under the Court's program of audit. And we tried to do that. My sense, from talking to the team members, was that it was relatively successful. And I have a – I heard Mr. Johnson testify on this subject. And he wasn't there. I never saw him there if he was. But I got the complete opposite impact. Rather than the lack of responsive nature of Maine Yankee to the inquiry, I really thought we had a good working relationship and that we were responsive. The government certainly didn't agree with our answers all the time and some of that. But in terms of completeness and a good process, while it was burdensome to the company and the staff, we're a small staff, busy people, I did bring in a former

Maine Yankee employee as a contractor to help coordinate the requests. And overall, while I – I can't say I would welcome it again, it was, I thought, a good process for us to communicate. I was not aware of any major problems or unresponsiveness on my part.").

– Tr. 7337:23-7338:13 (Smith) ("[At] the very outset of the audit process, which is a very extensive process that took place over the course of months, we provided the government's auditors with our entire general ledger, a copy of our entire general ledger depicting each and every transaction that took place over the course of time in which the auditors were performing their audit. I made a personal commitment to the auditors that whatever invoices, whatever was needed, we would do our very best to provide that information to the auditors. If there were invoices that were not supplied to the auditors and I personally knew about it, I would make sure that the auditors would receive all the necessary invoices.").

b. As a result of the audit process in this litigation, Maine Yankee agreed with some of the government's objections to Maine Yankee's damages claim. (*See* PFF ¶ 178).

172. Maine Yankee's Section 3 submittal on wet pool costs formed the basis for Dr. Wise's analysis of Maine Yankee's wet pool damages.

– Tr. 3245:16-18 (Wise) ("Maine Yankee's wet pool costs in their sectional analysis actually formed the basis for [that] part of our damage analysis.").

173. Dr. Wise properly included in damages pre-1999 costs Maine Yankee had incurred as a result of the government breach. Pre-1999 damages total $10,324,847.

– P2043A.22; Tr. 3221:18-3222:1 (Wise) (Maine Yankee's pre-1999 costs are for the third reracking of its spent fuel pool ($10,069,018), and for some studies that were done for ISFSI design work ($255,829).

– Tr. 3222:2-3223:7 (Wise) (Dr. Wise reviewed with the company Maine Yankee's pre-1999 cost information that was tabulated by Christopher Barry in an expert report submitted with Maine Yankee's 1999 damages submission).

174. The contingency amount included in Maine Yankee's damages calculation is appropriate.

a. Maine Yankee's Revision 7 Budget includes a contingency.

– Tr. 2978:25-2979:22; Tr. 2980:10-17 (Smith) (explaining that Maine Yankee uses a 10% contingency factor in its budget estimate, which is estimated by considering the difficulty of the project, the scope of work to be performed, and the risks of the project).

– Tr. 3223:14-19 (Wise) ("each of the companies applies contingency to their budget estimates, really for all purposes. When they're doing these budget estimates for internal purposes or doing these budget estimates for FERC purposes, they apply contingencies.").

b. Maine Yankee applied contingency in an economically sound manner.

– Tr. 3223:20-3224:8 (Wise) ("I have done a lot of work for engineers in the past where on occasion engineers would include a contingency that I didn't feel really was a legitimate contingency. What I mean by that is I didn't think it was a contingency designed to capture what you would actually spend ultimately. It was more of a contingency to give you some sort of a comfort level that you would have more than enough money to finish the job if bad things happen that you didn't expect. . . . And so [in the Yankee cases . . . [contingency] was a considerable item in terms of dollar value. And I wanted to make sure that we weren't putting something into our damages analysis that didn't belong there.").

– Tr. 3226:1-4 (Wise) ("I created a memo on this topic [contingency] to make sure that we were all on the same page in terms of what constituted an appropriate contingency and what did not."); Tr. 3227:8-12 (Wise) (identifying D318, 318A as memo on contingency that Dr. Wise prepared).

– Tr. 3227:17-3231:19; P2043A.10-.12 (Wise) (explaining and illustrating with demonstratives appropriate and unacceptable contingency.).

c. Maine Yankee appropriately applied contingency in its Revision 7 budget, P1726MY.

– Tr. 2979:25-2980:9 (Smith) ("Maine Yankee's contingency is no different than any other estimate of this magnitude. It's customary, as an estimator – I've been an estimator for 6, 8 years. I've worked with estimators in the heavy construction industry. I've worked with estimators, expert witnesses. It's very customary to have a contingency factor on a project of this magnitude. I would consider it, what we would refer to estimating as a known unknown.").

– Tr. 7359:20-7360:8 (Smith) ("[C]ontingency is absolutely a part of the best estimate. I've estimated jobs outside of the nuclear industry and heavy construction industry and the heavy demolition industry. I personally have never turned in an estimate without a contingency factor applied to it. It's common

business practice . . . I'm quite sure if you look at all the TLG decommissioning cost estimates and all the ABZ cost estimates, you will see a contingency factor placed on those estimates. And I'm quite sure those companies are representing their best estimates when they turn it in to a client.").

– [Tr. 5642:10-5643:9 (Abbott) (unforeseeable events are almost certain to occur in decommissioning based on industry experience and, in estimating costs, one way to handle unforeseeable events that may occur in decommissioning is by adding a contingency); Tr. 5643:10-16 (Abbott) (Mr. Abbott includes a contingency factor that runs in the neighborhood of 25 to 30 percent in the decommissioning cost estimates that he prepares; contingency is applied on a line item basis and some items will be lower); Tr. 5645:1-10 (Abbott) (Mr. Abbott calculates contingency in his decommissioning cost estimates by doing a line item contingency on each individual activity and period dependent costs and then make a judgment on what uncertainty in the costs should be for each, for individual ones, and then take a weighted average).]

175. Maine Yankee has established that it is appropriate to adjust its future damages to present value using a risk-free discount rate.

a. As a matter of economics, to the extent costs included in damages are expected to increase in the future at a rate greater than general inflation, it is appropriate to use a risk free discount rate.

– P2043A.13 (describing what is meant by "discount rate.").

– Tr. 3234:4-6 (Wise) ("What I mean by risk-free rate is a rate that is reasonably certain to be obtained. And that is generally viewed as a rate on government securities.").

– Tr. 3236:23-3237:12 (Wise) ("There is a nuance in this particular case, which is that I have used a much lower rate of inflation than the companies would be using for an escalation factor. And assuming a higher rate of inflation is mathematically equivalent, if you do the math right, to assuming a lower rate of discount. So that if you believed that in fact the company's escalation rates were more appropriate than my inflation rates, you might view the risk-adjusted rate as too high, and you might view the risk-free rate as a more appropriate rate for discounting the future cashflows . . . in my damage analysis.").

b. To calculate Maine Yankee's claim for future damages, Dr. Wise used an escalation/inflation rate based on consensus forecasts for general inflation in the economy, not the sorts of costs the companies are incurring.

– Tr. 3231:20-3233:3 (Wise).

c. Because the evidence shows that the types of costs included in Maine Yankee's future damages will increase in the future at a substantially higher rate than the general inflation rate, a low, indeed risk-free, discount rate is more appropriate than a risk-adjusted rate.

– Tr. 3232: 10-17 (Wise) ("3.8 percent is actually a very common escalation factor in the budgets that we got. This created an issue for me because 3.8 percent, while it may be reasonable for the sorts of costs that these companies incur and may be consistent with their experience and may even be approved by FERC, is a number that's in excess of what people are predicting for general inflation.").

– Tr. 5710:11-16 (Abbott); P1964 (accompanying the record), "Review of Decommissioning Cost Estimates for New England Nuclear Power Plants" (June 1997) prepared by Mr. Abbott and ABZ "for the Office of the Massachusetts Attorney General" at 2 (acknowledging that he concluded in this study that decommissioning cost estimates performed at different times for the same plant, over time, have increased at a rate well above the rate of inflation).

– P1726MY at "MY Rev. VII File 2-20-03" at lines 1432, 1433 (using an escalation factor of 3.8%); Tr. 2984:16-25 (Smith) (noting that the long-term ISFSI operations costs are "in 2002 dollars" and that "[w]hen we escalate future dollars, yes, we do use an escalation rate. Depending on the audience, we represent numbers as nominal year dollars, 2000 – the current year dollars or even present value dollars. Again, depending on the audience, we've done it numerous ways.").

176. In adjusting future damages to present value, it is appropriate to use an after-tax discount rate.

a. An after-tax risk-free rate is appropriate because any award received by Maine Yankee would be viewed as income and would be taxed, with the potential to be recaptured in subsequent years.

– Tr. 3234:7-14 (Wise); *see also* Tr. 7443:24-7444:4 (Wise) (stating Maine Yankee "expects to be paying taxes again in the very near future"); Tr. 7747:1-8 (Wise) (similar); Tr. 7192:11-7193:19 (Thomas) (similar).

– Tr. 7455:12-7458:5 (Wise); P2043.1, .2 ("Pre-Tax vs. After-Tax Discounting") (detailed explanation as to why after-tax discounting is appropriate in this case).

b. Potential recapture at a later date does not support pre-tax discounting.

– Tr. 7458:6-7465:17 (Wise); P2043.3 ("One Period Case with Recapture"); P2043.4 ("Portion of Damages Judgment Required to Pay Future Costs") (detailed discussion with demonstratives as to why potential recapture at a later date does not support pre-tax discounting).

177. Maine Yankee's annual cost of ISFSI-only operations will be approximately $6.85 million in 2003 dollars from 2011 and forward.

– Tr. 3271:14-23 (Wise); P2043A.25 ("Maine Yankee Damages By DOE Removal Date") (as reflected in Dr. Wise's 2003 expert report submitted with Maine Yankee's 2003 damages submission, P2043A.25 shows an average additional annual cost of storing Maine Yankee's spent fuel of between $6.8 to 6.9 million in 2011-2020 and shows total damages Maine Yankee would incur on a discounted basis in the event that DOE comes after 2010.).

178. The damages set forth in Maine Yankee's 2003 pretrial submissions were adjusted by changes agreed to at trial. The agreed changes to Maine Yankee's damages claim amount to $8,176,996, *see* P2043.14 (listing quantification of agreed changes), as set forth below:

a. Maine Yankee adjusted its damages claim downward by $1,391,092 for the removal of the costs of its crane upgrade. This downward adjustment is for ISFSI construction damages incurred prior to 2003.

– Tr. 3011:23-3012:8 (Smith) (explaining why the costs of the crane upgrade were not incremental to damages); Tr. 3272:16-3273:4 (Wise) ("adjustments [are] either in the form of changes to budget items and budget item costs, or offsets that would be appropriate to include in the analysis"); Tr. 7477:3-13 (Wise) (agreeing that P2043.14 lists Maine Yankee's agreed changes).

– P1726MY "Backup to Section 2, ISFSI Capital Costs—Actuals Through 2002" (detailing all costs paid to American Crane & Equipment for the crane upgrade).

b. Maine Yankee adjusted its damages claim downward by $4,525,220 to account for its pool-to-DOE transfer in the non-breach world. This downward adjustment is for ISFSI construction damages incurred prior to 2003.

– Tr. 3007:11-3009:16 (Smith) (explaining Maine Yankee's pool-to-DOE estimate); Tr. 7477:3-13 (Wise) (agreeing that P2043.14 lists Maine Yankee's agreed changes).

c. Maine Yankee adjusted its damages claim downward by $342,639 for the removal of excess severance payments to eleven union members. This downward adjustment is for ISFSI operations damages for 2004 and after.

– Tr. 3012:9-3013:21 (Smith) (explaining the recalculation of the severance payments for the eleven union members); Tr. 3272:16-3273:4 (Wise) ("adjustments [are] either in the form of changes to budget items and budget item costs, or offsets that would be appropriate to include in the analysis"); Tr. 7477:3-13 (Wise) (agreeing that P2043.14 lists Maine Yankee's agreed changes).

– P1726MY "Backup to Section 1 Sorted by Cost Center" at lines 4, 18 (noting severance payments).

d. Maine Yankee adjusted its damages claim downward by $697,874 by reducing the number of security guards for the ISFSI to 4 after fuel is removed in 2010. This downward adjustment is for ISFSI operations damages for 2004 and after.

– Tr. 3013:22-3014:10 (Smith) (agreeing with the reduction); P2043.14 (depicted separately as Security Lead, Security Training, Security Officers, Security Armorer/Trainer, and Security Training for New Hires); Tr. 3272:16-3273:4 (Wise) ("adjustments [are] either in the form of changes to budget items and budget item costs, or offsets that would be appropriate to include in the analysis"); Tr. 7477:3-13 (Wise) (agreeing that P2043.14 lists Maine Yankee's agreed changes).

– P1726MY "Backup to Section 1 Sorted by Cost Center" at lines 4, 6, 17, 18, and 19 (noting security staffing and training).

e. Maine Yankee adjusted its damages claim downward by $29,421 by removing the salary for a Fitness For Duty ("FFD") Medical Review Officer after fuel is

removed in 2010. This downward adjustment is for ISFSI operations damages for 2004 and after.

> – Tr. 3014:11-20 (Smith) (agreeing with the reduction); Tr. 3272:16-3273:4 (Wise) ("adjustments [are] either in the form of changes to budget items and budget item costs, or offsets that would be appropriate to include in the analysis"); Tr. 7477:3-13 (Wise) (agreeing that P2043.14 lists Maine Yankee's agreed changes).

> – P1726MY "Backup to Section 1 Sorted by Cost Center" at line 16 (noting FFD coverage).

f. Maine Yankee adjusted its damages claim downward by $970,961 to account for the use of a lower load of 54-kilowatt hours in Maine Yankee's ISFSI electrical usage estimate. This downward adjustment is for ISFSI operations damages for 2004 and after.

> – Tr. 3014:21:3015:11 (Smith) (agreeing with the reduction); Tr. 3272:16-3273:4 (Wise) ("adjustments [are] either in the form of changes to budget items and budget item costs, or offsets that would be appropriate to include in the analysis"); Tr. 7477:3-13 (Wise) (agreeing that P2043.14 lists Maine Yankee's agreed changes).

> – Tr. 6359:9-14, 6361:14-15 (Johnson); P1726MY "Backup to Section 1 Sorted by Cost Center" at line 71 (plant energy for Maine Yankee).

g. Maine Yankee adjusted its damages claim downward by $219,788 to account for non-incremental maintenance agreements. This downward adjustment is for ISFSI operations damages for 2004 and after.

> – Tr. 3277:19-21 (Wise); Tr. 7477:3-13 (Wise) (agreeing that P2043.14 lists Maine Yankee's agreed changes).

> – Tr. 6341:25-6342:5, 6349:21-6350:5 (Johnson); P1726MY "Backup to Section 1 Sorted by Cost Center" at line 68 (maintenance agreements).

## X. <u>TAKINGS</u>

179. The federal government has had responsibility for the disposal of SNF from domestic commercial utilities since before the enactment of NWPA.

– 10 C.F.R., Part 50, App. F. (2004) ("Disposal of high-level radioactive fission product waste material will not be permitted on any land other than that owned and controlled by the Federal Government.").

– Tr. 276:3-7 (Mills) ("[F]rom the very beginning of the commercial nuclear program in the United States, it was always understood that the federal government would be responsible for the disposal of waste from the program."); Tr. 276:18-24 (Mills) ("And it was a very well understood arrangement within the federal government at that time within the Atomic Energy Commission, as well as within the industry, that they [the government] would be responsible because of the concern of high-level waste and safety – long-term safety that they would be responsible for that.").

– Tr. 1680:17-1681:4 (Bennet) ("Well, it's always been our understanding that the federal government would be responsible for disposal of spent fuel. As I described early on, they actually owned the spent fuel. And until commercial power reactors were allowed to own it, that was the primary understanding. But with the high-level waste policy put in place, that put in place the mechanism by which they do that, that's the – that set up a reliance we had on their responsibility for spent fuel.").

180. The government has plenary authority to accept and store SNF. 42 U.S.C. §§ 2075, 2096, 2201(m) (2000); Brief for the Dep't of Energy at 25, *Idaho v. Dep't of Energy*, No. 91-70094 (9th Cir. filed Mar. 11, 1991); 42 U.S.C. § 2021c(b) (LLRWPAA).

181. DOE has decided to store SNF at utility sites until a repository is available.

– P1216 at 1 (July 6, 2001 letter from DOE Secretary Abraham to Governor King of Maine) (DOE is continuing to pursue repository but SNF may continue to safely be stored at utility sites in the meantime).

182. The government is using Maine Yankee's property for a public purpose – the storage of SNF.

– Tr. 2746:6-2749:17 (Thomas) (Maine Yankee implemented dry storage because "Maine Yankee had to deal with the spent fuel because the Department of Energy was not picking it up" pursuant to its contract with Maine Yankee).

– Tr. 7345:4-14 (Smith) ("[I]f the DOE would have shown up on site at Maine Yankee and removed the fuel in the committed time frame per the contract, there would have been no need to even construct the ISFSI or to transfer fuel. . . [T]he real point, the real fact is that if the DOE would have performed according

to their contract, it would never have been a need to construct an ISFSI or move spent nuclear fuel.").

– Tr. 3478:1-4 (Kouts) (DOE has no plan to accept commercial spent fuel that does not lead to the repository).

183. The government's use of Maine Yankee's property will continue until at least 2010, and more likely than not will continue for years beyond that time.

– P951 at 27,008 (DOE "Notice of Inquiry," Waste Acceptance Issues, 59 Fed. Reg. 27,007) (May 25, 1994) (In May 1994, DOE stated in a Federal Register notice that it would not be able to begin disposing of spent fuel in 1998 because a repository would not be operational until, at the earliest, 2010).

– P1456MY (November 3, 1997 Report by Raytheon, "Independent Assessment of Wet v. Dry Spent Fuel Storage" for Maine Yankee states, "Given . . . the risk of depending on someone else to 'take-over' Maine Yankee's high-level wastes, it appears prudent for MYAPC to assume that spent fuel will remain on-site until a repository is operational. A 2010 date for operation of this first-of-a-kind facility with century-long performance assessments to be accepted for public licensing in a state that has continually contested the selection and delayed the limited progress is clearly (and admitted by DOE) optimistic.").

– Tr. 5606:21-5607:6 (Abbott) (acknowledging that he had testified at his deposition that, if he were advising a client who was planning in a decommissioning cost estimate to estimate the time of the spent fuel pickup at 2010, he would say make it 2015, and it's likely it may never happen); Tr. 5609:10-13 (Abbott) ("Today, if we did a decommissioning cost estimate, I would probably say it would be 2015 for the purposes of putting the estimate together.").

– Tr. 3483:13-3484:7 (Kouts) (unaware of any proposal for government storage that would allow government acceptance of spent fuel prior to 2010).

184. The property the government is using for a public purpose consists of the approximately 20 acres on which Maine Yankee's ISFSI is situated.

– Tr. 2783:2-5 (Thomas) (the amount of "property [that] has been taken by storage of the spent fuel and high-level waste at Maine Yankee's ISFSI . . . is 20 acres.").

185. The property that the government has taken has a fair market value of $4,100 per acre, totalling $82,000 for 20 acres.

– Tr. 2783:18-19 (Thomas) ("I believe $4,100 an acre to be a reasonable estimate.").

– Tr. 2787:16-2789:25; Tr. 7224:5-15 (Thomas) (in August 2004 Maine Yankee sold approximately 431 acres of land to the Ferry Road Development Company for $1,750,000, which amounts to $4,060 per acre).

– P1750MY at AUD028295, AUD028298 (Estimate of April 1, 1997 and April 1, 1998 by Norman A. Gosline showing a value of $4,100 per acre for Maine Yankee's land); Tr. 2785:8-19 (Thomas) (explaining that $4,100 is obtained by dividing the total land value of $3,350,000 by 820± acres).

– P1751MY at AUD028291 (Updated estimate of May 21, 1999 by Norman A. Gosline showing a value of $4,100 per acre for Maine Yankee's land); Tr. 2785:20-2786:16) (Thomas) (explaining the updated estimate).

Dated: November 17, 2004

Respectfully submitted,

_s/ Jerry Stouck________________

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639

Counsel for Plaintiff,
MAINE YANKEE ATOMIC POWER COMPANY

Of Counsel:

Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH