**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| MAINE YANKEE ATOMIC POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 98-474 C<br>(Senior Judge Merow)<br><br>Filed electronically February 18, 2005 |

**MAINE YANKEE'S REPLY ON IT'S**
**<u>POST TRIAL PROPOSED FINDINGS OF FACT</u>**

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639 (facsimile)

Counsel for Plaintiff,
MAINE YANKEE ATOMIC POWER COMPANY

Of Counsel:

Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH

Dated: February 18, 2005

# Table of Contents

**Page**

I. General Findings and DOE Contract ....................1

II. Reracking ....................14

III. GTCC Waste ....................15

IV. Good Faith and Fair Dealing ....................16

V. Damages ....................16

VI. The Government's Proposed Alternative Damages Findings Set Forth in Its "Additional Response To Maine Yankee's Proposed Damages Findings" Fail to Account for the Agreed Changes to Maine Yankee's Damages or Are Wrong ....................33

A. The Government's "Summary" of the Abbott/Johnson Criticisms is Unreliable and Unhelpful....................38

B. The Government's Proposed Alternative Findings That Certain of Maine Yankee's Damages Were Not Caused By the Breach Are Wrong. ....................39

C. The Government's Assertions That Maine Yankee's Claim Must Be Reduced to Eliminate Contingency and Purportedly Speculative Property Tax Costs is Wrong. ....................48

D. The Government's Assertions That Maine Yankee's Damages Must Be Reduced to Eliminate Unreasonable Costs Either Fails to Account for Changes Agreed to at Trial or Are Wrong....................50

E. The Government's Proposed Alternative Findings That Maine Yankee's Damage Should Be Reduced to Eliminate Unsupported Costs is Wrong Because Maine Yankee Provided the Government With Support. ....................64

F. The Government's Position re Discounting Maine Yankee's Future Damages to Present Value is Incorrect. ....................65

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| MAINE YANKEE ATOMIC POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 98-474 C<br>(Senior Judge Merow)<br><br>Filed electronically February 18, 2005 |

**MAINE YANKEE'S REPLY ON IT'S**
**POST TRIAL PROPOSED FINDINGS OF FACT**

Maine Yankee submits this reply to the government's response to Maine Yankee's post-trial proposed findings of fact. As was the case in responding to the government's proposed findings, Maine Yankee can efficiently address many of the government's responses to Maine Yankee's Proposed Findings ("GRMYPF") in categories, while providing some additional replies to individual government responses. In many instances, the GRMYPF simply cite the government's own proposed findings of fact, to which Maine Yankee has already responded. Maine Yankee will not repeat those responses here, but instead respectfully refers the Court to Maine Yankee's prior filing.

## I. General Findings and DOE Contract

To a remarkable degree, the government's responses to Maine Yankee's proposed findings regarding general issues and the DOE contract deliberately ignore or speak past the evidence cited by Maine Yankee. Instead, the government stubbornly bases its responses on the government's views of the Contract, most of which have already been rejected by the Court. *See* Order of June 26, 2003, substantially adopting *Commonwealth Edison Co. v. United States*, 56

Fed. Cl. 652, 663 (2003). For example, the government cites *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994), at least two dozen times, for the proposition that testimony is not admissible on the issue of reasonable government performance. S*ee* GRMYPF 33-37, 41-56, 58, 72-74. The government's heavy reliance on *Berry* is misplaced, however, as it is neither a Federal Circuit decision nor even a contract case. It addresses the admissibility of expert testimony on the ultimate issue of fact in a 42 U.S.C. § 1983 case. Instead, in *David Nassif Assoc. v. United States*, 557 F.2d 249, 259 (Ct. Cl. 1977), the Federal Circuit's predecessor made clear in a contract case that consideration of testimony and other evidence is appropriate to determine what reasonable contract performance would have been where a term is missing from the parties' contract. This Court's ruling noted above (based on *Commonwealth Edison*) made clear that the DOE contract does not set out the terms of DOE's performance.

Likewise, the government's reliance on *First Heights Bank, FSB v. United States*, 51 Fed. Cl. 659 (2001), *see* GRMYPF 52, for the proposition that testimony is irrelevant to the Court's interpretation of the obligations created by the DOE contract is also misplaced. *First Heights* merely recites the traditional rule that extrinsic evidence will not be received to aid the interpretation of "the terms of a contract that is clear on its face." 51 Fed. Cl. at 659 (internal citation omitted). As explained above, however, this Court has already ruled that the DOE contract is not clear on its face.

The government similarly asks the Court to ignore much of the evidence cited by Maine Yankee regarding what reasonable DOE performance would have been on the ground that such performance is not contractually binding. *See, e.g.,* GRMYPF 55-56 (arguing that Mission Plan and related documents are not binding), 75 (arguing that testimony regarding the need for acceptance capacity to handle unanticipated contingencies is irrelevant, because such capacity is

not contractually required), 68 (arguing that evidence of DOE's plans to accept 3000 MTU of spent fuel per year is irrelevant because there is no obligation in the contract to accept spent fuel at that rate). Maine Yankee, of course, has not alleged that such documents were intended to automatically impose binding obligations. But such evidence is highly probative of what reasonable DOE performance would have been – evidence that the Court may use in the absence of an acceptance rate term in the parties' contract to fashion an appropriate acceptance rate provision.

4. The government's argument that the reasonably constant rate at which Maine Yankee will accrue damages beyond 2010 was not litigated at trial is belied by evidence cited with MYPF 177. Although Maine Yankee is not requesting in this litigation a judgment to include such damages given the remote possibility that the government might perform by 2010, a finding regarding the accrual of such damages would help promote a more efficient resolution of the claim that Maine Yankee will likely eventually have to bring for such damages.

32. The government's argument that Dr. Wise did little independent analysis of plaintiffs' damages claims does not fairly reflect the totality of his testimony or what Dr. Wise, in fact, did in this case. Dr. Wise explained well his close interaction with plaintiffs and his role in assessing plaintiffs' damages. Tr. 3352:12-3356:21.

53. The government's assertion that no evidence supports the portion of the finding that DOE would compensate utilities for the failure to timely accept spent fuel is belied by P633, which states clearly DOE's contingency plans in the event a repository is delayed. *See* P633 at PNL-173-1284-85 (if the repository is expected to be delayed by less than two years DOE will either add buffer storage at the repository or take title to the spent fuel and move it into dry

storage at the utility and pay a rental fee to the utility to store the casks at the reactor; if the repository is expected to be delayed by more than two years, then DOE would construct a MRS).

54. The government's claim that it specifically rejected utilities' requests for more detail in the Standard Contracts is not supported by the cited government proposed findings. Those findings either merely claim that DOE did not adopt the suggestions of certain utilities or reflect Mr. Morgan's *post hoc* explanations for DOE's actions. The government has not cited any evidence to dispute the finding in MYPF 54.b. that DOE did not contemporaneously disavow the utilities' expressed understanding of the Standard Contracts.

The government's assertion that Maine Yankee misstated the parties' understanding of the program's goals as set forth in early program documents is flatly wrong. The government's claim that DOE did not intend to eliminate the need for all utilities to construct additional at-reactor storage is belied by P678 at 11 (Mr. Morgan's December 1983 "Program Overview" for OCRWM), which stated clearly that "[d]uring the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that *no* utility would have to add *any* further storage facilities either on site or at another location." (emphasis added). P636 (a December 1983 draft of the Mission Plan) at 2-1, cited by the government, is in accord with Maine Yankee's proposed finding ("The waste materials will be accepted in accordance with a Waste Acceptance Schedule designed to provide an acceptance rate in the first five years such that *no* utility will have to provide additional storage capacity after January 31, 1998." (emphasis added). The Draft Mission Plan went on to explain that while an individual utility might face a need for expanded storage due to the timing of its shipment allocation, it was expected that in such instances, utilities would exchange with other utilities with earlier allocations and that "such

brokering arrangements should prevent the need for *any* utility to expand on-site storage and minimize transshipments.") (emphasis added). *See* P636 at 2-2 and 2-4.

57. Although the government argues that efficiency is not a contract requirement for the pace and schedule of SNF acceptance, the government concedes that efficiency is indeed "a program goal or objective," as the Yankees have alleged in its proposed findings. The government's argument that Dr. Bartlett's testimony that OCRWM was concerned with moving "must-move" fuel when he was director should be discounted because Dr. Bartlett approved the 1991 ACR, P60, which did not provide for must-move acceptance, misses the mark. As the government has emphasized, that ACR was submitted to Dr. Bartlett for approval with a memorandum, *see* D23, asserting that the acceptance rates in that ACR would enable utilities to avoid adding onsite storage (*i.e.*, the acceptance rates would address must-move fuel). Although, as the government acknowledges, the 1991 ACR acceptance rates would actually not have addressed all must-move fuel, the approval memorandum shows that such performance was a concern for OCRWM in general and Dr. Bartlett in particular. In other words, Mr. Milner (the official who signed D23) must have thought that at least claiming that the rates in the ACR would adequately address at-reactor storage needs was appropriate in order to secure Dr. Bartlett's approval of the ACR.

58. Once again, although the government argues that cost-effective performance was not a contract requirement, the government acknowledges that "the full costs recovery nature of the Standard Contract translates into a program goal or objective of operating the program in a cost-effective manner." The government's argument that Mr. Graves did not consider total system costs is wrong. In addition to his consideration of utilities' costs, as noted in MYPF 71, Mr. Graves relied, in part, on government studies, including P175, showing that an acceptance

rate of 3,000 MTU per year would have to minimize program costs. Tr. 782:10-783:3. He also considered the impact of exchanges on the ability for DOE to use efficient acceptance campaigns and found that the use of exchanges would have been much more consistent with campaigned acceptance than OFF acceptance. Tr. 836:1-839:24 and Graves Demonstrative 90.

60. The government's disputation of a generally self-evident fact (that is also supported by undisputed trial testimony), that a utility's at-reactor SNF storage costs rise if it is forced to add to its at-reactor storage capacity or if it is forced to extend at-reactor storage of SNF after it permanently shuts down, reflects a general lack of credibility in the government's positions. The government's claim that the costs of operating a particular type of storage facility does not generally depend on the amount of SNF and it is besides the point; plaintiff's proposed findings address situations where costs rise because either a new facility must be constructed and operated or an entire existing facility has to be operated because of the presence of SNF.

61. The government's claim that growth in must-move fuel could not be projected to rise at a 3,000 MTU per year rate is belied by the evidence the government itself cites in response to MYPF 63. It is unhelpful for the government to raise technical objections to the evidence in supporting proposed findings while elsewhere essentially conceding the essence of the finding. The government's claim that D23, the approval memorandum for the 1991 ACR, represents an "analysis" that the acceptance rates in that ACR would accommodate at-reactor SNF storage needs is wrong. The statement in the document is an unsupported assertion, and the government presented no analysis to substantiate this assertion. Moreover, the government's claim is contrary to Mr. Pollog's testimony. Tr. 4039:22 – 4047:1. Moreover, Mr. Graves demonstrated that the 900 MTU acceptance rate would not have addressed at-reactor storage needs. Tr. 786:23-788:7; 918:7-919:11; 7503:3-7506:9.

62. The government's argument that Dr. Bartlett stated that an annual acceptance rate of 900 MTU would have been reasonable uses Dr. Bartlett's statement out of context. Although it was reasonable for Dr. Bartlett to approve the 1991 ACR with a 900 MTU acceptance rate, that fact does not mean that such performance would have been reasonable in the context of the parties' 1983 agreement. By 1991, DOE had already made clear that it would not have a repository ready until 2010 and limitations on acceptance at another facility imposed by the 1987 NWPA amendments constrained other acceptance. *See* P101 (1989 Report to Congress on Reassessment of Program) and P60 (1991 ACR). Given that situation, acceptance of 900 MTU per year was reasonable in the sense that it was about the best DOE could do under the circumstances. Tr. 706:22-707:5 (as Dr. Bartlett testified, such a rate was not desirable, but reasonable).

63. The government's disputation that annual aggregate commercial discharges could be projected to be about 2,000 MTU is silly, given that the evidence cited by the government is consistent with such discharges being at a rate between 2,000 and 3,000 MTU. If anything, the evidence cited by the government would indicate that acceptance at a rate higher than 3,000 MTU per year would have been reasonable.

64. The government's urged distinction between acceptance from utilities and an efficient throughput for the DOE system is also silly. If DOE fails to accept spent fuel from utilities at a rate of at least 3,000 MTU per year then it could not run its system at an efficient 3,000 MTU per year rate because it would lack sufficient spent fuel to put through its system. Dr. Bartlett's testimony is in accord with this reality. Dr. Bartlett explained that the reasonable rates of acceptance from utilities and emplacement in a repository are the same 3000 MTU per year, in part because of how the two tasks relate to each other. Tr. 609:20-611:11.

66. Importantly, the government's response concedes that the evidence establishes "that campaigns are 'efficient'." The government's claim that plaintiff has not shown the relevance of campaigns in light of the oldest-fuel-first concept is wrong. Mr. Graves demonstrated that exchanges would have led to efficient campaigns. *See* MYPF 76.a.

68. The government correctly notes that there is a typographical error in Plaintiff's proposed findings; of course, the finding intended to note that DOE has been planning to accept 3,000 MTU per year from utilities. As noted in the reply to MYPF 64 above, the government's claim of significance between acceptance from utilities and emplacement in a repository is without merit. The government's claim of a distinction between use of a 3,000 MTU per year rate to determine program costs and use of that rate in determining an adequate fee is similarly silly. The purpose of the fee under the cost recovery program, of course, is to adequately fund the program.

69. The government's disputation of this proposed finding that DOE could technically have accepted spent fuel from utilities at a 3,000 MTU per year rate is evasive and disingenuous. It is obvious that the government cannot dispute that DOE could have accepted 3,000 MTU per year from utilities. The government's failure to find a place to put the spent fuel reflects the breach, not a technical impediment to robust acceptance. As reflected by the evidence cited by plaintiff (noting locations in Australia and Owl Creek), and indeed the ISFSIs plaintiff and the other Yankees are building at their sites, it is not technically difficult to identify a location at which to store spent fuel.

70. The government's suggestion that acceptance of 900 MTU per year would have been reasonable absent the breach is without merit for the reasons noted in the replies on MYPF 61 and 62 above. Importantly, the government has not proposed a finding that a 900 MTU per

year acceptance rate would have been reasonable absent the breach. The government's claim that it would have accepted spent fuel at the rates in the 1991 ACR is wrong as shown in Maine Yankee's response to GPF 93.

71. The government's claim that the record contradicts Dr. Bartlett's opinion that a ramp up to acceptance of 3,000 MTU per year could reasonably be accomplished in three years is wrong. The government's assertion that DOE was planning to accept spent fuel at a 900 MTU per year is not supported. The 1991 ACR does not support this claim as noted in response to GPF 93. The government's argument that a centralized interim storage facility is not the same as an MRS is beside the point (and the government cites no evidence for its assertion that Dr. Bartlett said that the facilities were the same). As explained by Dr. Bartlett in testimony cited by plaintiff, a centralized interim storage facility is the sort of facility that DOE could have used to accept spent fuel from utilities at a reasonable rate starting in 1998. The government's claim that plaintiff cannot establish what DOE actually would have done if it had started acceptance in 1998, missed the mark. Plaintiff's evidence (and the relevant issue) goes to what DOE should have done to meet its obligation to accept spent fuel at a reasonable rate. In addition, the government's reliance on P978 to challenge the ramp up rate set out in the proposed finding is misplaced. P978 (a June 1983 report on financing the DOE program) assumes that DOE will accept 1800 MTU of spent fuel in the first five years of program operations (a total of 9000 MTU). This is about the same as the ramp up used by Mr. Graves, in which the first five years of acceptance (1200, 1200, 2000, 2000, 2700) totals 9100 MTU.

72. The government's claim that the parties' contract requires OFF acceptance except for three exceptions notably ignores Art. VI.B.1(b).1. Similarly the government's argument that it can only be held liable for acceptance of spent fuel on an OFF basis ignores this Court's June

28, 2004 Order explaining that the Court must determine how the exchanges provision would have been used absent the government's breach.

75. For the most part, the government's disputation of plaintiff's proposed finding that utilities would have exchanged acceptance allocations consistent with their economic interests is based on the government's misinterpretation of Mr. Graves' analysis, debunked in plaintiffs' response to the government's proposed findings, that this finding depends on the development of a "perfect" market. Indeed, the government now admits that "some" exchanges may have occurred absent the breach.

a. The government's suggestion that Mr. Collier's testimony showing that utilities do tend find efficient ways to trade rights to further economic self interests should be ignored because his examples only pertained specifically to the front-side of the fuel cycle is without merit. The government offers no support for the proposition that utilities would have acted contrary to their economic self interests regarding the back end of the fuel cycle absent the breach.

b. Maine Yankee cites the evidence of prior success between the industry and DOE on dealing with fuel enrichment services as a good indication of the kind of success that the parties would have enjoyed arranging for exchanges under the spent fuel contracts. The government's accusation that plaintiff is trying to mislead the Court here is unhelpful and belies the fact that the government lacks any basis with which to appropriately dispute plaintiff's evidence. The government's claim that the plaintiff's statement that a robust and effective market developed is unsupported simply ignores Mr. Collier's testimony.

76. The government's assertion that its proposed findings show that DOE would have used a variety of criteria to analyze proposed exchanges is wrong. GPF 139 merely asserts that certain criteria "may" have been used.

a. The government asserts that Mr. Graves' model only shows allocations for some of the spent fuel acceptance through 2002 (assuming reasonable government performance). The government's claim that this assertion is supported by GPF 171 is wrong. That proposed finding simply asserts that under Mr. Graves' model, some of the spent fuel acceptance goes to utilities with must-move fuel.

b. The government's disputation of Maine Yankee's statement that exchanges would have led to DOE's acceptance of "cooler" fuel wrongly focusses on operating utilities. The point of the finding is that the exchange provision would have enabled shutdown reactors that have quantities of "cooler" fuel to ship all of their fuel to DOE.

77. It is significant that while the government technically disputes this proposed finding that there are no significant technical or transportation impediments to exchanges, the government does not even to attempt to address the particulars of Mr. Stuart's testimony cited by plaintiff on this issue.

78. The government is wrong to assert that it was not obligated by the parties' contract to accept SNF upon a reasonable or efficient schedule. Given the absence of more specificity in the contract, the Court must supply the terms of reasonable performance.

82. The government's claim that the record indicates that DOE would not have granted priority to plaintiff, if necessary, to prevent the company from waiting a substantial period to complete its decommissioning is unsupported. Similarly, the government's claim that there is no evidence of how DOE would have provided priority is belied by the Final Rule cited

by the government. The government's claim that Mr. Milner testified that DOE did not have an objective of granting priority to shutdown reactors tellingly does not meet plaintiff's evidence. The evidence cited by Maine Yankee is Mr. Milner's testimony that DOE has had an objective of allowing shutdown reactors to timely decommission. Preferably, that objective would have been met through an efficient swap mechanism. As stated in the proposed finding, the granting of priority to shutdown reactors would only have been used, "if necessary."

85. The government's primary reason for disputing this proposed finding that program delays caused Maine Yankee to reasonably believe that DOE would not start acceptance by January 1998 or proceed on a reasonable schedule and that there was significant uncertainty regarding the date when DOE would begin acceptance is that the proposed findings do not cite testimony from Yankee witnesses. The government ignores, however, testimony from Messrs. Thomas and Jordan, and the documents cited that fully support the proposed finding. Ultimately, the government has no means with which to dispute the cited evidence. As noted in the response to GPF 93, the 1991 ACR is not to the contrary, as the ACR made clear, and DOE knew, that the acceptance scheme set out in that document was inconsistent with existing law.

86. Although the government complains that the evidence supporting this proposed finding that Maine Yankee has not had options other than on-site storage of its SNF available is limited, the government neither disputes that evidence nor offers any contrary evidence on the issue.

87. The government does not dispute that Maine Yankee took the steps that it did. Instead, the government appears to argue that those steps were not taken in anticipation of DOE's breach, noting the government's proposed findings on that issue. Maine Yankee has

already responded to the GPF. The government's assertions that Maine Yankee would have run out of room in its spent fuel even if DOE had performed is refuted by MYPF 116-118.

88. The government does not dispute the gist of this proposed finding, that beginning in the late 1980s and through the late 1990s Maine Yankee evaluated alternatives for extended storage of its SNF and that these actions were reasonable. Instead, the government argues that these actions were not caused by the DOE breach. As established in MYPF 116-118, Maine Yankee was not going to run out of space in its pool so as to require anything more than a small, temporary rack if DOE had performed. Further, the government's argument that the studies evaluating whether Maine Yankee should store its SNF wet or dry show that a desire to decommission promptly, not the government's breach, was the cause of the need for extended storage is without merit. If DOE had been performing, the studies themselves would not have been necessary because DOE would have been removing the fuel, and Maine Yankee would not have needed to determine how best to store it. The need to decommission may have been a factor in the manner of extended SNF storage chosen by Maine Yankee, but the need to chose at all was caused by DOE's breach.

89. The government's arguments regarding this proposed finding are addressed in the replies on MYPF 88 above.

93. The government complains that Mr. Bennet's testimony is without foundation. Given that the Court has already received this evidence, this argument is not available to the government. Moreover, the argument is without merit. Mr. Bennet's testimony goes to the issue of why use of a transportable storage container for SNF is reasonable and appropriate for a shutdown reactor, which is the substance of the proposed finding.

94. Maine Yankee has already refuted the government's arguments that failed fuel is subject to delayed acceptance in its responses to the government's proposed findings of fact. But even if the that government were true, it would not support the government's argument that Maine Yankee's decision to store its failed fuel dry is, thus, not reasonable and appropriate. Indeed, the longer the duration of the storage, the more appropriate the use of dry storage. *See* GRYAPF 102 (conceding that economics generally favors dry storage over the long term).

96. The government's effort to link Maine Yankee's implementation of dry storage of its SNF to Mr. Graves' model of exchanges is without merit. The testimony cited explicitly relates to wet pool storage costs, not the costs of dry storage. The government's arguments with respect the excepts to Mr. Thomas' testimony cited appears to reflect a misreading of the testimony or the citations by the government; the first, citation, for example, is to three pages of testimony, not the few lines noted by the government.

## II. Reracking

107. The internal inconsistency in the government's response reflects the lack of merit to the government's challenge to Maine Yankee's rerakcing damages. On the one hand, the government argues that Maine Yankee had to rerack despite DOE's breach because Maine Yankee was scheduled to run out of pool space in 1996. On the other hand, the government argues that if Maine Yankee had waited to rerack until after 1996, then it would have found that no reracking was necessary because of its shutdown. MYPF 116-118 make clear that Maine Yankee was not going to run out of pool space in 1996. Nevertheless, it was not incumbent on Maine Yankee to wait until the very last second to rerack its spent fuel pool. The government has offered no evidence for the proposition that the timing of Maine Yankee's reracking was unreasonable or inappropriate.

108. These government arguments are addressed in Maine Yankee's responses to the cited government proposed findings and in MYPF 116-118.

**III. GTCC Waste**

130. Notwithstanding the hesitation by the government's counsel at closing argument to admit that the government would concede anything regarding GTCC waste, the government's response certainly does not dispute that GTCC waste is highly radioactive.

131. Although the government purports to dispute the finding that disposal in a repository constitutes permanent isolation, the government does not address (and cannot avoid) the admission of this issue by its Rule 30(b)(6) witness.

134. Notwithstanding the government's claim of lack of evidence on this point, there is ample support for the fact that the government has long been responsible for the disposal of high-level radioactive waste. *See, e.g.*, MYPF 33.

138. Helpfully, the government concedes "that the NRC has determined that GTCC waste requires permanent isolation 'unless proposals for disposal of such waste in a disposal site licensed pursuant to this part are approved by the Commission'." MYPF138 (*citation omitted*). And the government also concedes that it has not even proposed such an alternative. The government's claim that "[a]s part of the rule" NRC emphasized that it intended to preserve DOE's flexibility is wrong. The statement appears in the explanation of the rule, not the rule itself. *See* P1069 at 22579. And while the NRC clearly intended to preserve DOE's flexibility to pursue alternatives, that fact is not inconsistent with presently requiring (as it did in 1998 when DOE's performance was due) permanent isolation in order to "ensure that GTCC wastes are disposed of in a manner that would protect the public health and safety . . .." P1069 at 22578.

139. As is the case with spent fuel, the parties' contract is silent regarding the timing of DOE's obligation to remove GTCC waste. The cited evidence is support for the provision of a

reasonable term, that such waste had to be removed no later than the last of a utilities' spent fuel. The government's failure (and inability) to dispute any of the cited evidence or to offer any contrary evidence on this issue is telling.

## IV. Good Faith and Fair Dealing

146. The government's claim that the proposed finding, that DOE instructed and required Maine Yankee to complete its DCSs in conformity with the pace and schedule for spent fuel acceptance in the 1991 ACR, is contrary to the evidence is unsupported. Ultimately, the government's "response" further confirms the proposed finding.

148. The government's response to this proposed finding that DOE required utilities to conform their DCS to the acceptance rates in the 1991 ACR because it wanted to try to limit its liability to utilities is limited to a series of too late or rejected evidentiary arguments concerning the Court's decision to accept Mr. Vance's testimony and a plea to discredit his testimony because his employer represents other nuclear utilities. The notion that testimony from witnesses should be rejected as incredible if an interested party employs them is unhelpful, as it would effectively eliminate consideration of most evidence from witnesses with knowledge.

## V. Damages

In its responses to Maine Yankee's proposed findings 152-178, the government asserts boilerplate objections to Maine Yankee's damages based on 1) purported deficiencies in Mr. Graves' economic sequence model; 2) assumptions Maine Yankee made in planning documents purportedly based on "timely DOE performance," but actually reflecting planning in the face of DOE's breach; 3) the government's position that the DOE contract does not cover GTCC waste or require timely acceptance of failed fuel; 4) alleged deficiencies in the discount rate used by Maine Yankee in computing its damages; 5) the government's adjustments to Maine Yankee's damages, set forth in the government's alternative damages findings ("GAF"). Those objections

have all been refuted in Maine Yankee's previous post-trial submissions and/or are addressed elsewhere in this reply. Maine Yankee's reply points below address only objections other than this boilerplate that the government has asserted in response to Maine Yankee's indicated proposed findings.

152. The government's assertion that absent the breach, Maine Yankee would have constructed a dry storage facility to support prompt decommissioning of its site, to make use of existing personnel, to ensure availability of a low-level waste site for decommissioning waste, and to facilitate site reuse is wrong. First, these points were addressed in the Yankee's Response to the Government's Post-Trial Legal Brief at 20-23. Second, the cited testimony does not support the government's contention. *See* Tr. 2747:16-2754:8 (Thomas) (Maine Yankee considered both wet and dry storage as options for the long term storage of its spent nuclear fuel and its Decommissioning Operations Contract ("DOC") with Stone & Webster included the option to pursue both wet or dry storage); Tr. 3160:1-3164:23 (Meisner) (the availability of a low-level waste site was not a major determining factor in Maine Yankee's decision to go forward with decommissioning; it was a secondary concern because Maine Yankee had a range of options for disposing of its low-level waste materials.) Finally, not one of the purported supporting cites in the government's response even discusses re-powering at Maine Yankee.

153. *See* Response to 152 above regarding the government's contention that Maine Yankee would have constructed a dry storage facility to support prompt decommissioning of its site, to make use of existing personnel, to ensure availability of a low-level waste site for decommissioning waste, and to facilitate site reuse. Additionally, the government's contention that the inclusion of Maine Yankee's 2002 costs in past damages is a "mischaracterization of the evidence adduced at trial" is incorrect. Maine Yankee has in fact incurred costs for wet fuel

storage through 2002 and such costs are appropriately categorized as "past." That Maine Yankee "estimated" its wet pool storage costs does not transform such costs into "future" costs. To the contrary, Dr. Wise explained his categorization of costs as between the "past" and "future:" "we submitted the [expert] report in 2003 so at that point, 2003 was the future and 2002 was the past." Tr. 3248:8-9 (Wise). *See also* Plaintiffs' Demonstrative 2043A.14 (showing Maine Yankee's past damages in 2002 and prior years and future damages from 2003 forward). Since 2002, Maine Yankee has continued to incur additional costs due to DOE's breach, so at present an even greater percentage of Maine Yankee's damages are comprised of past costs. Tr. 3202:11-12 (Wise) (by 2003, a very large percentage of the costs were past costs).

154. *See* Response to 152 above regarding the government's contention that Maine Yankee would have constructed a dry storage facility to support prompt decommissioning of its site, to make use of existing personnel, to ensure availability of a low-level waste site for decommissioning waste, and to facilitate site reuse. Additionally, the government's assertion that Maine Yankee's future minimum damages are speculative and should await future adjudication is without merit, as set forth in Maine Yankee's response to DFF 314.

155. Contrary to the government's assertion, the terms "reasonable" and "reliable" in this finding are not vague. Maine Yankee's process for preparing the February 20, 2003 Rev. VII Budget, which is part of P1726MY, as described in MYPF ¶¶ 155 and 163-167, bolsters the reasonableness and reliability of Maine Yankee's estimates. Furthermore, the government's assertion that "the purposes for which FERC uses long-term costs estimates are different from the damages analysis in which this Court must engage," and citing Mr. Johnson's testimony (Tr. 6325-6326) that "it's incumbent upon the proper measurement of an asserted claim for damages for it to reflect the best estimate, only the best estimate," 1) ignores the fact that the FERC

estimate is relevant to the reasonableness of the damages claim, as the government's expert acknowledges, Tr. 5570:20-5571:22 (Abbott).

156. While accepting that Maine Yankee's damages claim fall into the three categories of ISFSI Construction, ISFSI Operations and Wet Pool-Related, the government objects to the contention that Maine Yankee has suffered any damages, citing its responses to the proposed findings above. Maine Yankee, therefore, refers the Court to the above responses to government's objections to Maine Yankee's proposed findings.

157. *See* Response to 152 above regarding the government's contention that Maine Yankee would have constructed a dry storage facility to support prompt decommissioning of its site, to make use of existing personnel, to ensure availability of a low-level waste site for decommissioning waste, and to facilitate site reuse. The government's additional objections concerning adjustments the government asserts should be made to Maine Yankee's ISFSI Construction Damages, based on its witness' opinion that certain of the costs are "non-incremental" or "unreasonable," duplicates GAFs 1-105, to which Maine Yankee responds below. Additionally, the government's objection to Maine Yankee's statement that all ISFSI construction costs have been "incurred" is frivolous. As the government acknowledges, Maine Yankee completed all ISFSI loading in 2004, thus all loading costs have, in fact, already been "incurred." That certain of Maine Yankee's ISFSI Construction costs included in the Rev. VII Budget were, at the time the damages submission was prepared, "estimated" for the years 2003 and beyond is not disputed.

158. *See* Response to 152 above regarding the government's contention that Maine Yankee would have constructed a dry storage facility to support prompt decommissioning of its site, to make use of existing personnel, to ensure availability of a low-level waste site for

decommissioning waste, and to facilitate site reuse. The government's additional objections concerning adjustments the government asserts should be made to Maine Yankee's ISFSI Operations Damages, based on its witness' opinion that certain of the costs are "non-incremental" or "unreasonable," duplicates GAFs 1-105, to which Maine Yankee responds below. Additionally, the government's assertion in response to 158.d., that Maine Yankee's ISFSI staffing should be reduced to 2 full-time technical staff positions and one half-time corporate executive is wrong. *See* Tr. 3128:14-3139:19 (Meisner) (explaining in detail the various functions and responsibilities required of each of member Maine Yankee's ISFSI staff and rebutting the government's experts assertions that Maine Yankee can or should operate with less staff). Furthermore, the government's response is not supported by the evidence it cites. Rather, P1462YA (cited by the government) supports Maine Yankee's current ISFSI staffing numbers. *See* YDK007538 (showing ISFSI staffing for 2002 and beyond at 5.1 FTEs – 2 on-site [Yankee] staff and 3.1 full time equivalent YNSD [Yankee Nuclear Services Division] staff – plus corporate staff of 3.5 FTEs); *see also* YDK007520 ("Overall staffing for the two options [wet and dry storage] differ, but total YNSD staffing is the same for both options . . . for the entire life cycle."); *compare* P1462YA, YDK007538 re dry storage staffing *with* YDK007537 re wet storage staffing). Staffing in D688 and D689 is for Connecticut Yankee's and Yankee Atomic's alternative GTCC only on-site storage alternatives in the nonbreach world, and is not relevant to the breach world staffing of Maine Yankee's ISFSI, which stores both SNF and GTCC waste**.** *See also*, Maine Yankee's response to GAFs 36 and 60 below, regarding corporate staffing.

159. *See* Response to 152 above regarding the government's contention that Maine Yankee would have constructed a dry storage facility to support prompt decommissioning of its

site, to make use of existing personnel, to ensure availability of a low-level waste site for decommissioning waste, and to facilitate site reuse. The government's additional objections concerning adjustments the government asserts should be made to Maine Yankee's Wet Pool Related Damages, based on its witness' opinion that certain of the costs are "non-incremental" or "unreasonable," duplicates GAFs 1-105, to which Maine Yankee responds below. Additionally, the government's objection to Maine Yankee's statement that all wet pool related costs have been "incurred" is frivolous. As the government acknowledges, Maine Yankee completed all ISFSI loading in 2004 (*see* Government's Response to MYPF ¶ 158), thus as of trial, all Wet Pool related costs have already been "incurred." That Maine Yankee's Wet Pool related costs were estimated is not disputed. *See also* Maine Yankee's response to the government's objection to MYPF ¶ 153 above.

With regard to the government's objection to the use of P169, the government produced in discovery a copy of the PNL Study from DOE's files at Headquarters (Bates no. HQR 25-0873-905). The PNL Study also is available to "DOE and DOE contractors from the Office of Scientific and Technical Information" and "to the public from the National Technical Information Service." P169 at 2. Pursuant to the Court's September 17, 2004 Order governing contractor-generated documents, P169 has been admitted.

Furthermore, the assertion in 159.c, that Maine Yankee's citation to Mr. Abbott's survey of other facilities' wet pool storage costs cannot support a finding that Maine Yankee's wet pool-related costs are reasonable, because the survey results are "utility specific," is belied by Mr. Abbott's own reliance on the wet pool costs at General Electric's Morris, Illinois facility as a good method of identifying and determining the cost of operating a wet storage pool. Tr. 5652:11-17 (Abbott). The further contention in 159.c. that Zion information "is not contained

with *(sic)* in an admitted exhibit" is disingenuous (and irrelevant), because the testimony regarding the Zion decommissioning cost study is in the record. Moreover, the implication in 159.c. that the cost of $7.5 million at Zion to "maintain dormancy" refers to something other than the annual cost to run the Zion spent fuel pool is wrong. Mr. Abbott identified the "4B Dormancy" period in the Zion report as the period having "fairly isolated wet pool costs." Tr. 6036:6-6037:25. And the conclusion in MYPF 159.c. regarding the annual cost of running Zion's wet fuel pool is not "base[d] upon the response to a hypothetical" but on knowledge of the author of the Zion decommissioning cost estimate. Tr. 6043:3-18 ("in our report C04-1326-002 [TLG's decommissioning cost study for the Zion Nuclear Power Station], the wet storage costs shown in tables 4.1 and 4.2 for period 4B must be added together to obtain the total wet storage costs for the Zion units. There is only one pool, and the wet storage costs were shared between both Zion pools.").

The government's cite to Mr. Abbott's opinion that staffing should be reduced to a total of 18 positions, also is unsupported. *See* Response to GAF 94, below.

Additionally, the government's contention in Response to MYPF ¶ 159.d, that the citation to Mr. Abbott's testimony regarding staffing estimates contained in decommissioning estimates for other plants is mischaracterized is false. The five decommissioning cost estimates that Mr. Abbott and ABZ (his company) prepared for other utilities, Tr. 5673:14-19, showed that, during periods when the only or the predominant activity is operation of the wet pool, wet storage staffing far exceeded the 18 positions net of security that Mr. Abbott claims is "reasonable" for Maine Yankee. The wet staffing numbers in those studies range from a low of 29.25 to a high of 112. *See* Abbott Demonstrative 1; Tr. 5687:4-10 (Abbott) (agreeing that 50 positions, net of security, is what he determined would be necessary to run the wet pool at Duane

Arnold); Tr. 5849:14-5850:5 (Abbott) (confirming wet storage staffing net of security of 112 in ABZ Nine Mile Point decommissioning cost estimate); Tr. 5853:3-5854:14 (Abbott) (conceding that wet storage staffing of 29.25 in ABZ Vermont Yankee estimate exceeds his estimate of 18); Tr 5855:1-5856:14 (Abbott) (acknowledging 60 wet storage staff in ABZ estimate for Calvert Cliffs); Tr. 5858:8-5860:7 (acknowledging wet storage staffing of 48.5 in San Onofre decommissioning cost estimate, in the preparation of which he was substantially involved).

In addition, contrary to Mr. Abbott's contention (Tr. 5383:15-5384:1), a January 29, 1996 Yankee memorandum re Wet Spent Fuel Storage Evaluation (D603), does not support his wet staffing opinion. As Mr. Heider, who participated in the meeting associated with the memorandum and whose initials are on the bottom of Exhibit C to the memo, Tr. 2185:24-2186:6, testified: 1) Exhibit C to the memo recommends six people versus five people to fill an operating position, which would bring the 18 up to 20, Tr. 2184:15-17 (Heider) & D603 at YDK000662; 2) the analysis also includes three and a half people from the Yankee Nuclear Services Division that are providing technical support to the operation of the spent fuel pool, which brings the total to 23 and a half, Tr. 2185:8-2186:1 (Heider), which Mr. Abbott conceded, Tr. 5864:10-5865:5 (Abbott); 3) there are numerous assumptions in D603 associated with licensing changes, Tr. 2186:3-5 Heider) (citing YDK000652-53), which Mr. Abbott conceded, Tr. 5865:6-5866:8 (Abbott); 4) there also is an assumption in D603 that contractors or employees from sister utilities, for example, Vermont Yankee, which was approximately 30 or 40 miles away from the Yankee Atomic site, could be used to cover some of the positions, Tr. 2186:2-24 (Heider) & YDK000662, which Mr. Abbott also conceded, Tr. 5866:9-5867:6 (Abbott); and 5) D603 assumed that, to achieve the staffing levels noted below, a substantial investment of $3 million was required to modify the spent fuel building and operating systems to simplify

operations and reduce the staffing level, a modification that was never made. Tr. 2186:25-2187:1 (Heider). As Mr. Heider further testified, Yankee Atomic implemented many of the concepts set forth in the memo, but it was never able it get near the 18 number. Tr. 2187:13-2188:2 (Heider); *see also* 2184:6-4 (Heider) ("now that we've completed spent fuel operations at Yankee Rowe, I can say that we never operate[d] the spent fuel pool with 18 people."). The remaining evidence on which the government relies does not support this finding.[1]

160. Contrary to the government's assertion, Maine Yankee's process for preparing the cost estimates that support its damages claim, as described in MYPF ¶¶ 155 and 163-167, bolsters the reliability of Maine Yankee's estimates. The government's additional objections concerning adjustments the government asserts should be made to Maine Yankee's damages claim on the basis that Maine Yankee damages claim "conflicted with the government's audit and the opinions expressed by Messrs. Johnson and Abbott" duplicates GAFs 1-105, to which Maine Yankee responds below.

161. While the government acknowledged that Todd Smith, Michael Thomas, and Michael Meisner are knowledgeable about the costs that Maine Yankee incurred or will incur to manage and store SNF on site, the government's asserts that they are not "qualified as experts" to express opinions about damages and that furthermore, Dr. Wise "abdicated" his role in that determination to these witnesses. This response is inaccurate. First, the estimates prepared by Maine Yankee were reasonable and reliable. *See* MYPF ¶¶ 152-178. And the government's complaints regarding the expert nature of the testimony are both too late, since the Court has

---

[1] The statement in P1462YA (on which the government relies) regarding 18 wet staffing positions cites D603 as its source. *See* P1462YA at YDK007521 (citing "Reference 3"), YDK007532 (identifying Reference 3 as D603). DX266 (on which the government also relies) in turn also cites D603 as its source. *See* D266 at COF006444 (citing "Reference 3") and COF006447 (identifying reference 3 as D603)

heard the testimony and wrong, since the witnesses have sufficient personal knowledge with which to testify on the issues. Second, Dr. Wise reasonably relied upon Maine Yankee's estimate to support his own expert opinion about the damages Maine Yankee incurred. *See* MYPF ¶¶ 167-173. The government's assertion that Dr. Wise abdicated his role, inferring that he did little independent analysis of Maine Yankee's claim is incorrect. Dr. Wise testified that it was his independent decision to rely on Maine Yankee's cost estimates in preparing its damages claim: "This goes back to the very early days of the project where we were trying to determine the best way to go about doing our damage analysis. And through the process of educating ourselves and the companies as to what the issues are going to be and how we might address them, the use of the company budgets as a primary source of information for our analysis was a result of that process. The deliberative process led us to the conclusion that using the company budgets would be a very good way to do this analysis." Tr. 3364:11-3365:4 (Wise). *See also* Tr. 3195:8-18 (Wise) (same). Far from abdicating his role, as the government suggests, Dr. Wise testified that he and his staff 1) constructed an economic damages model by going through the Yankees" budgets "to see what line items would constitute damages and what line items would not constitute damages," and "interact[ing] with the company to make sure we all understand the budgets and that we're identifying the proper lines," Tr. 3196:24-3197:2, 3197:11-13, *see also* Tr. 3196:19-3206:25, 3208:1-3220:11 (Wise) & Wise Demonstratives 2043A.2-.8 (detailed explanation of use of company budgets to construct damages model); and 2) put their own imprimatur on the damages by "review[ing] the information from the company and challenge[ing] it where it looked like there may be inconsistencies among the companies, or numbers might look anomalously high in particular line items." Tr. 3360:25-3361:4 (Wise) *see*

*also* Tr. 3353:15-3355:12, 3356:15-21, 3369:12-23 (Wise) (identifying line-item changes in company budgets).

With respect to his analysis of Maine Yankee's cost estimates, Dr. Wise testified that: "[I]t's a very thorough process where we went over every line in their budgets to make sure that there wasn't some sort of issue that we had to address to get a correct estimate of damages." Tr. 3369:24-3370:2 (Wise). *See also* Tr. 7284:25-7285:24 (Jewell-Kelleher) ("we worked endlessly with the Brattle Group staff, line item by line item, looking in particularly and being challenged on what lines [of the 10/29/02 cost estimate] . . . would occur . . . in the nonbreach world, and what the appropriate offsets would be for each and every line item in the cost estimate, so as to determine what the true incremental costs are to the damages in this case . . . . I was very involved in that myself."). Regarding adjustments to Maine Yankee's cost estimates, the companies determined the *amount* of the adjustments because "[they] have the information necessary to determine what appropriate changes in staffing would be, what appropriate changes in other items would be." Tr. 7497:2-5. Dr. Wise, however, "was involved in the process of preparing the changes. There were changes where conversations with the companies would identify an issue where it was useful for us to go into the links. And people working under my direction would do that so that we could address those issues properly." Tr. 3360:11-16 (Wise). *See also* Tr. 3370:17-23 (Wise) (same).

The remaining assertions in this response regarding the government's "adjustments" to Maine Yankee's cost estimates duplicate the GAFs 1-105 to which Maine Yankee responds below.

162. The government does not dispute this finding other than their objection to Maine Yankee's statement that all wet pool related costs have been "incurred." This objection lacks

merit. As the government acknowledges, Maine Yankee completed all ISFSI loading in 2004 (*see* Government's Response to MYPF ¶ 158), thus as of trial all Wet Pool related costs have already been "incurred." That Maine Yankee's Wet Pool related costs were estimated is not disputed. *See also* Maine Yankee's response to the government's objection to MYPF ¶ 153 above.

163. The government's assertion that P1726MY is not reliable (or was "prepared for this litigation") has been rejected by the Court's ruling to the contrary. *See* Tr. 3436:5-6 (Court ruling: "It's [P1726MY] admitted in evidence for business record purposes."). Moreover, the assertions in this response regarding the government's "adjustments" to Maine Yankee's damages duplicate GAFs 1-105, to which Maine Yankee responds below.

164. The government does not dispute the detailed description of the process by which Maine Yankee prepared the Rev. VII Budget, which contrary to the government's assertions does bolster its reliability and also is relevant. The government's additional response asserting that P1726 MY does not fall within the business records exception has been rejected by the Court's ruling to the contrary. *See* Response to Government's Objections to 163, immediately above. Also, the assertions of this response regarding the government's "adjustments" to Maine Yankee's damages duplicates GAFs 1-105, to which Maine Yankee responds below. Finally, the government's contention that Dr. Wise did no critical review of P1726MY is incorrect. *See* Response to the Government's Objections to MYPF ¶ 161 above.

165. This response largely reiterates the assertions in the government's response to 164 above, to which the same reply is applicable. The government does not dispute the facts cited in MYPF 165.a. and 165.b. detailing the experience that Maine Yankee personnel have in preparing cost estimates, which contrary to the government's assertions does bolster the reliability of

Maine Yankee's estimates and is relevant. The government's additional objections concerning adjustments the government asserts should be made to Maine Yankee's damages claim, based on its witness' opinion that certain of the costs are "non-incremental" or "unreasonable," duplicates GAFs 1-105, to which Maine Yankee responds below.

166. This response to 166.a. disputing that Maine Yankee is tracking within 1% of the Budget approved as part of the 1998 FERC settlement is flawed. The government ignores the testimony of Mr. Smith, which stated that the FERC settlement number of $500 million was in "nominal" dollars as of 1998. Tr. 3003:1-11. Additionally, the government's objections based on "lack of foundation" and "relevance" to MYPF ¶ 166.b. regarding the October 2003 FERC rate case settlement are frivolous. The cited testimony supports the finding. With respect to the government's response to 166.c., the government does not dispute that when utilities submit cost estimates to FERC in a rate-making proceeding, those estimates have to be reasonable and that if such costs are not reasonable, they are likely to be thrown out. However, the government's suggestion that these findings do not support the reasonableness of Maine Yankee's budget estimates because Maine Yankee includes $5 million in contingency and because Maine Yankee made $8.1 million in adjustments, is erroneous. Maine Yankee properly includes contingency as part of its damages claim, see Maine Yankee's response to GAFs 50-52 below, and the reason for each adjustment to Maine Yankee's damages estimate are attributable to issues unique to calculating an appropriate "damages" award, as opposed to issues related to Maine Yankee's estimate of costs. Finally, the government's assertion that "the purposes for which FERC uses Maine Yankee's long-term estimates are different from the damages analysis in which this Court must engage," and citing Mr. Johnson's testimony (Tr. 6325:25-6326:2) that "it's incumbent upon the proper measurement of an asserted claim for damages for it to reflect the best estimate,

only the best estimate," ignores the fact that the FERC estimate is relevant to the reasonableness of the damages claim, as the government's witness acknowledges, Tr. 5570:20-5571:22 (Abbott). Maine Yankee's finding 166.d. citing its award of damages in the Stone & Webster litigation squarely supports Maine Yankee's proposed finding that Maine Yankee's long-term cost estimates have been found to be reliable by others, which, contrary to the government's assertions, is supportive of the reasonableness and reliability of Maine Yankee's estimating process.

168. This response largely reiterates the assertions in the government's response to 161 above, to which the same reply is applicable.

169. This response largely reiterates the assertions in the government's response to 161 above, to which the same reply is applicable.

170. This response largely reiterates the assertions in the government's response to 161 above, to which the same reply is applicable. The last sentence of this response, asserting that Dr. Wise did not rely entirely upon Maine Yankee's three-section analysis, supports the conclusion that Dr. Wise performed his own independent damages analysis. As Dr. Wise explained, "The sectional analysis is the companies' first pass at what *damages* should be by category. But we didn't start our analysis from there. We started it from the *actual budgets* and *the individual line items*." Tr. 3279:20-24 (Wise) (emphasis added). The government's response does not, in any event, detract from the proposed finding that the three-section analysis provides a "check" on Dr. Wise's work.

171. Contrary to the government's assertions, Maine Yankee established the admissibility of P1726MY and Dr. Wise reasonably relied upon Maine Yankee's estimate to support his own expert opinion about the damages Maine Yankee incurred. *See* Tr. 3436:5-6

(Court ruling: "It's [P1726MY] admitted in evidence for business record purposes.") and MYPF ¶¶ 167-173. Moreover, this response regarding the government's "adjustments" to Maine Yankee's damages duplicates GAFs 1-105, to which Maine Yankee responds below.

173. The government's assertion in this response that Maine Yankee is not entitled to recover any of its "pre-1999" costs as a matter of law is addressed in Maine Yankee's previous post-trial submissions. With respect to Maine Yankee's pre-1999 costs discussed in this response, Dr. Wise reviewed no source documents supporting pre-1999 damages because he reviewed with Maine Yankee his use of the numbers from the Barry reports. Tr. 3221:14-3223:7 (Wise) (received pre-1999 cost information from Barry report and reviewed Barry numbers with companies prior to inclusion in damages); *see also* Tr. 3338:16-17 (Wise) ("I'm relying on [Mr. Barry's] work as reviewed by the companies."). The government's additional objections concerning adjustments the government asserts should be made to Maine Yankee's damages claim, based on its witness' opinion that certain of the costs are "non-incremental," duplicates GAFs 1-105, to which Maine Yankee responds below.

174. The government's objections to Maine Yankee's proposed findings concerning contingency duplicate GAFs 50-52, to which Maine Yankee responds below.

175. Contrary to the implication in the government's response to 175.a., Dr. Wise did not testify that a risk free discount rate is only appropriate when the future cost is expected to be a sum certain. He also testified that "if you believed that in fact the company's escalation rates were more appropriate than my inflation rates, you might view the risk-adjusted rate as too high, and you might view the risk-free rate as a more appropriate rate for discounting the future cash flows." Tr. 3237:5-10 (Wise). *See* Wise Demonstrative 2043A.13 (after-tax risk-free rate "may be appropriate if escalation of these costs is expected to exceed general inflation"). In addition,

the government evasively cites only half of Dr. Wise's testimony regarding how to correct a present value calculation to accommodate a higher escalation rate. Dr. Wise testified: "There would be two ways to handle it. One way would just be to put in the higher inflation rate. The other way would be to leave my inflation rate alone but achieve the equivalent result by *lowering the discount rate*. Tr. 3237:17-21 (Wise) (emphasis added). Finally, contrary to the assertion in this response, there is evidence in the record to support a finding that the companies' higher escalation rate was the appropriate rate to use. *See* Tr. 3232:10-17 (Wise) ("3.8 percent is actually a very common escalation factor in the budgets that we got. This created an issue for me because 3.8 percent, while it may be reasonable for the sorts of costs that these companies incur and may be consistent with their experience and may even be approved by FERC, is a number that's in excess of what people are predicting for general inflation."); Tr. 3002:14-16 (Smith) ("I used the escalation rate of 3.8 percent because that was the approved escalation rate from our FERC settlement from 1998."); Tr. 1667:19-22, 1668:18-23 (Bennet) (noting FERC's approval of GDP deflater as escalation factor for many items in FERC decommissioning cost estimates, and a higher escalation rate for worker salaries). Ample other evidence also shows that costs of handling high-level nuclear materials are increasing at a rate well above the general inflation rate. *See* response to 175.c below. The remaining assertions in this response regarding the appropriate discount rate for Maine Yankee's damages to present value duplicate GAFs 71-78, to which Maine Yankee responds below.

The government's assertion in response to 175.c. that "there is no evidence to support the proposition that 'the types of costs included in Maine Yankee's future damages will increase in the future at a substantially higher rate than the general inflation rate used by Dr. Wise'" is anomalous in view of the government's complaints regarding the increase in Maine Yankee's

damages claim from 1999 to 2003. The citation to P1964 (which, as Maine Yankee noted, is "accompanying the record") is appropriate, because rising decommissioning cost estimates reflect the movement of actual costs. Indeed, Mr. Abbott counseled in P1964 that "[m]any decommissioning estimates try (usually implicitly) to argue that . . . rates of increase will not continue by ignoring the history or making philosophical arguments as to why this history can not continue. This is an example of 'hopeful' engineering. That is, when faced with an unpleasant or undesirable conclusion based on current or historical facts, the implication for future events is simply hoped away." P1964 at 12.

176. The premise on pages 216-223 of this response, that the Yankees could invest any award received in tax-free securities, is based upon two assumptions: 1) that the Yankees themselves can invest the award; and 2) that they can invest in tax-free securities. Neither assumption is correct. First, as Mr. Thomas and Mr. Bennet testified, FERC's prudent investor rule requires that the investment management be a separate function that is and not controlled by utility management. Tr. 1677:17-1678:11 (Bennet); Tr. 2777:13-2778:21 (Thomas) (to satisfy FERC prudent investor standards, Maine Yankee hires professional advisors to help manage its investments); Tr. 1677:25-1678:3 (Bennet) ("[T]here is a general set of requirements . . . that . . . investment managers, under the oversight of the trustee, . . . manage that [decommissioning trust] money.") The FERC prudent investor rule also "requires a very thoughtful allocation and diverse investment of the funds . . . Hence, the fact that we hire investment managers. And the trustee is the one that oversees the level of investments and the adherence to the prudent investor rule." Tr. 1678:12-23 (Bennet). Thus, the government's hypothetical set forth on pages 216-223 and in Figure 2: Pre-Tax Discount Rate Demonstrative (which was not presented at trial, and

thus is not in the record) that assumes that the award is "assumed to be deposited in tax-free securities," *id.* at 193, is incorrect and should be disregarded.

In addition, the assertion at pages 223-224 that the Yankees may either pay no tax or a significantly lower tax than what Dr. Wise assumed upon any award they receive, is contradicted by the evidence. Mr. Thomas testified that any damages award will be recorded as revenue and subject to taxes. Tr. 7192:11-7193:19. Maine Yankee will exhaust its NOL carry forwards in 2004 and is expected to pay substantial taxes going forward both at the state and federal levels. *Id.*

177. These government arguments regarding future damages are addressed in the reply to MYPF 4 above.

178. This response regarding the government's "adjustments" to Maine Yankee's damages duplicates the GAFs 1-105, to which Maine Yankee responds below.

## VI. The Government's Proposed Alternative Damages Findings Set Forth in Its "Additional Response To Maine Yankee's Proposed Damages Findings" Fail to Account for the Agreed Changes to Maine Yankee's Damages or Are Wrong

The government's "additional response to Maine Yankee's proposed damages findings" sets forth for the third time the same criticisms of Maine Yankee's damages claim that Mr. Abbott and Mr. Johnson first made in their pretrial reports and then read (with little or no accompanying reasoning) nearly word-for-word at trial from hundreds of "flash-card" slides that comprised their "testimony." The government ignores the cross-examination of these witnesses, which demonstrated that Mr. Abbott has no credibility (or relevant experience) and that Mr. Johnson, who relied on Mr. Abbott for the majority of his criticisms, Tr. 6673:13-6674:15 (Johnson), is largely (if not entirely) simply an advocate for the government's litigation positions. *See, e.g.*, Tr. 6820:24-6821:25 (Johnson) (after he had opined that Maine Yankee's costs for janitorial services were "unreasonable" solely because they were higher than Yankee

Atomic's and Connecticut Yankee's costs, and after it was pointed out at trial that he had deducted all of Yankee Atomic's and Connecticut Yankee's janitorial services costs as "not adequately supported," he concluded that "I'm not sure I can explain to you, as I sit here, why [the Yankee Atomic and Connecticut Yankee costs were excluded]."). The government's post-trial presentation on these issues also ignores Maine Yankee's rebuttal case, which fully answered those government criticisms that retained any life after the cross-examinations.

By thus ignoring what happened at trial, refusing to make any adjustments following Maine Yankee's very effective cross-examination and rebuttal case – and even refusing to acknowledge the "agreed changes" that Maine Yankee accepted at trial – the government's post-trial "additional response" is entirely unhelpful to the Court (particularly in light of its reliance only on the incredibly thin, "bare bones with no meat" trial testimony of Messrs. Abbott and Johnson) and ultimately is merely a distraction. Indeed, the government displayed its own lack of confidence in the Abbott/Johnson criticisms by virtually ignoring them at the January 24 closing arguments, focusing instead on broader arguments the government hopes will lead to a "zero damages" result.

Despite the government's unhelpful (and ineffectual) reiteration of the Abbott/Johnson criticisms, Maine Yankee sets forth below a succinct reply to each of the government's numbered "additional responses" with citations to more complete treatment of the issue at trial during cross-examination or rebuttal (or in some cases voir dire).

Initially, however, it is important to reiterate the overarching reasons why Mr. Abbott and Mr. Johnson lack credibility and why their testimony is unreliable.

**Abbott.** Neither Mr. Abbott nor anyone else at his consulting firm who worked on this case has an engineering degree or license (except for a Mr. Brewer, who has an engineering degree but no engineering license). Tr. 5337:9-5338:2 (Abbott).

The last time Mr. Abbott had any responsibility for any operations at a nuclear plant was twenty-five years ago in 1979 at FitzPatrick nuclear power plant, and his operator's license expired when he left FitzPatrick. Tr. 5322:24-5323:9 (Abbott). Even at FitzPatrick, only ten to fifteen percent of Mr. Abbott's time was devoted to dealing with spent fuel matters. Tr. 5324:19-5325:3 (Abbott). Mr. Abbott has never had any responsibility for operating an ISFSI, nor has he participated in transferring spent fuel from wet to dry storage at a commercial reactor, in loading spent fuel storage casks or in transporting spent fuel assemblies. Tr. 5325:7-21, 5326:5-8 (Abbott); *see* Tr. 5329:8-5333:10 (Abbott) (no one at ABZ, Mr. Abbott's company, has ever been involved in transporting spent nuclear fuel).

Mr. Abbott also has never been employed in a position where his duties included anything involved with decommissioning a nuclear power plant or with spent fuel storage or management at a decommissioning plant. Tr. 5326:9-23, 5327:6-13 (Abbott). He has never participated in preparing an application for an ISFSI license, or in the licensing of a storage container for spent fuel. Tr. 5327:19-25 (Abbott). Prior to his engagement by the Department of Justice ("DOJ") in this case, Mr. Abbott had not reviewed even one certificate of compliance, the licensing document for a spent fuel transportation and/or storage cask. Tr. 5329:1-7 (Abbott). Mr. Abbott also has no experience with the design of transportation containers, Tr. 5333:18-20 (Abbott), and he has never been involved personally in a Part 72 license application for an ISFSI. Tr. 5353:23-5354:2 (Abbott).

During the time Mr. Abbot worked at the NRC in 1979 to 1981, he did not work at all on the development of the Nuclear Waste Policy Act (and is not even sure that he was aware at that time that a statute like the NWPA or the program it established was under consideration), nor did he deal with any decommissioning or dry storage issues because they were not in the regulatory pipeline at that time. Tr. 5347:21-5348:25 (Abbott). He also cannot offer any opinions that are based upon specific knowledge about the current design of the Yucca Mountain repository, and, prior to this case, he had not even seen DOE's spent fuel contract with utilities. Tr. 5333:25-5334:6 (Abbott). Mr. Abbott also does not know whether or not the current design of the planned repository at Yucca Mountain contemplates the accommodation of nonstandard fuel or failed fuel as defined in the DOE spent fuel contracts. Tr. 5334:7-11 (Abbott). Nor, with three exceptions (a meltdown situation at TMI, a review of one failed fuel assembly at Maine Yankee, and inspection of failed fuel at FitzPatrick) has Mr. Abbott ever analyzed any failed fuel issues prior to his engagement by DOJ in this case. Tr. 5334:12-23 (Abbott); *see also* Tr. 5352:11-14 (Abbott) (when Mr. Abbott was at FitzPatrick 25 years ago, the pool did not contain any failed rods or failed rod containers).

At the time of his first deposition in this case in 2002, Mr. Abbott was not qualified to receive safeguards information regarding nuclear-related security issues and therefore he did not have access to significant information about additional post-9/11 security requirements at nuclear plants and ISFSIs, nor was he permitted at that time to look at the security plans for the Yankee plants. Tr. 5334:24-5335:17 (Abbott). Nevertheless, he believed he was qualified at that time to offer expert opinions on security matters at nuclear plants and ISFSIs. Tr. 5335:18-22 (Abbott). In fact, Mr. Abbott still believes that one can be an expert on nuclear plant security matters without being privy to safeguards information. Tr. 5335:23-5336:2 (Abbott).

Even though Mr. Abbott has no training in accounting, and accounting is not his area of expertise, he believes that he is as qualified to estimate the cost of spent fuel management at Maine Yankee as the management and plant staff, Tr. 5338:15-5339:6 (Abbott) – even assuming management and plant staff at Maine Yankee have more knowledge and expertise in their particular facility than he and others at ABZ. Tr. 5342:17-5345:3 (Abbott). The rate case work Mr. Abbot has performed was for four nuclear plants that had not yet gone into operation, so the plants involved had no spent fuel issues or related cost issues. Tr. 5357:1-8.

At the time of trial, about half of all of ABZ's work was on spent fuel cases with DOJ as the client, and Mr. Abbott made significant changes to his 2004 expert reports, such as adding significantly more detail to a specific scenario addressed in that report, because DOJ requested it. Tr. 5352:20-24, 5353:10-15 (Abbott). And DOJ conceived all five of the damages scenarios presented in his expert report. Tr. 5353:19-22 (Abbott). Finally, Mr. Abbott has never been a member of any industry group that is involved in helping DOE with the Yucca Mountain repository. Tr. 5362:25-5366:7 (Abbott), *compare* Tr. 3091:12-3093:15 (Meisner) (delineating Mr. Meisner's participation and leadership role in various industry groups addressing spent fuel issues relevant to decommissioning plants and to the Yucca Mountain repository).

**Johnson**. Mr. Johnson was largely an advocate for the government's litigation positions. *See, e.g.,* 6651:2-6 (Johnson) (acknowledging that he relied on Mr. Abbott with respect to many of his opinions); Tr. 6651:7-6652:6, 6662:4-6663:3 (Johnson) (acknowledging that Johnson demonstratives note with an "x" many (but not all) of the instances in which he had considered or relied upon Abbott's opinion). Mr. Johnson conceded that approximately fifty-five percent of his proposed adjustments to Maine Yankee's damages claim is attributable to input from Mr. Abbott, and approximately forty-five percent to his own opinions, Tr. 6671:5-6673:12 (Johnson);

*see also* Plaintiffs' Johnson Demonstrative 2, and as set forth above (and demonstrated at trial), Mr. Abbott was not a credible witness.

Apart from his reliance on Mr. Abbott, Mr. Johnson knew little about the costs about which he was opining. For example, Mr. Johnson did not know what the Nuclear Waste Policy Act of 1982 is, and his opinions are not based upon interpretations of the contract. Tr. 6642:8-15. Mr. Johnson has never worked for a utility company (nor have his companies, Veris Consulting and Johnson, Lambert & Company), Tr. 6640:6-14, and he has no experience in the management of companies that own and operate ISFSIs. Tr. 6640:15-17. Veris and Johnson Lambert have never done work for a utility rate-making body, and have had no dealings with the Nuclear Regulatory Commission. Tr. 6640:25-6641:13. (Johnson). Other than limited contacts related with this case, Mr. Johnson and his companies have had no dealings with the Department of Energy. Tr. 6641:14-6642:7 (Johnson). Mr. Johnson also does not consider himself to be an expert 1) in economics, Tr. 6646:4-6; 2) in assessing tax effects on spent nuclear fuel and decommissioning trust funds, Tr. 6680:23-6681:1, or 3) on corporate taxes levied by the State of Maine. Tr. 6685:4-21 (Johnson). Mr. Johnson estimated that, at the time of trial the total fees for Veris on this case probably were in excess of $2 million. Tr. 6647:23-6648:21.

**A. The Government's "Summary" of the Abbott/Johnson Criticisms is Unreliable and Unhelpful.**

1- 8. Paragraphs 1 through 8 of the government's additional response summarize the deductions Mr. Johnson would make to Maine Yankee's damages in various categories conceived by Mr. Johnson. None of these deductions is warranted, for reasons discussed below in response to the government's additional alternative findings ("GAF") that address each proposed deduction in more detail. Even the government's conclusory summary in paragraphs 1 through 8 is unhelpful, however, and cannot be correlated to Maine Yankee's damages claim,

because the government states all dollar amounts in constant mid-2002 dollars rather than appropriately discounting amounts in future years to present value, and because the government's figures also fail to take account of adjustments agreed to by Maine Yankee at trial.

**B. The Government's Proposed Alternative Findings That Certain of Maine Yankee's Damages Were Not Caused By the Breach Are Wrong.**

9. This alternative proposed finding asserts that costs relating to the supply of a transportation cask, licensing of fuel canisters for transportation, and costs for the four canisters and casks that store Maine Yankee's GTCC waste, are not recoverable as damages "DOE is responsible for the supply of transportation casks when it picks up the fuel" and "for the costs of transporting the SNF from the utilities to a repository" and because "DOE is not responsible for the acceptance and disposal of GTCC waste." But the legal issue, at least with respect to mitigation, is whether these costs were reasonably incurred by Maine Yankee, *see* legal brief(s), and the factual answer is yes, *see* MYPF 102, 157d., particularly given DOE's own expressed preference for transportable storage containers, *see* Tr. 1603:25-1605:16 (Bennet) (describing DOE's 1994 initiative to procure multipurpose canisters); *see also* MYPF 93, and Maine Yankee's reasonable belief that GTCC would go to the DOE repository. *See* MYPF 131-139. Indeed, the Contract requires DOE to provide transportation hardware, and Maine Yankee's costs for transportation cask licensing and supply are not merely a reasonable, but an eminently sensible, substitute for that DOE contract obligation. *See* YA response to GFF 302.

In any event, the government's $4,910,865 figure, purportedly for the NAC contract costs in the transportation and GTCC cask categories it criticizes, is incorrect and not substantiated by Mr. Abbott or Mr. Johnson in any credible way. *See* Tr. 5409:9-14 ("canisters were qualified under the NRC code for transportation and storage, so any work related to [transportation] would be, again, on the DOE side"); Tr. 6266:3-23 and 6271:23-25 (Johnson) (adjustments made based

upon Mr. Abbott's assessment of the out of scope contract issues); Tr. 5408:17-24 (Abbott) ("Because DOE will bring the transportation cask, so any costs associated with that are not part of the breach.").

12. This proposed alternative finding, asserting that Maine Yankee's labor costs related to salaried workers who did not work exclusively on ISFSI-related tasks should be deducted from Maine Yankee's damages because they would have been incurred absent DOE's breach, is unsupported and wrong. Mr. Johnson acknowledged that "it is probably the case" that, if two people are spending half their time working on matters related to the ISFSI and half their time on other matters, he doesn't compensate Maine Yankee at all for the half time for either of those people; he doesn't give Maine Yankee credit for one person, even though Maine Yankee might have gotten by in the non-breach world with just that one person. Tr. 6693:19-6694:11 (Johnson). *See also* Tr. 7346:11-7347:21 (Smith) (Maine Yankee's cost tracking system was set up to do more work with fewer people; "It's quite frankly a mitigation of cost to allow an in-house engineer that's . . . familiar with the day-to-day construction activities, to go perform a three-hour task as opposed to spending much more money on an outside firm to come in, . . . get themselves up to speed, perform the analysis and leave," "without the need to construct the ISFSI and to perform a fuel transfer, Maine Yankee's organization would be smaller."); Tr. 6696:21-6697:2 (Johnson) (he did not analyze the size of the staff with which Maine Yankee could have operated in the absence of the breach).

13. This proposed finding, asserting that the cost of the future decommissioning and dismantlement of the Security Operations Building ("SOB") should be deducted from Maine Yankee's damages because the SOB served as a low-level radioactive waste disposal facility during plant operations, and Maine Yankee would have incurred costs to decommission and

dismantle the building absent the breach, is wrong, as Mr. Smith explained. Tr. 7347:22-7348:21 (Smith) (Maine Yankee for all intents and purposes decommissioned the building by removing all of the waste stored there, demolishing the interior, remediating any radioactivity, performing a final status survey, deeming it a clean shell, and then constructing a new security operations building from the old shell); *see also* Tr. 6940:9-6941:19 (Mr. Meisner responding to Abbott criticism) ("The low-level waste building is . . . a two-plus-story sheet metal building. And regardless of whether you're in the breach or the nonbreach world, that's got to come down. What's missing here is that, in order to use that building for an ISFSI and in accordance with NRC regulations, we had to build a building within the . . . low-level waste building. And this building within a building is a rugged, hardened facility to meet NRC's security requirements . . . [for protection] against any number of security events to allow [security officers] sufficient time to carry out their security function. . . . [T]aking down a sheet metal building is one thing. But taking down a hardened facility is an entirely different thing and more difficult and costly.").

14-22. These proposed alternative findings, asserting that the offset for costs Maine Yankee would have incurred in the nonbreach world to transfer SNF from its wet pool to DOE transportation casks ("pool-to-DOE costs") should equate with the costs Maine Yankee incurred or expects to incur in transferring its SNF from its wet pool to its ISFSI, are unsupported and wrong. As established at trial, Tr. 3148:12-20 (Meisner), and contrary to GAF 15, there are very substantial differences between the process of loading SNF from pool to DOE and the process of loading SNF from pool to ISFSI, and the former process would be far less costly (and more comparable to transferring SNF from ISFSI to DOE).

Mr. Abbott opined in his first report (and testified in his related deposition) that ISFSI-to-DOE costs were a reasonable proxy for the Yankees' pool-to DOE transfer costs in the

nonbreach world. Tr. 5889:22-5890:3. *See also* 5892:22-5893:2 (Abbott) (at first deposition he testified "it was reasonable to assume that the level of effort needed to load the canisters . . . from the ISFSI to DOE, is similar to the level of effort needed to move the fuel in the fuel pool to the canisters"). Subsequently, Mr. Abbott changed his mind and opined in his second report, at his second deposition and at trial that the pool-to-DOE transfer costs in the nonbreach world should equate with the costs Maine Yankee included in its damages claim for the transfer of its SNF from its pool to its ISFSI, based upon its Bechtel/NAC contract, costs Mr. Abbott pegs at $5,473,516, Tr. 5425:8-14 (Abbott).[2] Mr. Abbott admitted he performed no bottoms up analysis, Tr. 5896:1-8 (Abbott), as Maine Yankee did in preparing its agreed change regarding its spent fuel transfer from pool to DOE. Tr. 3007:11-21 (Smith). He merely took "money that was spent for fuel transfer [from pool to ISFSI], and that's what we used as the offset. It's as simple as that." Tr. 5896:14-16; *see also* Tr. 5905:23 (Abbott) ("We didn't check the number"); Tr. 5898:1-6 (Abbott) (although he "think[s] we could" come up with a bottoms-up pool to DOE estimate without reference to the Yankees' numbers, " that wasn't our job in this case.") He also testified that he still had no opinion one way or the other about whether that $25 million is what Maine Yankee's pool-to-DOE transfer would actually cost in the non-breach world, Tr. 5905:13-5906:22, nor could he give an approximation of the number of people it would take to accomplish the transfer. Tr. 5903:23-5908:14 (at 5907:6: "No, that wasn't part of our scope.").

After Mr. Abbott changed his mind, Maine Yankee took a closer look and developed a rigorous, "bottom's up" estimate of its nonbreach world pool-to-DOE costs of approximately $5

[2] Mr. Johnson then subtracted Maine Yankee's original $1,497,185 pool-to-DOE offset (set forth in its March 2003 damages claim), for a net total of $5,048,006. Tr. 6557:1-6 (Johnson).

million, Tr. 3007:19-3009:16 (Smith) & Meisner Demonstrative 3.[3] This estimate takes account of the substantial cost differences between pool to DOE loading and pool to ISFSI loading. Tr. 3178:22-3179:6 (Meisner) ("[T]his bottoms up [pool-to-DOE] estimate is a fair bit less, for good reason, than what it cost us to move fuel from the pool to the ISFSI."). Tr. 3148:12-20 (Meisner) ("And since there would be no storage involved, the assumption was that they [DOE] would arrive with containers that could be easily opened on the other side [the DOE repository] to be put into long-term storage containers. So it wouldn't make any sense, not only to vacuum dry, but it wouldn't make any sense to weld lids on either, because that's a lot of work having to open those up on the other side."); Tr. 3182:23-3184:4 (Meisner) (pool-to-ISFSI transfer costs compared to cost of pool-to-DOE transfer is "almost all due to vacuum drying and the difference between bolting and welding").

23-26 (& n.6), 29, 30-32, 56-57. These alternative proposed findings, asserting that a portion of the recovery Maine Yankee received in a settlement of a lawsuit with Stone & Webster's surety (and all such recoveries in the future) should be credited against Maine Yankee's ISFSI construction damages, are incorrect. Tr. 2773:10-2775:10, Tr. 7181:3-7182:10 (Thomas) (Maine Yankee properly accounted for Stone & Webster recoveries).

27-29 & note 7. This proposed alternative finding, asserting that the amount Maine Yankee received from NAC under a termination and mutual release agreement relating to Maine Yankee's fuel transfer contract should be credited to Maine Yankee's ISFSI construction damages, is unsupported and wrong, as Messrs. Thomas and Smith explained. Tr. 2775:24-2776:20 (Thomas) (Maine Yankee properly accounted for NAC recoveries crediting $10.4

[3] Net of adjustments (to add contingency and deduct Maine Yankee's initial pool-to-DOE estimate), Maine Yankee's pool-to-DOE costs are $4,525,220. *See* MYPF 178.

million to the ISFSI project). Tr. 2974:4-2975:21 (Smith) (costs incurred by Maine Yankee as a result of NAC's breach of contract, including costs of Maine Yankee's self-performance to complete the contract, far exceeded the amount of the NAC settlement recovery.) Tr. 2769:1-2770:13 (Thomas) (after it terminated the NAC fixed-priced contract, Maine Yankee paid contractors directly, took on the financial risk to complete the project, and completed the NAC scope of work.).

33, 35. Maine Yankee agreed with the removal of excess severance payments and set forth an appropriate adjustment. *See* MYPF ¶ 178.c.

34, 63. These proposed alternative findings, asserting that costs for computer support and document control support for the years 2004-2008 should be deducted from Maine Yankee's damages claim because Maine Yankee failed to explain how these additional services were required as a result of the breach, is unsupported and wrong. Tr. 7348:22-7349:20 (Smith) (Maine Yankee needs computer and document control support to conduct its business and the costs for such services in the breach world are higher than in the nonbreach world, where Maine Yankee's sole operating function would have been to collect money and prepare power bills on a monthly basis).

36, 60. These proposed alternative findings, asserting that the ¼ FTE for the President/CFO position in Maine Yankee's alternative GTTC-only on-site storage estimate in the nonbreach world is equally applicable to SNF storage costs in the breach world, and therefore Maine Yankee's costs in 2004-2008 for the President/CFO are not incremental, is unsupported and wrong. As Mr. Smith explained, the duties and responsibilities of the President/CFO in a GTCC waste-only scenario differ from those in the breach scenario, where SNF is stored on site. Tr. 7350:1-7351:15 (Smith).

GAF 37. This proposed alternative finding, asserting that costs included in Maine Yankee's claim for retirement plan consulting after 2003 should be eliminated because there are no employees on-site doing spent fuel storage work during this and therefore, these costs are not incremental costs caused by the breach, is incorrect, as Mr. Thomas explained. Tr. 7209:1-12 (Thomas) (retirement plan consulting costs are incremental to the breach because Maine Yankee will continue to maintain its pension plan, even without active employees, for some period of time and this requires Maine Yankee to enlist consultants to help prepare related financial reports and tax reporting); Tr. 7202:25-7205:17 (Thomas) (absent the breach, Maine Yankee could have terminated its benefit plans earlier).

38, 73. These proposed alternative findings, asserting that costs associated with Maine Yankee employees in 2005-2008 (for business auto insurance, crime bond insurance, employment practices liability insurance, excess workers compensation insurance, fiduciary insurance, and harbor workers bond insurance) should be deducted from the damages claim because there are no employees performing spent fuel storage work on site during this period, and therefore these costs are either non incremental or unreasonable, is incorrect. Tr. 7202:25-7205:17 (Thomas) (absent the breach, Maine Yankee could have terminated its benefit plans earlier); Tr. 7205:18-7206:14 (Thomas) ($2500 for business auto insurance annually to cover claims for auto accidents involving Maine Yankee officers or contractors, in cases where the liability exceeds the amount of the contractor's insurance, is a reasonable business expense); Tr. 7206:15-7207:3 (Thomas) (it is reasonable to carry crime bond insurance, which protects against fraud and theft and covers Maine Yankee officers and can apply to contractors); Tr. 7207:4-18 (Thomas) (employment practices liability insurance, which covers claims associated with hiring, firing, discrimination, etc. protect Maine Yankee from complaints arising in connection with the

termination of a contractor, to the extent the contractor did not absorb such a liability); Tr. 7207:19-7208:8 (Thomas) (fiduciary liability insurance is necessary because in the breach world, Maine Yankee maintains a 401(k) plan and other post-retirement and welfare benefits, whereas in the nonbreach case, Maine Yankee could have extinguished these liabilities earlier.).

40, 102. These proposed alternative findings, asserting 1) that because Maine Yankee would maintain its corporate existence in the non-breach world from 2004 to 2008, the costs of Director's and Officers' liability ("D&O") insurance are not incremental to the breach and 2) that because the market for D&O liability insurance is so volatile, any estimate of the cost of future premiums is "pure speculation," and should be removed from damages for lack of adequate support, are unsupported and wrong. Tr. 7201:7-7202:8 (Thomas) (the estimate is reasonable; Maine Yankee assumed that D&O annual premiums would be fifty percent less in the nonbreach world years (2004-2008) as a result of the diminished risk after the fuel is removed from the site and after multi-million financial projections are no longer required); Tr. 7202:16-7203:24 (Thomas) (Maine Yankee's estimate for D&O insurance for the future periods (2009 and later) is reasonable and is based on information provided to Maine Yankee by its insurance broker, who is very familiar with D&O insurance market trends).

41. This proposed alternative finding, asserting that Maine Yankee failed to show that $750,000 in legal costs for its FERC rate case in 2008 is related to the breach, is wrong, as Mr. Smith explained. Tr. 7356:1-7357:7 (Smith) (FERC rate case in the breach world would be four times as costly as in the nonbreach world; in the nonbreach world, the final rate case in 2008 is after Maine Yankee has terminated its Part 50 license, completed decommissioning, and returned the site to its brownfield status (nothing more than adding up the debits and the credits make sure the collections are accurate for the periods post physical decommissioning), while in the breach

world, the Part 50 license has not been terminated, and therefore, there will still be prudency issues, state regulator and possibly NRC involvement).

42a. & c. This proposed alternative finding, asserting that costs for external audits of Maine Yankee's benefit plans in 2005-2008 should be deducted from damages because there will be no employees on site doing spent fuel storage work during this time period, and therefore these costs are not incremental to caused by the breach, is incorrect. Tr. 7202:25-7205:17 Thomas) (explaining that Maine Yankee could have terminated its benefit plans earlier in the nonbreach world).

43. This alternative proposed finding asserts that Maine Yankee's damages claim should be reduced by the costs of internet and phone services during 2004-2008 because they would have been incurred absent the breach, is incorrect. Tr. 7209:13-7211:9 (Thomas) (in the nonbreach case, Maine Yankee would share internet and phone services with a third party, but in the breach world, such services must be borne entirely by Maine Yankee; in addition, only the incremental portion of costs for these services is included in damages).

44, 87, 104. These proposed alternative findings, asserting that travel and meal-related costs for Maine Yankee's President/CFO are non-incremental, unreasonable, and/or unsupported, is wrong. Tr. 7351:16-7353:18 (Smith) (Maine Yankee's travel and meal costs for its President/CFO are incremental, reasonable, and adequately supported).

46. This proposed alternative finding, asserting that costs for trustee fees for Maine Yankee's 401(k) plan during ISFSI operations from 2004-2008 should be deducted from damages because there are no employees on-site doing spent fuel storage work during this time period, and therefore these costs are not incremental to the breach, is incorrect. Tr. 7208:9-25

(Thomas) (that in the nonbreach case, Maine Yankee could have terminated its 401(k) plan earlier).

47. This proposed alternative finding, asserting that costs for PGBC annual premiums in 2004-2008 should be deducted from Maine Yankee's damages because there are no employees on-site doing spent fuel storage work during this time period, and therefore these costs are not incremental to the breach, is wrong. Tr. 7202:25-7205:17 (Thomas) (Maine Yankee could have terminated its benefit plans earlier in non breach world).

48, 95c. These proposed alternative findings, asserting that the wet pool-related costs for a Security Director, for fire protection duties, and for emergency planning are not incremental to the breach because these positions are necessary for decommissioning work, is unsupported and wrong. Tr. 3120:21-3126:12, Tr. 6930:2-6932:5 (Meisner) (once the spent fuel is removed from Maine Yankee's site, a fire protection program, an emergency planning program, and the security director position are no longer needed).

49. The government's proposed alternative finding, asserting that Maine Yankee's re-racking costs are non-incremental to the breach and should be excluded from damages is wrong. *See* Maine Yankee's Reply to GRMYPF 103-128.

**C. The Government's Assertions That Maine Yankee's Claim Must Be Reduced to Eliminate Contingency and Purportedly Speculative Property Tax Costs is Wrong.**

50. This proposed alternative finding is wrong because the contingency factor used by Maine Yankee did not "increase" its estimated future costs by use of contingency as the government asserts; rather, Maine Yankee used contingency to account for "known unknowns" and assure that its estimates of future items costs were accurate. Tr. 2979:23-2980:17 (Smith) (Maine Yankee applies contingency to its cost estimates to account for known unknown costs); *see also* Tr. 7359:7-7360:14 (Smith) (contingency, as applied to Maine Yankee's cost estimate is

the company's "best estimate" of costs, a common business practice in the industry, and has been awarded as part of damages to Maine Yankee in the Stone & Webster litigation).

51-52. These proposed alternative findings, asserting that it is improper to include a contingency factor in the context of a damages claim, are legally and factually wrong. In *In re Stone & Webster, Inc.* 279 B.R. 748, 801 (Bankr. D. Del. May 30, 2002), for example, the court approved the addition of a 5.7 percent contingency to Maine Yankee's total cost to complete decommissioning work, concluding that contingency "is a reasonable and appropriate part of Maine Yankee's damages award." *Id.* at 801. The court found that "[i]ncluding contingency as a real cost of decommissioning is . . . an acknowledged practice within the industry" and that "practice in the industry has demonstrated that a certain percentage of contingency is required to account for unexpected costs . . . it is a 'known unknown.'" *Id.* The court found numerous factors supporting this finding: 1) witnesses testified that every budget for decommissioning should include a contingency; 2) SWEC's bids on Maine Yankee's project, before and after termination, included contingencies; 3) a DOE handbook supported using contingencies in decommissioning cost estimates; and 4) SWEC's earned value statement carried a contingency at the time of its termination. *Id. See also Brooklyn Waterfront Terminal Corp. v. Int'l Terminal*, 211 F. Supp. 702, 708 (S.D.N.Y. 1962) (accepting defendant's expert's inclusion of contingency in repair estimate for damaged pier, but reducing percentage of contingency in awarding damages); *In re M & M Towing Co.*, 1997 WL 96377, *5 (E.D. La. 1997) (the application of fifteen percent contingency to damages award for repairs not yet made were found appropriate). Factually, including a contingency for "known unknowns" is necessary to assure that estimates of future costs are accurate and reasonably certain.

53-55. These proposed alternative findings, asserting that Maine Yankee's $5.2 million estimate for future property taxes is speculative because 1) it is inconsistent with Maine Yankee's historical costs and 2) it disregards the potential availability of a property tax exemption applicable to the ISFSI site, is unsupported and wrong. Tr. 7189:23-7192:10 (Thomas) (Maine Yankee's current property tax assessment is just over $3.5 million, which is substantially higher than the $750,000 annual property tax estimate in its damages claim and over half of this assessment relates to the land itself, which is not subject to exemption).

**D. The Government's Assertions That Maine Yankee's Damages Must Be Reduced to Eliminate Unreasonable Costs Either Fails to Account for Changes Agreed to at Trial or Are Wrong.**

58a. This proposed alternative finding, asserting that the ISFSI/security leads should be paid at a security lieutenant (rather than a control room operator) rate, is wrong because assumptions made in Maine Yankee's costs estimate (P1726MY) were reasonable at the time it was made. Tr. 7361:15-7364:4 (Smith) (at the time its cost estimate was prepared, Maine Yankee reasonably believed that the ISFSI security leads would be required to be certified fuel handlers). Moreover, the government relies on post-claim information to support reductions to Maine Yankee's damages while ignoring post claim *increases* to Maine Yankee's costs. *See, e.g.*, Tr. 7361:15-7364:4 (Smith) (identifying a $4 million increase for additional security and a new $350,000 *annual* fee imposed by the state of Maine post-submittal that is not accounted for in Maine Yankee's damages submission).

58b. This proposed alternative finding is addressed on page 53.

59.a. This proposed alternative finding, asserting that costs for Rad protection software should be excluded from damages because the software will not run on the personal computer system Maine Yankee plans to install at the ISFSI, and is not needed at the ISFSI, is wrong. Tr. 6928:13-6930:1 (Meisner) (Maine Yankee intends to purchase the type of software required to

support the ISFSI program); Tr. 7364:5-24 (Smith) (ISFSI rad protection program is required under Maine Yankee's Part 50 license).

59b. This proposed alternative finding, asserting that the costs of Maine Yankee's janitorial services should be excluded because they are higher than the costs claimed by Connecticut Yankee and Yankee Atomic for janitorial services, is unsupported, as Mr. Johnson conceded at trial, because he also excluded the costs of janitorial services claimed by Yankee Atomic and Connecticut Yankee. Tr. 6820:17-25 (Johnson) ("I'm not sure I can explain to you, as I sit here, why [$36,000 of janitorial services at Yankee Atomic are being excluded]."); Tr. 6821:1-25 (Johnson) (same re Connecticut Yankee); *see also* Tr. 7364:25-7366:13 (Smith) (structural differences among the Yankees' ISFSIs account for the cost differences in janitorial services; Maine Yankee's actual expenditures for janitorial services for a six-month period were approximately $50,000).

61. This proposed alternative, asserting that Maine Yankee's accounting costs are unreasonable and should be reduced by $637,250, is based on the government's incorrect assumption that Maine Yankee's average accounting costs for the period of 2000-2003 are $193,000 per year. *See* Tr. 7368:11-7369:25 (Smith) (over the past three years Maine Yankee paid on average $334,000 per year as noted in Maine Yankee's general ledger); Tr. 7337:23-7338:13 (Smith) (Maine Yankee provided the government's auditors with a copy of its entire general ledger).

62b. This proposed alternative finding, asserting annual costs relating to Maine Yankee's contract for general maintenance and calibrations should be eliminated because such services can be provided by the on-site ISFSI staff, is unsupported and wrong. Tr. 6925:14-6926:16 (Meisner) (the on-site ISFSI staff cannot perform general maintenance, calibrate

equipment and address all of their other required duties and functions); Tr. 7370:1-7371:15 (Smith) (maintenance and calibration services require specialized skills (in HVAC, man-lift repairs, or specialty-type calibrations) that Maine Yankee on-site personnel do not have).

66. The premise of the government argument that the costs for an ISFSI Security Armorer/Trainer should not be received because the costs are for firearms and other training is unsupported and untrue. Mr. Meisner made clear that the Security Armorer is the general supervisor for security guards at the ISFSI; the fact that the guards may already come trained doesn't eliminate the need for such a position. Tr. 3130:23-3131:18.

67. This proposed alternative finding, asserting (based on Mr. Abbott's opinion, Tr. 5404:4-19) that the costs relating to the ISFSI Licensing Engineer allegedly needed to handle "routine submittals and federal and state notices" should be deducted from Maine Yankee's damages because the duties can be performed by the ISFSI Manager or tech expert, is unsupported and wrong, as explained by Mr. Meisner. Tr. 3135:23-3139:19 (detailing the duties of a licensing engineer and explaining that an ISFSI tech expert cannot be expected "to be able to do much more than the management function"); Tr. 6903:13-6905:11 (ISFSI license submittals are not expected to be "minimal" as the government's expert suggests).

69. This proposed alternative finding, asserting that (based on Mr. Abbott's opinion, Tr. 5402:8-5403:8) the costs of an ISFSI RP technician should be deducted from damages because his tasks can be performed by the ISFSI manager or tech expert, is unsupported and wrong, as Mr. Meisner explained. Tr. 3128:14-3129:21 (explaining the ISFSI RP technician function); Tr. 3133:11-3135:22, Tr. 6925:14-6926:16 (the on-site ISFSI staff cannot handle RP technician tasks and address all of their other required duties and functions); *see also* Tr.

7366:14-7367:13 (Smith) (it is not a good business practice to have the ISFSI manager or tech expert double as an ISFSI RP technician).

70. This proposed alternative finding, asserting (based on Mr. Abbott's opinion, Tr. 5403:9-5403:20) that the costs of the ISFSI quality assurance manager should be deducted from damages because his tasks can be performed by the ISFSI tech expert is unsupported and wrong, as Mr. Meisner testified. Tr. 3135:23-3139:19 (the ISFSI tech expert cannot adequately support the QA program responsibilities while attending to his other job duties); *see also* Tr. 7367:14-7368:10 (Smith) (explaining the importance of keeping the quality assurance function separate and distinct from the line functions of the operation).

71. This proposed alternative finding, asserting (based on Mr. Abbott's opinion, Tr. 5437:19-5438:13) that costs for ad-hoc engineering support should be eliminated from Maine Yankee's damages claim because Maine Yankee's contract with NAC provides for five years of technical support after the ISFSI is installed, is unsupported and wrong, as Mr. Meisner again explained. Tr. 6926:17-6928:12 (costs included for ad-hoc engineering support cover tasks *not* associated with the containers, such as electrical, HVAC, emergency diesel generators, security equipment, and general building maintenance, all areas in which NAC does not have competence and which the NAC contract does not cover).

74. This proposed alternative finding, asserting that the costs of non-nuclear property insurance covering property and equipment at Maine Yankee is unnecessary after decommissioning is complete and should be excluded from Maine Yankee's damages, is wrong. Tr. 7196:21-7199:6 (Thomas) (it is prudent to carry non-nuclear property insurance, which covers equipment at the ISFSI, including security equipment, computer, office equipment, etc.; it

also covers theft, fire, pipe breakage, etc. at rates far below the deductible levels for Maine Yankee's nuclear property insurance).

75a. This proposed alternative finding, asserting (based solely on Mr. Abbott's opinion, Tr. 5472:12-5473:4) that the annual premium costs for nuclear energy hazard liability insurance should be reduced based on a coverage limit of $25 million, is unsupported and wrong. Mr. Abbott cited as support for his opinion regarding nuclear liability insurance D637 at EXD0132643, a June 28, 2000 SECY paper, recommending that "[o]ff-site [nuclear liability] coverage should be further reduced to $25 million when spent fuel is removed from the pool"). Tr. 5472:3-5473:20, (Abbott). Mr. Bennet explained that 10 CFR140.11 requires a nuclear utility to procure nuclear liability insurance subject to exemptions, that Yankee Atomic had filed for an exemption to reduce its nuclear liability insurance from $100 million to $25 million but that NRC had taken no action on that request. Tr. 6989:15-6991:13 (Bennet). Mr. Thomas also testified that Maine Yankee's application for an exemption has been pending for a year, and there was no guarantee it will be approved. Tr. 7194:18-7196:2. The NRC subsequently denied Yankee Atomic's request for an exemption by letter dated December 22, 2004 (attached hereto as Attachment 1).[4]

75.b. Mr. Abbott's opinion that Maine Yankee has not adequately accounted for the ICRP credits related to nuclear liability insurance, also is unsupported and wrong. Tr. 7196:3-7196:20 (Thomas) (IRCP credits are associated with premiums that Maine Yankee paid 10 years

[4] [In a "Safety Evaluation Report," attached to the 12/22/04 letter at 4, the staff noted, among other things, that the SECY paper on which Mr. Abbott relied in forming his opinion was based on a "qualitative judgment recommended by the staff as a reasonable starting point for public consideration at the beginning of a rulemaking process. Since the proposed decommissioning rulemakings never progressed, there has been no validation or endorsement of the proposed insurance levels by either the Commission or the public." Safety Evaluation Report at 4.]

prior, which are unrelated to Maine Yankee's damages claim; future IRCP credits are uncertain as they are wholly dependent on the next ten years of industry experience.).

76. This proposed alternative finding, asserting (based solely on Mr. Abbott's opinion, Tr. 5470:20-5472:11) that the costs of premiums for nuclear property insurance should be deducted from Maine Yankee's damages because such insurance is unnecessary, again is unsupported and wrong, as Messrs. Meisner and Thomas explained. Tr. 6943:12-6944:9 (Meisner) (successful terrorist attack is likely to result in on-site contamination, *not* offsite contamination as Mr. Abbott suggests); Tr. 7193:20-7194:17; Tr. 7197:22-7198:11 (Thomas) (nuclear property insurance is required; additionally, it makes good business sense to carry this type of insurance as it covers not only the costs to replace damaged equipment, but the costs of cleaning up of the facility from contamination and third party claims for radiation exposure).

77. This proposed alternative finding, asserting that nuclear liability supplier's and transporter's (S&T) insurance costs should be removed from Maine Yankee's damages for 2005-2009, was refuted by Mr. Thomas. Tr. 7199:13-7201:6, 7226:17-7227:13.

78. This proposed alternative finding, asserting that Maine Yankee is double counting costs of supplying rifles to its security guards during ISFSI operations because Maine Yankee's security contract provided that the cost of weapons are included in staffing costs, is wrong, as Mr. Smith explained. Tr. 7371:16-7372:16 (the $5,000 per year covers materials and supplies for the ISFSI leads and other ISFSI operational staff that are not covered by the scope of the security contract.).

79. Mr. Abbott's opinion that Maine Yankee's estimated costs of $266,000 for NRC Annual Fees should be reduced by $59,000 based upon the most recent NRC final rulemaking of $203,000 for FY2004, Tr. 5456:1-5458:9, also is wrong, as explained by both Mr. Meisner and

Mr. Heider. Tr. 6898:13-21 (Meisner) (NRC annual fees are expected to trend upwards in the future). Mr. Heider explained that the annual fee value ($266,000 per year) for 2002 was directly out of the code of federal regulations; that the number was $319,000 in 2003 and $203,000 in 2004; and that the average of those three numbers is about $263,000, which demonstrates that the $266,000 damages estimate was reasonable. Mr. Heider agreed with Mr. Meisner that the general trend of NRC regulatory fees is up, although it may apparently vary between the various years. Tr. 7148:3-7149:1.

80. This proposed alternative finding, asserting (based solely on Mr. Abbott's opinion, Tr. 5458:10-5459:22) that Maine Yankee's estimate for NRC inspections should be based on three hours per inspector, two inspections per year, for a total of $7800 annually, is wrong, as Mr. Meisner explained. Tr. 6885:15-6898:8; Tr. 3105:9-3112:3 (Maine Yankee's estimate, which assumes 280 hours per year for an annual cost of $50,000 and is based on two standard inspections per year, is reasonable because NRC ISFSI inspections will cover both procedure and design changes, as well as programmatic elements such as the ISFSI quality assurance programs, radiation programs, and emergency planning programs.).

81a. This proposed alternative finding, asserting that costs for NRC base submittals should be reduced by $50,000 annually because the NRC does not charge for "routine" submittals, and it would be speculative to anticipate any "other-than-routine" submittals in the future, is wrong, as Mr. Meisner explained. Tr. 6903:13-6905:11 (NRC does charge for "routine" submittals and Maine Yankee has already incurred costs for a series of "other-than-routine" submittals at the ISFSI, for such things as emergency plan changes, QA program changes, and technical issues related to security orders, more of which are expected in the future.).

68, 81b. This proposed alternative finding, asserting (based again on Mr. Abbott's opinions, Tr. 5461:6-5463:3; Tr. 5463:13-23) that costs for NRC base submittals related to D&D of Maine Yankee's ISFSI in 2010-2011 are both duplicative of other costs included in Maine Yankee's damages and unsupported, is wrong. Tr. 6899:8-6901:24 (Meisner) (Maine Yankee's estimated costs for its license termination plan amendment, licensing contractor support, NRC review and approval of the license termination plan and final status survey are all reasonable, given the scope of the ISFSI-related work as compared to actual costs for similar work regarding the rest of Maine Yankee's plant site.) Tr. 6901:25-6902:12 (Meisner) (government expert Abbott's suggestion that $54,000 in costs elsewhere in Maine Yankee's budget are duplicative of costs in the budget for base NRC submittals, the scope of which under any reasonable estimate covers $1 million of work, is clearly mistaken).

82. This proposed alternative finding, asserting that the costs for Maine Yankee's independent management assessment committee ("IMAC") should be eliminated from damages because there is no regulatory requirement for it and because it is unnecessary given the size of the organization, is incorrect. Tr. 6919:4-6920:15 (Meisner) (explaining the role of IMAC and the continuing need for such oversight during the ISFSI-only operations period).

83. This proposed alternative finding, asserting that costs associated with membership in the Nuclear Energy Institute ("NEI") in 2005-2011 should be eliminated from Maine Yankee's damages claim because there is no regulatory requirement for such membership, is wrong. Tr. 7215:7-7216:5, Tr. 7219:6-7219:22 (Thomas) (NEI membership is important to Maine Yankee, a small company, for effective communication of its position on spent fuel storage issues); Tr. 6920:16-6922:2 (Meisner) (NEI membership is of value to Maine Yankee on issues such as for example, security, Yucca Mountain funding, and ISFSI decommissioning.).

84a., c., e. These proposed alternative findings, asserting that the costs of training ISFSI security leads and firing range training should be eliminated from Maine Yankee's damages because they are already covered under the Maine Yankee's security contract, is wrong. Tr. 7372:17-7375:23 (Smith) (training-related costs are for site specific training and/or corporate-related training that is not covered by the security contract).

84b., f. This proposed alternative finding, asserting that costs for incentive-related expenses for Maine Yankee's ISFSI security leads should be eliminated, is unsupported. Tr. 7375:24-7377:18 (Smith) (Maine Yankee is responsible for the safety and welfare of its employees and as a prudent business practice, Maine Yankee sponsors its own team building activities and safety incentives.).

85. This proposed alternative finding, asserting that costs associated with Maine Yankee's community advisory panel ("CAP") should be deducted from damages because CAP will complete its work in 2005, is wrong. Tr. 7213:21-7215:5 (Thomas) (after Maine Yankee's current CAP expires, Maine Yankee will incur costs at a lower, $2,000 annual cost for a successor panel related to spent fuel storage, which will handle communications with the community).

86a. This alternative proposed finding, asserting that internal audits are unnecessary, and that the costs of auditing the spent fuel trust fund, which Maine Yankee elected to establish, are not caused by the breach, is wrong. Tr. 7187:1-7188:3 (Thomas) ("[I]n a case where you have a very small number of employees, particularly in the financially related areas, and you have such very important corporate responsibilities, including large trust funds which could approach a couple hundred million dollars, it becomes even more important because one principle of financial control . . . are things like segregation of duties. . . . Our damages claim

assumes a reduced level of internal audit work. But we think it's a very important function going forward."); Tr. 7189:6-22 (Thomas) (absent the breach there would be no need for the trust fund).

86b. This proposed alternative finding, asserting that costs for consulting/tax audit fees in 2006-2011 should be deducted from Maine Yankee's claim because they are duplicative, is wrong. Tr. 7188:4-7189:5 (Thomas) (costs for such fall outside of the scope of work covered by the fees paid by Maine Yankee for other audit service).

88. This proposed alternative finding, asserting that Maine Yankee's estimate for water and sewer costs should be reduced by $27,363, is wrong. Tr. 7381:6-7382:5 (Smith) (the government failed to take into account the minimum monthly usage fee for water and sewage usage charged Maine Yankee by the town of Wiscassett).

89. This proposed alternative finding, asserting that the costs of three additional Board meetings per year should be deducted from damages because Maine Yankee's corporate by-laws only require one Board meeting per year, is wrong. Tr. 7211:10-7212:13 (Thomas) (Maine Yankee's by-laws do not limit it to no more than one board meeting per year, and in fact, in recent years Maine Yankee has generally held twelve Board meetings per year; four Board meetings annually during ISFSI operations is prudent corporate governance).

90. Maine Yankee concurred with the government's criticism regarding ISFSI electrical usage as one of the "agreed items." *See* MYPF 178f., noting and quantifying agreed change of $970,961 and allocating the deduction to ISFSI operations damages for 2004 and thereafter.

91, 104. These proposed alternative findings, asserting that Maine Yankee's current operations only require one copier and three pagers and that the cost of additional such items are

unreasonable and/or unsupported, are wrong. Tr. 7377:19-7379:13 (Smith) (one copier is needed in the secured area and the other copier is needed for the non-secured area); Tr. 7379:14-7380:12 (Smith) (ten pagers are necessary for the president, the ISFSI manager, the ISFSI tech expert, the armorer, the RP tech, and the five security leads who are responsible for the 24 hour/7 day a week operations of the ISFSI).

93. Mr. Thomas and Dr. Wise explained why Mr. Johnson's opinion (Tr. 6372:5-12; Tr. 6373:17-6374:1), in this proposed finding that the fees the companies pay to the managers of their decommissioning (and spent fuel) trust funds should be excluded from damages is incorrect. Tr. 2777:13-2778:21 (Thomas) (to satisfy FERC prudent investor standards, Maine Yankee hires professional advisors to help manage its investments); Tr. 7182:11-7183:17 (Thomas) (why it is not prudent or feasible for Maine Yankee to pay its one-time, pre-1983 fee now); Tr. 3332:20-3334:9 (Wise) the companies have legal responsibilities to have their investments professionally managed, and they incur fees to manage their money), Tr. 3359:23-3360:2 (Wise) (to the extent that the size of the trust is influenced by the flow of dollars in and out, the management fees are also influenced by those amounts, and those fees are costs included in damages).

94. This proposed alternative finding, asserting that Maine Yankee's wet storage staffing should be reduced to a total of 18 positions, is unsupported and wrong. The sole basis for these proposed findings is Mr. Abbott's opinion that it takes only 18 people, net of security to run a wet fuel pool. Tr. 5380:1-5381:3 (Abbott). Mr. Abbott's opinions again are not credible. For example, Mr. Abbott testified that General Electric's Morris spent fuel storage facility "can be used as a standard for wet fuel storage," including staffing, Tr. 5655:24-25, because its operations consist solely of a wet pool, Tr. 5653:11-14. Mr. Abbott, however, did not consider

P169 (contractor document), a 1991 Pacific Northwest Laboratories (PNL) study prepared for DOE entitled "Cost Estimates of Operating On-Site Spent Fuel Pools After Final Reactor Shutdown."[5] Tr. 5664:17-20. The PNL study used General Electric's Morris Operation – which has been operating virtually in a "storage-only mode" and whose operation and maintenance programs appear to be typical of those that would be encountered at future wet-storage – "as a typical wet-storage facility." P169 at 1.2. Mr. Abbott agreed that the PNL study shows Morris wet pool staffing at 24 positions, net of security, Tr. 5667:6-5669:10 (Abbott) & P169, table 3.1, and acknowledged that at his deposition, he had conceded that he could not tell which of the Morris wet staffing positions should be eliminated to reduce the number from 24 to 18. Tr. 5669:11-19. Mr. Abbott also conceded that the PNL study proposed increasing the Morris levels to 29 positions net of security to reflect changes in utility wet pool staffing levels anticipated after the study was prepared in 1991. Tr. 5669:20-5670:10 & P169 at 3.4, Table 3.1.

In addition, five decommissioning cost estimates that Mr. Abbott and ABZ (his company) prepared for other utilities, Tr. 5673:14-19, showed that, during periods when the only or the predominant activity is operation of the wet pool, wet storage staffing far exceeded the 18 positions net of security that Mr. Abbott claims is "reasonable" for Maine Yankee. The wet staffing numbers in those studies range from a low of 29.25 to a high of 112. *See* Abbott Demonstrative 1; Tr. 5687:4-10 (Abbott) (agreeing that 50 positions, net of security, is what he determined would be necessary to run the wet pool at Duane Arnold); Tr. 5849:14-5850: 5 (Abbott) (confirming wet storage staffing net of security of 112 in ABZ Nine Mile Point decommissioning cost estimate); Tr. 5853:3-5854:14 (Abbott) (conceding that wet storage

[5] P169 (contractor document) was admitted into evidence, contrary to the government's assertions at page 157 in response to YAPF 142c. *See* Yankee Atomic's reply to the government's response to 157c.

staffing of 29.25 in ABZ Vermont Yankee estimate exceeds his estimate of 18); Tr 5855:2-5856:13 (Abbott) (acknowledging 60 wet storage staff in ABZ estimate for Calvert Cliffs); Tr. 5858:8-5860:7 (acknowledging wet storage staffing of 48.5 in San Onofre decommissioning cost estimate, in the preparation of which he was substantially involved).

In addition, contrary to Mr. Abbott's contention (Tr. 5383:15-5384:1), a January 29, 1996 Yankee memorandum re Wet Spent Fuel Storage Evaluation (D603), does not support his wet staffing opinion. As Mr. Heider, who participated in the meeting associated with the memorandum and whose initials are on the bottom of Exhibit C to the memo, Tr. 2184:2-2185:22, testified: 1) Exhibit C to the memo recommends six people versus five people to fill an operating position, which would bring the 18 up to 20, Tr. 2184:15-17 (Heider) & D603 at YDK000662; 2) the analysis also includes three and a half people from the Yankee Nuclear Services Division that are providing technical support to the operation of the spent fuel pool, which brings the total to 23 and a half, Tr. 2185:8-2186:1 (Heider), which Mr. Abbott conceded, Tr. 5864:10-5865:5 (Abbott); 3) there are numerous assumptions in D603 associated with licensing changes, Tr. 2186:3-5 (Heider) (citing YDK000652-53), which Mr. Abbott conceded Tr. 5865:6-5866:8 (Abbott); 4) there also is an assumption in D603 that contractors or employees from sister utilities, for example, Vermont Yankee, which was approximately 30 or 40 miles away from the Yankee Atomic site, could be used to cover some of the positions, Tr. 2186:2-24 (Heider) & YDK000662, which Mr. Abbott also conceded, Tr. 5866:9-5867:6 (Abbott), and 5) D603 assumed that, to achieve the staffing levels noted below, a substantial investment of $3 million was required to modify the spent fuel building and operating systems to simplify operations and reduce the staffing level, a modification that was never made. Tr. 2186:25-2187:10 (Heider). As Mr. Heider further testified, Yankee Atomic implemented many of the

concepts set forth in the memo, but it was never able it get near the 18 number. Tr. 2187:13-2188:2 (Heider); *see also* 2184:6-8 (Heider) ("now that we've completed spent fuel operations at Yankee Rowe, I can say that we never operate[d] the spent fuel pool with 18 people."). The remaining evidence on which the government relies does not support this finding.[6]

94a. This proposed alternative finding, asserting that Maine Yankee should have operated its spent fuel pool with a five-crew, instead of a six-crew, rotation, is wrong. Tr. 6932:8-6936:7 (Meisner) (Maine Yankee operates with six shifts because of the small number of overall shift personnel, and also to take into account the intensive training required of the operating personnel, sick time, vacations, illnesses and/or family issues that can arise).

96-99. These alternative proposed finding, asserting that costs of a 15-month construction delay were not caused by the breach and therefore should be deducted from Maine Yankee's damages, is unsupported and wrong. First, Mr. Johnson's adjustment is based entirely on Mr. Blair's opinion that the delay is unrelated to the breach, Tr. 6381:20-6383:11 (Johnson), but Mr. Blair failed to establish that fact. *See* Tr. 5228:15-5238:15 (Blair). Moreover, had DOE performed, Maine Yankee would not have had to construct dry storage of any type or to transfer spent nuclear fuel from the pool to the ISFSI. Tr. 7344:20-7345:14 (Smith); *see also* MYPFs 83-102.

[6] The statement in P1462YA (on which the government relies) regarding 18 wet staffing positions cites D603 as its source. *See* P1462YA at YDK007521 (citing "Reference 3"), YDK007532 (identifying Reference 3 as D603). DX266 (on which the government also relies) in turn also cites D603 as its source. *See* D266 at COF006444 (citing "Reference 3") and COF006447 (identifying reference 3 as D603).

**E. The Government's Proposed Alternative Findings That Maine Yankee's Damage Should Be Reduced to Eliminate Unsupported Costs is Wrong Because Maine Yankee Provided the Government With Support.**

100. This proposed alternative finding, asserting that Maine Yankee's damages should be reduced by $1,387,910 in ISFSI construction costs because Maine Yankee failed to provide invoices for these amounts, is wrong. *See* P2010, P2005, and P2032, P2003-A; Tr. 7337:13-7343:9 (Smith).

101. This proposed alternative finding, asserting that Maine Yankee's costs of document storage and destruction, miscellaneous software/security cask monitoring and computer hardware maintenance are unsupported and should be deducted from Maine Yankee's damages, is unsupported and wrong. Tr. 7382:6-25 (Smith) (invoices for these costs were recalled from storage; Maine Yankee is required to store a variety of documents through the termination of its Part 50 license, certain NRC regulations require documents to be stored for three years and IRS regulations require storage for up to seven years); Tr. 7383:1-14 (Smith) (Maine Yankee will need to purchase software in the future for the computers at the ISFSI and the estimated costs are reasonable); Tr. 7383:15-7384:3 (Smith) (Maine Yankee's estimate of costs to maintain hardware at the ISFSI is reasonable.).

103. This proposed alternative finding, asserting that Maine Yankee's ISFSI operations costs for materials and supplies (for basic and preventative maintenance, office supplies and for computer hardware maintenance in 2004-2011 are unsupported and should be deducted from damages, is wrong. Tr. 7383:15-7384:3 (Smith); Tr. 7385:13-7386:4 (Smith).

104. This proposed alternative finding, asserting that Maine Yankee's miscellaneous ISFSI operations costs (for copiers, pagers, postage meter, basic telephone and internet, travel and meal expenses and Fed Ex postage) are unsupported and should be deducted from damages, is wrong. *See* response to GAF 91, *supra* (re copiers, pagers, and postage meter); Tr. 7353:19-

7355:24 (Smith) (re travel and meal expenses); *see* Response to GAF 44, *supra* (re President/CFO travel and meal expenses); Tr. 7380:13-7381:5 (Smith) (re Fed Ex costs); Tr. 7386:5-20 (Smith) (re miscellaneous IT expenses); Tr. 7386:21-7387:12 (Smith) (reinternet service costs).

105. This proposed alternative finding, asserting that the costs of certain periodic services (electricity, Echolochem, Underwater Demins, fuel pool chemistry, purification system, and for IT Support of the PLC) should be deducted from Maine Yankee's claim because they are unsupported, is wrong. Tr. 2994:13-2997:20, Tr. 7389:21-7391:1, Tr. 7394:6-7395:19 (Smith) (wet pool costs for electricity, Echolochem, and water waste purification related costs were fully supported during the audit process); Tr. 2994:5-2995:1 (Smith) (explaining how wet pool-related electricity costs were derived); *see also* P2024 and P2025 (wet pool cleaning and purification-related invoices produced during the audit process).

106-109. Maine Yankee has addressed the contract's coverage of GTCC waste in MYPF 129-144. Moreover, even if GTCC waste was not covered by the contract and would not have been picked up by DOE, the costs of storing only GTCC waste would have been relatively small. Tr. 6906:13-6910:16 (Meisner) (noting facility construction cost of $2 million and annual operating costs of $1 million); D789 (Maine Yankee alternative GTCC waste-only storage budget).

**F. The Government's Position re Discounting Maine Yankee's Future Damages to Present Value is Incorrect.**

115. Dr. Wise refuted at trial the assertion in this proposed alternative finding that a risk-free discount rate is only appropriate where there is no uncertainty. *See* Maine Yankee's reply to GRMYPF 175.

120-121. These proposed alternative findings, asserting that it is improper to use an after-tax discount rate to calculate the Yankees' damages claims and that a pre-tax, risk-adjusted discount rate should be applied to discount the Yankees' damages to present value, is wrong, as Maine Yankee's witnesses testified. For example, Mr. Thomas refuted the assertion in 120a. that, because at varying times, Maine Yankee has not paid taxes, it will not pay them in the future. "[T]here's nothing speculative about it. It wouldn't be lawful if we didn't record the revenues of the company. And to the extent that we received a judgment in this case, that would be on our – filed on our tax return as a revenue line to our corporation. There's no choice about that. So we would expect to pay taxes on the revenues coming into the company. What's happened in the past is our deductions have – from the permanent shutdown of the plant and some of the expenditures that we've incurred in decommissioning, have given us a reasonably heavy load of tax deductions up until this point, even some tax loss carry forwards, some deductions which were not able to completely offset with income, so we are allowed to roll them forward. We're just rounding the point now, probably this year, where we will become a current taxpayer. In future years, we've exhausted those tax deductions, so we will have revenues coming in without offsetting tax deductions to a very large extent. And we expect to be a very heavy current cash taxpayer going forward, for both state and federal income taxes." Tr. 7192:21-7193:19 (Thomas). Dr. Wise refuted the assertion in 75b., that when the claimed damages are spent, the Yankees will receive a tax deduction which will eliminate any tax paid on the award. *See* Tr. 7447:6-7448:14, 7455:3-7465:17 (Wise) & Wise demonstrative P2043.2-.4. Mr. Thomas refuted the assertion in 120c. that Maine Yankee could shelter its damages award by investing the money in tax-free securities. "We're really required to manage the funds and have them invested meeting prudency standards. And in the case of Federal Energy Regulatory

Commission, it's really the prudent person standard, which requires, in our case, the use of professional money managers and advisors who help – help us establish the investment guidelines and criteria to keep those funds invested." Tr. 2778:14-21 (Thomas). *See also* reply to GRMYPF 176.

Respectfully submitted,

s/ Jerry Stouck

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639

Counsel for Plaintiff,
MAINE YANKEE ATOMIC POWER COMPANY

Of Counsel:

Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH

Dated: February 18, 2005